# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SAMANTHA SIVA KUMARAN | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20-cv-03871-GHW-SDA |
| | ) | |
| vs. | ) | |
| | ) | Related Case: 1:20:CV 03668 |
| VISION FINANCIAL MARKETS, LLC, | ) | Related Case: 1:20:CV 03873 |
| VISION INVESTMENT ADVISORS, LLC, | ) | |
| VISION BROKERAGE SERVICES, LLC, | ) | |
| H ROTHMAN FAMILY, LLC, | ) | December 1, 2020 |
| BOSHNACK FAMILY, LLC, | ) | |
| HIGH RIDGE HOLDING CORPORATION, | ) | |
| LLC, HIGH RIDGE FUTURES, LLC, | ) | |
| HOWARD ROTHMAN, ROBERT | ) | |
| BOSHNACK, JOHN FELAG, JULIE VILLA, | ) | |
| GERARD STEPHEN LAZZARA, | ) | |
| LAZZARA CONSULTING, INC. | ) | |
| | ) | |
| Defendants. | ) | |

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 2

   I.    Factual Background. ....................................................................................... 2

   II.   Kumaran's Allegations of Wrongdoing. ........................................................ 5

   III.  Procedural History. ........................................................................................ 7

   IV.  The Moving Defendants. ................................................................................ 9

ARGUMENTS ........................................................................................................ 11

   I.    Dismissal Is Warranted for Failure to Comply with Fed. R. Civ. P. 8. ........... 11

   II.   Kumaran Lacks Standing to Assert Derivative Claims on behalf of NRCM. ... 14

   III.  Kumaran Fails to Pierce High Ridge or VIA's Corporate Veil. ..................... 17

   IV.  Kumaran's Claims Fail for Additional Reasons. ........................................... 18

      A.  Count I, Common Law Fraud.................................................................... 19

      B.  Count II, Fraudulent Inducement of Contract. .......................................... 25

      C.  Count III, Aiding and Abetting Fraud. ...................................................... 26

      D.  Count IV, Conspiracy ............................................................................... 26

      E.  Counts V & VI, Civil RICO and Civil RICO Conspiracy. ......................... 27

      F.  Counts VII & VIII, Misappropriation of Trade Secrets under State and Federal Law. .. 28

      G.  Count IX Aiding & Abetting in Misappropriation of Trade Secrets............. 33

      H.  Count X, Unfair Competition. ................................................................... 33

      I.    Count XI, Unjust Enrichment. .................................................................. 34

      J.   Count XII, Interference in Economic Advantage. ....................................... 35

      K.  Count XIII, Tortious Interference with Contract........................................ 37

      L.  Count XIV, Breach of Implied Covenant of Good Faith and Fair Dealing. .. 38

      M. Count XV, Negligent Misrepresentation/Breach of Duty of Care. ............... 39

CONCLUSION....................................................................................................... 39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACR Sys., Inc. v. Woori Bank*,
    232 F. Supp.3d 471 (S.D.N.Y. 2017)......................................................................26

*Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*,
    04 Civ. 3531 (LTS) (HBP), 2009 WL 7133660 (S.D.N.Y. Aug. 5, 2009),
    *adopted in relevant part*, 2010 WL 4780772 (S.D.N.Y. Nov. 22, 2010) ...............32

*Alexander & Alexander of N.Y., Inc. v. Fritzen*,
    68 N.Y.2d 968 (1986) ..........................................................................................26

*Alloco v. Dow Jones & Co.*,
    02 Civ. 1029, 2002 WL 1484400 (S.D.N.Y. July 10, 2002) ..................................12

*Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*,
    2019 WL 146993 (S.D.N.Y. Mar. 30, 2019) .........................................................19

*Alpvex, Inc. v. John Swan Ltd.*,
    2019 WL 6330274 (N.D.N.Y. Nov. 26, 2019) .......................................................16

*In re Aluminum Warehouse Antitrust Litig.*,
    No. 13-md-2481, 2015 WL 1344429 (S.D.N.Y. 2015) ..........................................14

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
    122 F.3d 130 (2d Cir. 1997)..................................................................................18

*Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Electrical Supply Inc.*,
    18 Civ. 12255 (PAE), 2019 WL 5498094 (S.D.N.Y. Dec. 3, 2019) ......................23

*Antwi v. Health & Human Servs. (Ctrs.) F.E.G.S.*,
    13 Civ. 835, 2018 WL 2452755 (S.D.N.Y. May 31, 2018)........................... *passim*

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)..............................................................................19, 20

*AUA Private Equity Partners., LLC v. Soto*,
    17 Civ. 80355 (GHW), 2018 WL 1684339 (S.D.N.Y. Apr. 5, 2018)...........29, 30, 31

*Backus v. U3 Advisors., Inc.*,
    16 Civ. 8990 (GHW), 2017 WL 3600430 (S.D.N.Y. Aug. 18, 2017)..............16, 37

*Barron Partners, LP v. LAB123, Inc.*,
    593 F. Supp. 2d 667 (S.D.N.Y. 2009) ...................................................................25

*Berrios v. N.Y. City Hous. Auth.*,
    564 F.3d 130 (2d Cir. 2009) ............................................................................14

*Bingham v. Zolt*,
    66 F.3d 553 (2d Cir. 1995) ..............................................................................16

*Blakely v. Wells*,
    209 F. App'x 18 (2d Cir. 2006) .......................................................................12

*Buhannic v. Am. Arbitration Assoc.*,
    18 Civ. 2430 (ER), 2019 WL 4735005 (S.D.N.Y. Sept. 27, 2019) .........................27

*Bytemark, Inc. v. Xerox Corp.*,
    342 F. Supp. 3d 496 (S.D.N.Y. 2018) ........................................................33, 34

*Carvel Corp. v. Noonan*,
    3 N.Y.3d 182 (2004) ......................................................................................36

*Citibank, N.A. v. Walker*,
    12 A.D.3d 480 (2d Dep't 2004) .....................................................................34

*Commodity Futures Trading Comm'n v. Heritage Cap. Advisory Servs., Ltd.*,
    823 F.2d 171 (7th Cir. 1987) ...........................................................................24

*Crawford v. Franklin Credit Mgmt. Corp.*,
    758 F.3d 473 (2d Cir. 2014) ............................................................................39

*Crosses v. BCBSD, Inc.*,
    836 A.2d 492 (Del. 2003) ...............................................................................17

*Debellis v. White*,
    19 Civ. 8730, 2020 WL 50576827 (S.D.N.Y. Aug. 27, 2020) .............................11

*Dep't of Commerce v. New York (Census)*,
    — U.S. —, 139 S. Ct. 2551 (2019) ...................................................................15

*DiVittorio v. Equidyne Extractive Indus., Inc.*
    822 F.2d 1242 (2d Cir. 1987) ..........................................................................14

*Doberstein v. G-P Indus., Inc.*,
    2015 WL 6606484 (Del. Ch. Oct. 30, 2015) ....................................................17

*El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*,
    152 A.3d 1248 (Del. 2016) ..............................................................................16

*Flatiron Acquisition Vehicle, LLC v. CSE Morg. LLC*,
    17 Civ. 8987-GHW, 2019 WL 1244294 (S.D.N.Y. Mar. 18, 2019) ......................................39

*Fletcher v. Atex, Inc.*,
    68 F. 3d 1451 (2d Cir. 1995)....................................................................................................17

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990)................................................................................................................15

*Gabayzadeh v. Global Equip. & Mach. Sales Inc.*,
    18 Civ. 3851 (LGS), 2019 WL 5880639 (S.D.N.Y. Jan. 28, 2019) .................................15, 16

*Georgia Malone & Co. v. Reider*,
    19 N.Y.3d 511 (2012) .............................................................................................................35

*Gonzalez v. Wing*,
    113 F.3d 1229 (2d Cir. 1997)..................................................................................................12

*Graham v. Take-Two Interactive Software, Inc.*,
    19 Civ. 2183 (GBD)(SDA), 2019 WL 8111915 (S.D.N.Y. Nov. 25, 2019)
    *adopted*, 2020 WL 408408 (Jan. 24, 2020) .....................................................................34, 35

*Hadami S.A. v. Xerox Corp.*,
    272 F. Supp. 3d 587 (S.D.N.Y. 2017).....................................................................................36

*Harley v. Steamlicensing Networks LLC*,
    18 Civ. 9528, 2019 WL 2866563 (S.D.N.Y. July 3, 2019) .....................................................12

*Iacovacci v. Brevet Holdings, LLC*,
    437 F. Supp. 3d 367 (S.D.N.Y. 2020).....................................................................................28

*Interallianz Bank AG v. Nycal Corp.*,
    No. 93 Civ. 5024 (RPP), 1994 WL 177745 (S.D.N.Y. May 4, 1994) .....................................38

*Isidro Mejia v. N.Y.P.D.*,
    1:16-cv-9706-GHW, 2019 WL 3412151 (S.D.N.Y. July 28, 2019)...................................13, 14

*Jones v. Niagara Frontier Transp. Auth.*,
    836 F.2d 731 (2d Cir. 1987)....................................................................................................15

*JPMorgan Chase Bank, N.A. v. The IDW Grp.*,
    2009 WL 321222 (S.D.N.Y. Feb. 9, 2009)...............................................................................38

*Kim v. Kimm*,
    884 F.3d 98 (2d Cir. 2018)......................................................................................................27

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)....................................................................................................26

*Kogan Law Group, P.C. v. Brace*,
    20 Civ. 1012 (GHW), 2020 WL 503764 (S.D.N.Y. Aug. 26, 2020)......................................38

*Kumaran v. ADM Inv'r Servs., Inc.*,
    20 Civ. 3873 (S.D.N.Y. May 18, 2020)........................................................................1, 7

*Kumaran v. National Futures Assoc., et al.*,
    20 Civ. 3668 (S.D.N.Y. May 11, 2020)....................................................................1, 7, 8

*Lafurno v. Walters*,
    18-CV-1935, 2018 WL 2766144 (E.D.N.Y. June 8, 2018)....................................................12

*Mahon v. Ticor Title Ins. Co.*,
    683 F. 3d 59 (2d Cir. 2012)..................................................................................14

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006)...................................................................................3

*Marks v. Energy Materials Corp.*,
    14 Civ. 8965 (GHW), 2015 WL 3616973 (S.D.N.Y. June 9, 2015) ................................34, 35

*McCall v. Chesapeake Energy Corp.*,
    817 F. Supp. 2d 307 (S.D.N.Y. 2011)........................................................................17

*McCray v. New York*,
    17 Civ. 1395, 2019 WL 5634841 (S.D.N.Y. Oct. 31, 2019) .................................................12

*United States ex rel. Mergent Servs. v. Flaherty*,
    540 F.3d 89 (2d Cir. 2008)...................................................................................37

*Middleton v. United States*,
    10 Civ. 6057 (JFB) (ETB), 2012 WL 394559 (E.D.N.Y. Feb. 7, 2012) ...............................14

*MPC Franchise LLC v. Tarnito*,
    19 F. Supp. 3d 456 (W.D.N.Y. 2014), *aff'd*, 826 F.3d 653 (2d Cir. 2016) ............................2

*MWH Intern. Inc. v. Inversora Murten, S.A.*,
    1:11 Civ. 2444-GHW, 2015 WL 728097 (S.D.N.Y. Feb. 11, 2015).......................................18

*N. Atl. Instruments, Inc. v. Haber*,
    188 F.3d 38 (2d Cir. 1999)...................................................................................31

*Nat'l Union Fire Ins. Co. v. Worley*,
    257 A.D.2d 228 (1st Dep't 1999) ............................................................................25

*Navigant Consulting, Inc. v. Kostakis*,
    No. 07 Civ. 2302, 2007 WL 2907330 (E.D.N.Y. Oct. 4, 2007) ...........................................25

*New York v. Scalia*,
    464 F. Supp. 3d 528 (S.D.N.Y. 2020) .................................................................................15

*Nichols v. Mahoney*,
    608 F. Supp. 2d 526 (S.D.N.Y.) ........................................................................................27

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..............................................................................................19

*Ohio Players, Inc. v. Polygram Records, Inc.*,
    99 Civ. 33, 2000 WL 1616999 (S.D.N.Y. Oct. 7, 2020) ....................................................38

*Palatkevich v. Choupak*,
    152 F. Supp. 3d 201 (S.D.N.Y. 2016) ..........................................................................27, 28

*Press v. Chem Inv. Servs. Corp.*,
    166 F.3d 529 (2d Cir. 1999) ..............................................................................................24

*Prezzi v. Schelter*,
    469 F.2d 691 (2d Cir. 1972) ..............................................................................................12

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
    813 F. Supp. 2d 489 (S.D.N.Y. 2011) ...............................................................................30

*RCC Ventures v. Brandtone Holdings. Ltd.*,
    322 F.R.D. 422 (S.D.N.Y. 2017) .......................................................................................18

*Rich v. Fox News Network, LLC*,
    939 F.3d 112 (2d Cir. 2019) ..............................................................................................37

*Rosa v. Goord*,
    29 F. App'x 735 (2d Cir. 2002) .........................................................................................12

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988) ..........................................................................................11, 12

*Sanchez v. Walentin*,
    526 F. App'x 49 (2d Cir. 2013) .........................................................................................14

*Schentag v. Negben*,
    17 Civ. 8734 (GHW), 2018 WL 3104092 (S.D.N.Y. June 21, 2018) .............................19, 21

*Schiff v. ZM Equity Partners, LLC*,
    19 Civ. 4735 (WHP), 2020 WL 5077712 (S.D.N.Y. Aug. 27, 2020) ..................................16

*SEC v. Egan*,
    994 F. Supp. 2d 558 (S.D.N.Y. 2014) ...............................................................................21

*Selevan v. N.Y. Thruway Auth.*,
  584 F.3d 82 (2d Cir. 2009)........................................................................................14

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir.)..............................................................................................21

*Shomo v. State of N.Y.*,
  374 F. App'x 180 .......................................................................................................11

*Silvercreeek Mgmt., Inc. v. Citigroup, Inc.*,
  346 F. Supp. 3d 473 (S.D.N.Y. 2018)......................................................................26

*Sperry v. Crompton Corp.*,
  8 N.Y.3d 204 (2007).................................................................................................34

*Spokeo, Inc. v. Robins*,
  — U.S. —, 136 S. Ct. 1540 (2016)...........................................................................15

*State St. Global Advs. Trust Co. v. Visbal*,
  431 F. Supp. 3d 322 (S.D.N.Y. 2020)......................................................................37

*Steves & Sons Inc. v. Jeld-Wen, Inc.*,
  252 F. Supp. 3d 537 (E.D. Va. 2017) .......................................................................33

*Stewart v. J.P. Morgan Chase & Co.*,
  02 Civ. 1936 (MHD), 2004 WL 1823902 (S.D.N.Y. Aug. 16, 2004) ..............24, 25

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*,
  15 Civ. 211 (LGS) (SDA), 2020 WL 1442915 (S.D.N.Y. Jan. 27, 2020)...............32

*Tannerite Sports, LLC v. NBCUniversal Media LLC*,
  135 F. Supp. 3d 219 (S.D.N.Y. 2015).......................................................................3

*TNS Holdings., Inc. v. MKI Sec. Corp.*,
  92 N.Y.2d 335 (1998) ...............................................................................................18

*Trahan v. Lazar*,
  457 F. Supp. 3d 323 (S.D.N.Y. Apr. 30, 2020) ........................................................38

*In re Tremont Secs. Law, State Law and Ins. Litig.*,
  703 F. Supp. 2d 362 (S.D.N.Y. 2010).......................................................................19

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
  549 F.3d 100 (2d Cir. 2008)......................................................................................14

*William Wrigley Jr. Co. v. Waters*,
  890 F.2d 594 (2d Cir. 1989)......................................................................................18

*Wynderv. McMahon*,

360 F.3d 73, 80 (2d Cir. 2004)..................................................................................12

**Statutes, Regulations, and Rules**

28 U.S.C. § 1654 ......................................................................................................14

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* ................. *passim*

Commodity Exchange Act, 17 U.S.C. 777 § 1 *et seq.* ........................................... *passim*

Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* ........................................... *passim*

17 C.F.R. § 1 *et seq.* ................................................................................... *passim*

Fed. R. Civ. P. 8 ...............................................................................1, 11, 12, 14, 32

Fed. R. Civ. P. 9(b) ...........................................................................19, 20, 22, 39

Fed. R. Civ. P. 12(b)(1)....................................................................................1, 39

Fed. R. Civ. P. 12(b)(6)..................................................................................11, 39

Fed. R. Civ. P. 12(f) ...................................................................................1, 11, 40

**Other Authorities**

5 C. Wright & A. Miller, Federal Practice and Procedure § 1281 ................................12

National Futures Association, Compliance Rules,
    https://www.nfa.futures.org/ruleb ook/rules.aspx?Section=................................5, 25

National Futures Association, "Opportunity AND Risk: An Educational Guide to Trading
    Futures and Options on Futures," *available at*
    https://www.nfa.futures.org/investors/investor-resources/files/opportunity-and-risk-
    entire.pdf ..........................................................................................................2, 3

## <u>INTRODUCTION</u>

This lawsuit, and two related suits, *Kumaran v. National Futures Assoc., et al.*, 20 Civ. 3668 (S.D.N.Y. May 11, 2020) (the "NFA Lawsuit") and *Kumaran v. ADM Inv'r Servs., Inc.*, 20 Civ. 3873 (S.D.N.Y. May 18, 2020) (the "ADMIS Lawsuit") stem from Plaintiff Samantha Siva Kumaran ("Kumaran") and now-dismissed plaintiff Nefertiti Risk Capital Management, LLC ("NRCM")'s claims that defendant Gerard Lazzara and ADM Investor Services ("ADMIS") failed to disclose the involvement of defendant High Ridge Futures, LLC ("High Ridge") in performing risk-management services on NRCM's commodities futures trading accounts, and that ADMIS charged certain unauthorized fees. From this narrow premise, NRCM and its managing member, Kumaran, asserted a far-reaching conspiracy allegedly involving Lazzara, his business, ADMIS, High Ridge, High Ridge's owners, other affiliated individuals and entities, and even the commodity futures industry's self-regulatory entity, the National Futures Association, itself.

This Court has already dismissed NRCM, and all claims Kumaran purported to bring on behalf of NRCM and others, on the ground that a *pro se* plaintiff is precluded from representing either a limited liability company or a class in federal court. (ECF No. 13, at 2.) Remaining plaintiff Kumaran's First Amended Complaint ("Complaint") also should be dismissed under Fed. R. Civ. P. 12(b)(1) and/or (6), or, alternatively, stricken pursuant Fed. R. Civ. P. 12(f).

*First*, the Complaint does not even satisfy the minimum requirements of Fed. R. Civ. P. 8(d) that pleadings be "short and plain" and provide defendants with adequate notice of the nature of the claims against them.

*Second*, Kumaran ***still*** asserts claims on behalf of NRCM that this Court has ***already held*** she lacks standing to bring.

*Third*, Kumaran fails to meet the stringent requirements for piercing the corporate veil to

reach High Ridge's owners and affiliated entities.

*Fourth*, Kumaran otherwise fails to adequately plead any of her fifteen causes of action.

## BACKGROUND

**I.    Factual Background.**

Kumaran registered NRCM as a limited liability company in New York on December 14, 2015.[1] Kumaran alleges that she was referred to Lazzara and LCI by defendant Julie Villa[2] in or around December 2016, and that after speaking with Lazzara by telephone, she decided to open commodities futures trading accounts for NRCM at ADMIS. (*See* ¶¶ 147, 153–54, 344.)[3]

By way of background, a commodities futures contract is a legally binding agreement to buy or sell a commodity at a later date.[4] Someone expecting the price of a particular commodity to increase over a given period of time can seek to profit by buying futures contracts. If they are correct, the futures contract can later be sold for a higher price, yielding a profit; if they are incorrect, the trade will result in a loss.[5] As is standard in commodities futures trading, NRCM's accounts traded on futures-based margin, meaning that an account can deposit margin representing a small amount of a futures contract's notional value, which in turn places the brokerage firm, here

---

[1] New York Department of State records indicate NRCM is still active with no registered agent. *See* N.Y. Dep't of State, *Search Our Corporation and Business Entity Database*, https://appext20.dos.ny.gov/corp_public/CORPSEARCH.ENTITY_SEARCH_ENTRY (enter "Nefertiti Risk Capital Management, LLC"); *see MPC Franchise LLC v. Tarnito*, 19 F. Supp. 3d 456, 461 & n.10 (W.D.N.Y. 2014) (taking judicial notice of New York corporate records), *aff'd*, 826 F.3d 653 (2d Cir. 2016).

[2] Villa is not represented by the undersigned in this matter.

[3] Citations to "¶ _" refer to the numbered paragraphs of the First Amended Complaint, dated September 30, 2020 (ECF No. 20) ("Complaint").

[4] *See* National Futures Association, "Opportunity AND Risk: An Educational Guide to Trading Futures and Options on Futures," *available* at https://www.nfa.futures.org/investors/investor-resources/files/opportunity-and-risk-entire.pdf ("NFA Educational Guide"), at 14.

[5] *Id.* at 30.

ADMIS, as the ultimate insurer if an unpaid deficit occurs throughout trading. (*See, e.g.,* ¶¶ 221, 275(g) (referring to "Plaintiffs margining").[6] The margin required to buy or sell a futures contract is a deposit of good faith money that can be drawn on by the brokerage firm to cover losses that the investor may incur in the course of futures trading. NFA Educational Guide, at 27. Due to the risk involved for the customer and the brokerage firm, brokerage firms monitor margin levels and may require higher margin amounts from their customers than the exchange-set minimums. *See id.*

In connection with opening NRCM's accounts at ADMIS, Kumaran received ADMIS's Privacy Policy and signed a Customer Agreement and Arbitration Agreement as NRCM's Managing Member.[7] ADMIS's Privacy Policy expressly provides that ADMIS has permission to "*. . . share your personal information with affiliates and subsidiaries and/or unaffiliated third parties . . . to service your account . . . .*" (*See* Ex. 1, ADMIS Privacy Policy.) As relevant here, ADMIS had an arrangement with Defendant High Ridge for High Ridge to perform risk-management services for accounts opened by certain introducing brokers, including LCI. Accordingly, ADMIS provided High Ridge with margin reports and access to NRCM's accounts as needed for High Ridge to perform the requisite risk management functions for ADMIS, which

---

[6] *See also* NFA Educational Guide, at 23 ("Perhaps more so than in any other form of speculation or investment, gains and losses in futures trading are highly leveraged.").

[7] The Privacy Policy, Customer Agreement and Arbitration Agreement, attached hereto as Exhibits 1-3, were attached as Exhibits to Respondents' Supplemental Answer to NRCM's Statement of Claim in Arbitration. They should be considered incorporated in the Complaint by reference as the Complaint "relies heavily upon their terms and effect, thereby rendering the document[s] integral to the complaint." *Tannerite Sports, LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 224 n.1 (S.D.N.Y. 2015) (citing *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)).

High Ridge principally conducted through its employee, John Felag. (*See* ¶ 231 (alleging ADMIS provided access to High Ridge).)

NRCM was not unique in this regard; as the Complaint alleges, NRCM's accounts were among thousands of commodities futures trading accounts for which High Ridge monitored margin levels and performed third party risk management services for ADMIS. (*See* ¶ 5.) Crucially, the arrangement between ADMIS and High Ridge was well-known to the National Futures Association ("NFA") – the self-regulatory organization that maintains standards of conduct, polices compliance of its members with federal law, and adjudicates disputes between its members and associates – and was (and still is) without objection.[8]

NRCM conducted trading activity on the ADMIS platform from approximately December 2016 through June 2017. (*See* ¶ 323–25.) Kumaran alleges that she disclosed to Lazzara that she intended for NRCM to utilize a "quantitative commodity options trading strateg[y]" entitled "STORM." (¶ 171; *see* ¶¶ 172–80.) Kumaran alleges that she "specifically designed" STORM in 2011 "for the commodities options market," and that STORM "offers programs in multi-commodities including, but not limited to S&P options." (¶ 34.)  Kumaran alleges that although she "licensed" STORM to certain unspecified hedge funds, she – and not NRCM– owns the rights to STORM. (¶ 178.) Kumaran characterizes STORM differently throughout the Complaint, at times calling it an "algorithm," a "program," a "strategy," or a "fund." (*See, e.g.* ¶¶ 168 (program), 172 (algorithm), 176 (fund), 285 (strategy).) Kumaran does not allege how, practically speaking, the receipt of information about NRCM's margin levels – or even access to NRCM's trading information as alleged – would enable High Ridge to access, view, or obtain STORM.

---

[8] High Ridge and ADMIS have undergone multiple independent audits since the arrangement was consummated; never was a red flag raised by the arrangement.

In May 2017, based upon margin reports provided to it by ADMIS in the regular course of its risk management functions (¶ 255), High Ridge became aware that amounts in NRCM's accounts fell below the standard margin requirements imposed by ADMIS. High Ridge informed Lazzara at LCI, and Lazzara informed Kumaran of this violation and that NRCM would need to infuse additional funds in the accounts to resume trading, but NRCM failed to comply.[9] Kumaran closed NRCM's accounts in approximately summer of 2017. (¶ 323.) At the end of the eight-month period during which NRCM was active on the ADMIS platform, NRCM incurred a total loss of $32,666.32 from the $90,000 it had invested in its accounts.

## II.   Kumaran's Allegations of Wrongdoing.

As best one can tell, Kumaran alleges that Defendants conspired to lure her to open commodities future trading accounts for NRCM with a specific broker and on a specific platform so that the Vision Defendants could gain access to and misappropriate STORM and impose upon NRCM unauthorized fees.

***The Disclosure Allegations***: Kumaran alleges that Lazzara and LCI violated duties under the Commodity Exchange Act ("CEA"), 17 U.S.C. ch. 1 § 1 *et seq.*, the regulations promulgated by the Commodity Futures Trading Commission ("CFTC"), 17 C.F.R. § 1 *et seq.*, the rules promulgated by the NFA,[10] and the common law, when they (1) purportedly misrepresented

---

[9] In its Customer Agreement with ADMIS, NRCM agreed to "at all times maintain adequate margins, so as continually to meet the margin requirements established by ADMIS," and that "when required, to wire transfer margins to ADMIS or any monies so required. (*See* Ex. 2, para. 4.). The Customer Agreement further provided that "ADMIS may, in its sole and absolute discretion, at any time or from time to time…close out [NRCM's] open positions in whole or in part ***or take any other action it deems necessary to satisfy such [margin] requirements…***" (*See id.*, para. 5 (emphasis added).) NRCM's failure to maintain adequate margins led to restrictions on NRCM's accounts to prevent it from establishing new positions.

[10] *See* National Futures Association, Compliance Rules, https://www.nfa.futures.org/ruleb ook/rules.aspx?Section=4.

High Ridge and its employees as being a unit or part of ADMIS, as opposed to an outside party retained by ADMIS to conduct risk-management services, and (2) omitted that ADMIS outsourced risk-management services and that High Ridge – an alleged direct competitor of NRCM – was the third-party responsible for such services. (*See, e.g.*, ¶¶ 156, 182–95, 232–42, 250, 274.) According to Kumaran, Lazzara and LCI had a financial interest in these purported misrepresentations and omissions, including (1) an "interest and risk-free credit line from Vision[']s owners and affiliates to get to stay alive and in business,"[11] and (2) LCI's continued "association with a brand name like ADM[IS]." (¶¶ 70–71, 73.)

*The Misappropriation Allegations*: Kumaran alleges that High Ridge and its principal employee, John Felag, "improperly acquire[d] real-time computer access, details, and inner-workings of [NRCM]," (¶ 48) and downloaded STORM onto "VFM's servers." (¶ 60.) Kumaran further alleges that, because of the lack of barriers between the Vision Defendants,[12] once housed in VFM's servers, any Vision Defendant could access STORM. (¶¶ 51, 56.) Kumaran avers that, ten months after NRCM had ceased all trading activity, Rothman and Boshnack registered Vision Investment Advisors, LLC ("VIA") as a directly competing commodity trading advisor ("CTA"), and that VIA used a program entitled "SSP," from which it and, by extension Rothman and Boshnack, directly profited, that "incorporated" and was otherwise similar to STORM (¶¶ 126–27, 503.)

---

[11] Kumaran suggests that Lazzara and LCI needed those funds to clear trades of their own. (¶¶ 70–71.) For avoidance of doubt, LCI is an introducing broker that does not clear trades, nor do LCI or Lazzara manage a CTA of their own; Kumaran does not allege that to be the case.

[12] Kumaran alleges that High Ridge, VFM, VBS, and VIA were "all under the common ownership and control of Howard Rothman and Robert Boshnack," (¶ 84), and that Felag is an employee of High Ridge Holding, High Ridge, VFM, VBS, VIA, and the Family LLCs (¶ 52).

***The Account Interference Allegations***: Kumaran further alleges that, on or around May 12, 2017, the Vision Defendants "began withdrawing and scalping additional cash deductions from" NRCM in the form of "trade processing" and "management fees." (¶¶ 294, 331–39.) Kumaran purports that these fees were unjustified and "deliberately excised to "thwart competition of [NRCM]," because the charges were levied only after NRCM started showing gains averaging 12% every 60 days. (¶¶ 118, 294.)

## III.   Procedural History.

### A.   The NFA Arbitration.

In or around June 2018, NRCM filed an arbitration claim with the NFA. *In re Nefertiti Risk Capital Management LLC*, 18-ARB-5 (NFA). NRCM named as Respondents ADMIS, its Chief Compliance Officer, Greg Hostetler, and Defendants High Ridge, Rothman, Boshnack, Felag, Lazzara and LCI. The Statement of Claim concerned the same events and purported injuries alleged here. *See* NFA Lawsuit, Complaint ¶ 135 (ECF No. 1). Citing purported biases of the NFA, in November 2019, NRCM petitioned for, and was granted by the NFA panel, a one-year stay of the Arbitration for the limited purpose of proceeding ***against the NFA*** in U.S. District Court. *Id.*, Ex. 13 (attaching NFA Panel's Nov. 13, 2019 Order of Stay).

### B.   The Federal Litigations.

Instead of bringing a federal lawsuit against just the NFA, in May 2020 Kumaran filed ***three separate lawsuits***, *pro se*, on behalf of herself, NRCM and a putative class, against (1) the NFA, two unnamed NFA compliance officers, and NFA Director Tom Kadlec, *see* NFA Litigation Lawsuit, Complaint (ECF No. 1); (2) ADMIS, *see* ADMIS Lawsuit, Complaint (ECF No. 1); and (3) High Ridge, Felag, Lazzara, LCI, Villa, *and* various entities and individuals associated with

Vision, *see* Complaint (collectively, the "Federal Actions"). The Federal Actions are designated as related cases.

On its own accord, this Court dismissed all three actions; of particular note, in this action and the NFA Lawsuit, the Court dismissed **all** the claims Kumaran brought on behalf of others, including NRCM, on the ground that, as a *pro se* non-attorney, she is statutorily prohibited from representing others in federal court.[13] However, the Court granted Kumaran leave to replead her own claims in all three actions. (*See* Dismissal Order, dated August 20, 2020 (ECF No.13)).

**C.    The First Amended Complaint.**

On September 30, 2020, Kumaran filed an amended Complaint, spanning 103 pages, 547 separately enumerated paragraphs, and fifteen separate causes of action. Specifically, Kumaran presses claims of:

- Fraudulent Inducement of Contract (Count II) and Negligent Misrepresentation (Count XV) against Lazzara and LCI;

- Unfair Competition (Count X); Unjust Enrichment (Count XI); and Tortious Interference with Contract (Count XIII) against Vision Defendants;

- Fraud and Fraudulent Omission (Count I); Aiding and Abetting Fraud (Count III); Civil Conspiracy (Count IV); Violation of Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count V); Conspiracy to Commit a RICO Violation, 18 U.S.C. § 1962(d) (Count VI); Violation of the Defend Trade Secrets Act, 18 U.S.C.1836(b) (Count VII); Misappropriation of Trade Secrets under New York law (Count VIII); Aiding and Abetting Misappropriation of Trade Secrets (Count IX); Interference with an Economic Advantage (Count XI); and Breach of Implied Covenant of Good Faith and Fair Dealing (Count XIV) against **all** Defendants.

Most notably, the Complaint attempts to re-write NRCM's trading accounts and activities

---

[13] The Court initially dismissed the NFA Lawsuit in its entirety on the ground that the NFA and its employees enjoyed absolute immunity from the sorts of claims Kumaran lodged against them. It also denied Kumaran's request to enjoin the Arbitration set out in that action. NFA Lawsuit, Order of Dismissal, dated July 2, 2020 (ECF No. 13). However, the Court granted Plaintiff's motion for reconsideration, and granted leave to Kumaran to replead her own claims therein. *Id.*, Order, dated October 23, 2020 (ECF No. 34).

– and potential claims – as Kumaran's own. The Complaint is replete with this "hide-the-ball" pleading tactic, which essentially strips the barrier between Kumaran's status as an individual from her legally distinct role as sole member of NRCM. (*See, e.g.*, ¶ 275(h) (referring to "Kumaran's and NRCM's account"); ¶ 392 ("Plaintiff Kumaran, *individually as a CTA*, has suffered, economic interference, financial loss in *their* trading accounts . . . .").)[14]

## IV.    The Moving Defendants.

The moving defendants are as follows:

**Vision Financial Markets, LLC ("VFM")** – VFM was a futures commission merchant owned by the owners of High Ridge.  The lone allegation Kumaran directs at VFM is that it owns the servers onto which High Ridge allegedly "download[ed]" STORM. (¶¶ 51, 56.)

**Vision Brokerage Services, LLC ("VBS")** – Kumaran does not direct a single meaningful, specific allegation towards VBS, and only generically alleges that it "unlawfully acquired" competitor CTAs' trading strategies, including her own. (¶ 47.) The claims against VBS should be dismissed for this reason alone.

**Vision Investment Advisors, LLC ("VIA")** – VIA is a long-established investment management and advisory firm founded by Howard Rothman and Robert Boshnack. VIA has provided discretionary investment advisory services to its clients in the area of securities and stock options for approximately twenty years.[15]  Kumaran alleges that VIA "directly compet[ed]" with NRCM apparently based on the fact that VIA registered with the NFA as a CTA in 2018, nearly a

---

[14] Other examples in the Complaint of this tactic to shroud the true nature of NRCM's trading activity and accounts include, but are far from limited to: Paragraphs 276 (LCI "deceived Kumaran, as ADMIS . . . had disseminated *its CTA trading account*"); 283 ("Plaintiff notified Lazzara that *its registration had been completed as a CTA* . . . ."); and 284 ("*Kumaran's CTA account* performance was proving out and showing higher than average returns"). For avoidance of doubt, the accounts at ADMIS belong to NRCM, not Kumaran individually.

[15] *See* http://www.advicewithvision.com/.

year after NRCM accounts had closed. (¶ 127.) Kumaran alleges that VIA used a trading strategy that "incorporat[ed]" and was otherwise similar to STORM, but fails to aver anywhere what commodities VIA actually traded, much less the ways in which VIA's trading strategies were allegedly similar to STORM's. (¶¶ 37, 353.)

**High Ridge Holding Company, LLC ("High Ridge Holding")**[16] – Kumaran does not direct a single meaningful, specific allegation towards High Ridge Holding other than its ownership of High Ridge Futures and relationship to other Vision defendants. The claims against High Ridge Holding should be dismissed for this reason alone.

**High Ridge Futures, LLC ("High Ridge")** – Kumaran alleges that High Ridge was a "non-trading" unit of the "Vision Defendants" that handled "the day-to-day operations and improper acquisition [of trade secrets]" by the "Vision Defendants". (¶¶ 48, 59.)

**Howard Rothman and Robert Boshnack** – Rothman and Boshnack are the co-founders of VIA and the managing members of High Ridge.[17] Kumaran seeks to pierce the corporate veil and attribute to Rothman and Boshnack the conduct of High Ridge, VIA, and each of their affiliates. (¶¶ 39–46.) Because Kumaran fails to plead requisite facts to pierce the corporate veil, and does not direct a single meaningful, specific allegation towards either of them directly, the claims against Rothman and Boshnack can be dismissed for this reason alone.

**H. Rothman Family LLC and Boshnack Family, LLC –** H. Rothman Family LLC and Boshnack Family, LLC (the "Family LLCs"), are limited liability companies established by Rothman and Boshnack, respectively, which hold ownership interests in certain Vision entities and affiliates; the Family LLCs' members include High Ridge's owners and/or their family

---

[16] Erroneously named as "High Ridge Holding Corporation, LLC".

[17] *See* http://www.highridgefutures.com/company/executive-team/.

members. The Family LLCs do not – nor does Kumaran allege that they do, in fact – play any role in managing or directing High Ridge or its affiliated entities. Indeed, Kumaran does not direct a single meaningful, specific allegation towards the Family LLCs, other than that they are owned by Rothman and Boshnack. The claims against the Family LLCs should be dismissed for this reason alone.

**John Felag** – Felag is High Ridge's Chief Risk Officer.[18] Kumaran alleges that Felag, through his provision of risk-management services as High Ridge's principal employee, accessed NRCM's accounts in order to misappropriate STORM and impose purportedly unauthorized fees. (The foregoing collectively, are referred to as the "Vision Defendants".)

**Lazzara Consulting, Inc. ("LCI") and Gerard Lazzara** – LCI is an ADMIS introducing broker located in Austin, Texas, whose sole employee is Lazzara. Kumaran alleges that LCI and Lazzara were responsible for facilitating NRCM's opening of accounts with ADMIS, and failed to disclose ADMIS's relationship with High Ridge. (¶¶ 69–73.) (LCI and Lazzara, together with Vision Defendants, are referred to as the "Defendants".)

## ARGUMENTS

## I.     Dismissal Is Warranted for Failure to Comply with Fed. R. Civ. P. 8.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Noncompliance may be met with dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or, alternatively, a court may strike redundant, immaterial, impertinent, or scandalous portions thereof pursuant to Fed. R. Civ. P. 12(f). *See Debellis v. White*, 19 Civ. 8730, 2020 WL 50576827, at *1 (S.D.N.Y. Aug. 27, 2020) (Furman, D.J.) (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) and *Shomo v. State of N.Y.*, 374

---

[18] *See id.*

F. App'x 180, 182) (Summary Order) (where a complaint "contain[ed] a surfeit of detail … the district court was within the bounds of discretion to strike or dismiss the complaint for noncompliance with Rule 8.")). Granting such relief is appropriate "where the allegations would stand to result in prejudice to the movant." *Alloco v. Dow Jones & Co.*, 02 Civ. 1029, 2002 WL 1484400, at *1 (S.D.N.Y. July 10, 2002) (McKenna, D.J.).

Kumaran's Complaint speaks for itself. As an initial matter, courts in this district have dismissed, and the Court of Appeals has affirmed dismissals of, *pro se* complaints of equivalent prolixity.[19] "Unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin*, 861 F. 2d at 42 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281); *see also Wynderv. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) (a noncompliant complaint "overwhelm[s] defendants' ability to understand or mount a defense). Kumaran's 103-page, 547-paragraph Complaint, along with 179 accompanying pages of exhibits, rests on all fours with complaints courts routinely and uniformly dismiss.

---

[19] *Salahuddin*, 861 F.2d at 43 ("[T]here is no doubt that [a *pro se* plaintiff's] complaint fails to comply with Rule 8's 'short and plain' requirement. It spans 15 single-spaced pages[,]contains explicit descriptions of 20-odd defendants, [and asserts 22 claims.]"); *Prezzi v. Schelter*, 469 F.2d 691 (2d Cir. 1972) (affirming dismissal of "plaintiff's 88-page, legal size, single spaced *pro se* complaint" that "contained a labyrinthian prolixity of unrelated and vituperative charges that defied comprehension"); *Blakely v. Wells*, 209 F. App'x 18, 20 (2d Cir. 2006) (Summary Order) (affirming dismissal of 57-page, 597-paragraph complaint brought by *pro se* plaintiff as "far from short or plain."); *Rosa v. Goord*, 29 F. App'x 735, 735 (2d Cir. 2002) (Summary Order) (affirming dismissal of amended *pro se* complaint that as "prolix" and "for the most part incomprehensible"); *Gonzalez v. Wing*, 113 F.3d 1229 (2d Cir. 1997) (Summary Order) (affirming dismissal of *pro se* plaintiff's 287-page "incredibly dense and verbose" complaint); *McCray v. New York*, 17 Civ. 1395, 2019 WL 5634841 (S.D.N.Y. Oct. 31, 2019) (Roman, D.J.); *Harley v. Steamlicensing Networks LLC*, 18 Civ. 9528, 2019 WL 2866563 (S.D.N.Y. July 3, 2019) (McMahon, D.J.); *Antwi v. Health & Human Servs. (Ctrs.) F.E.G.S.*, 13 Civ. 835, 2018 WL 2452755 (S.D.N.Y. May 31, 2018) (Roman, D.J.); *Lafurno v. Walters*, 18-CV-1935, 2018 WL 2766144, at *1 (E.D.N.Y. June 8, 2018) (dismissing 108-page, 272-paragraph *pro se* complaint as "sprawling and voluminous").

Beyond its prolixity, the redundant and repetitive nature of the Complaint renders it nonsensical, leaving Defendants to guess what theory of liability Kumaran is alleging. For example, the Complaint asserts in the *same Count* multiple, unrelated causes of action.[20] So, too, is the Complaint crammed with immaterial and irrelevant information. For example, Kumaran spends paragraphs complaining about the quality of High Ridge's risk-management services, but does not bring any claims arising therefrom, and devotes pages to non-party ADMIS's conduct, but does not bring any claims against it in this action (choosing instead to sue ADMIS in a separate action). (*See* ¶¶ 228-40, 260–330.)

Most troublingly, the Complaint lumps together all Defendants in a fashion that precludes them from fully discerning the nature and basis of the claims against them. The Complaint repeatedly refers to Vision Defendants as a group, and never once sets forth anything more than minimal conclusory allegations against Defendants VFM, VBS, High Ridge Holding, Rothman, Boshnack, or the Family LLCs. (*See supra* Background Sec. IV.) Put simply, the Complaint fails to plead facts that "establish the specific personal involvement by any of the[se] Defendants . . . in the alleged wrongful acts." *Isidro Mejia v. N.Y.P.D.*, 1:16-cv-9706-GHW, 2019 WL 3412151, at *7 (S.D.N.Y. July 28, 2019) (Woods, D.J.). Such allegations not only fail to establish a "fairly

---

[20] (*See*, *e.g.*, ¶¶ 496–507 (Count X asserting a claim for "unfair competition" and/or "misappropriation of confidential information); ¶¶ 538–47 (Count XV asserting "negligent misrepresentation" and/or "breach of duty of care".)

traceable injury" to any Defendant for standing purposes[21] or to state a claim,[22] but they also violate a central tenet of Rule 8(a)(2): "to give defendants 'fair notice of what plaintiff's claim is and the grounds upon which it rests in order to enable the opposing party to prepare answer and prepare for trial, and to identify the nature of the case.'" *Id.* at *7 (quoting *Middleton v. United States*, 10 Civ. 6057 (JFB) (ETB), 2012 WL 394559 at *2 (E.D.N.Y. Feb. 7, 2012)).

## II.    Kumaran Lacks Standing to Assert Derivative Claims on behalf of NRCM.

"[A] layperson may not represent a corporation in which [s]he is the shareholder, a limited liability company of which [s]he is the sole member, or a partnership where [s]he is a partner." *Sanchez v. Walentin*, 526 F. App'x 49, 51 (2d Cir. 2013) (Summary Order) (citing *Berrios v. N.Y. City Hous. Auth.*, 564 F.3d 130 (2d Cir. 2009) ("Although [28 U.S.C.] § 1654 . . . recognizes that an individual generally has the right to proceed *pro se* with respect to his *own* claims or claims against him personally, the statute does not permit unlicensed laymen to represent anyone but themselves.") (internal citation omitted)). It was on this ground that the Court dismissed Kumaran's initial Complaint, which named NRCM without representation by an attorney. *(See* Dismissal Order (citing 28 U.S.C. § 1654).)

---

[21] "It is well-established that a plaintiff must demonstrate standing for each claim [it] seeks to press." *Mahon v. Ticor Title Ins. Co.*, 683 F. 3d 59, 64 (2d Cir. 2012). To demonstrate standing, a plaintiff must show, *inter alia*, "(1) *injury-in-fact*, which is a 'concrete and particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant[.]" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008)). A plaintiff cannot predicate standing to sue one defendant based merely on facts supporting standing to sue another. *Mahon*, 683 F.3d at 66.

[22] A pleading must "inform each defendant of the nature of [its] alleged participation in the [alleged wrongdoing.]" *DiVittorio v. Equidyne Extractive Indus., Inc.* 822 F.2d 1242, 1247 (2d Cir. 1987). Corporate proximity is insufficient. *See, e.g.*, *In re Aluminum Warehouse Antitrust Litig.*, No. 13-md-2481, 2015 WL 1344429, at *3 (S.D.N.Y. 2015) (Engelmayer, D.J.) ("The fact that two separate legal entities may have a corporate affiliation does not alter [Rule 8's] pleading requirement.").

Although the Court invited Kumaran to retain a lawyer on behalf of NRCM or, alternatively, set forth a "legal basis to assert a claim on behalf of [NRCM]" by amendment, she did neither. (Dismissal Order at 2.) Instead, she simply dropped NRCM as a plaintiff from the caption, and replaced references to NRCM throughout the Complaint with references to herself, as if NRCM's trading activity and accounts belonged to her individually. The Court should see through and reject Kumaran's attempt to circumvent the prohibition against *pro se* representation of NRCM. Although NRCM has been removed as a plaintiff, this suit is still brought, effectively, derivatively on NRCM's behalf.

"The doctrine of standing 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong[.]'" *Dep't of Commerce v. New York (Census)*, – – U.S. —, 139 S. Ct. 2551, 265 (2019) (quoting *Spokeo, Inc. v. Robins*, — U.S. —, 136 S. Ct. 1540, 1547 (2016)). "Cases have established that the 'irreducible constitutional minimum' of standing consists of three elements": (1) that the plaintiff "suffered an injury in fact"; (2) "that is fairly traceable to the challenged conduct of the defendant"; and (3) that is likely to be redressed by a favorable judicial decision." *New York v. Scalia*, 464 F. Supp. 3d 528 (S.D.N.Y. 2020) (Woods, D.J.) (quoting *Spokeo*, 136 S. Ct. at 1547). "It is a long-standing principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

As a general rule, "[a] shareholder – even the sole shareholder – does not have standing to assert claims alleging wrongs to the corporation." *Gabayzadeh v. Global Equip. & Mach. Sales Inc.*, 18 Civ. 3851 (LGS), 2019 WL 5880639, at *2-3 (S.D.N.Y. Jan. 28, 2019) (Schofield, D.J.) (citing *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731 (2d Cir. 1987)). "When the claim is that corporate property has been removed from the corporation, it is the corporation – having an

independent legal duty – that must seek on its own or derivatively, to redress its injury. The shareholder in such a case is injured only as a result of the injury to another, *i.e.*, the corporation, and therefore generally lacks standing." *Id.* at *3 (quoting *Bingham v. Zolt*, 66 F.3d 553, 561–62 (2d Cir. 1995)). These "same principles apply to limited liability companies" and their members. *Schiff v. ZM Equity Partners, LLC*, 19 Civ. 4735 (WHP), 2020 WL 5077712, at *10 (S.D.N.Y. Aug. 27, 2020) (Pauley III, D.J.).

Applying this standard, Kumaran plainly lacks standing to bring the claims for Fraudulent Inducement of Contract (Count II), Tortious Interference with Contract (Count XIII), and Breach of Implied Covenant of Good Faith and Fair Dealing (Count XIV), which solely implicate the contractual rights of **NRCM**. *See Backus v. U3 Advisors., Inc.*, 16 Civ. 8990 (GHW), 2017 WL 3600430, at *16 (S.D.N.Y. Aug. 18, 2017) (Woods, D.J.) (holding when a claim "sounds in breach of a contractual duty owed to the company" and the "essence" of the alleged injury is to an interest belonging to the company, the claim is derivative (citing *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1260 (Del. 2016)).

Kumaran also lacks standing to bring claims for Fraud (Count I), Aiding and Abetting Fraud (Count III), Civil Conspiracy (Count IV), Violation of RICO, 18 U.S.C. § 1962(c) (Count V), Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) (Count VI), Unfair Competition (Count X), Unjust Enrichment (Count XI), Interference with Prospective Economic Advantage (XII), and Negligent Misrepresentation (XV), to the extent that they invoke duties owed to **NRCM** and/or injuries suffered by **NRCM**. *See ZM Equity Partners, LLC*, 2020 WL 5077712, at *10 (finding plaintiff lacked standing to bring claim premised upon allegations that limited liability company had been charged "excessive" professional fees); *Alpvex, Inc. v. John Swan Ltd.*, 2019 WL 6330274, at *6 (N.D.N.Y. Nov. 26, 2019) (dismissing fraudulent conveyance, conversion, bad

16

faith, and unjust enrichment claims, finding each "hing[ed] entirely on alleged abuses of the capital contribution after it became[the limited liability company's]—and not plaintiffs'—property.").

To the extent that Kumaran alleges standing to bring claims for Misappropriation of Trade Secrets (Counts VII and VIII) and Aiding and Abetting Misappropriation of Trade Secrets (Count IX) based on her allegation that she owns the rights to STORM, those claims are addressed in Arg. Secs. IV(F) and (G), below.

### III.   Kumaran Fails to Pierce High Ridge or VIA's Corporate Veil.

Apart from her lack of standing to pursue the vast majority of her claims, Kumaran fails to allege any discernible direct claims against Defendants VFM, VBS, High Ridge Holding, Rothman, Boshnack, or the Family LLCs, and apparently seeks to hold them liable by piercing the corporate veil of High Ridge and/or VIA. Kumaran's efforts fall far short.

"Under New York's choice of law rules, the law of the state of incorporation determines when the corporate form will be disregarded." *Fletcher v. Atex, Inc.*, 68 F. 3d 1451, 1456 (2d Cir. 1995). High Ridge and VIA are both organized in Delaware. "To state a 'veil-piercing claim' [under Delaware law] the plaintiff must plead facts supporting an inference that the corporation, through its alter ego, has created a sham entity designed to defraud investors and creditors." *Crosses v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003). "Specific facts a court may consider . . . include: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a façade for the dominant shareholder." *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015); *McCall v. Chesapeake Energy Corp.*, 817 F. Supp. 2d 307, 313–14 (S.D.N.Y. 2011) (Cote, D.J.) (explaining that under Delaware law a plaintiff seeking to pierce the

corporate veil under the alter ego theory must show that "the corporate structure cause[s] fraud or similar injustice," and that the corporation "is a sham that exists for no other purpose than as a vehicle for fraud"); *RCC Ventures v. Brandtone Holdings. Ltd.*, 322 F.R.D. 422, 448 (S.D.N.Y. 2017) (Woods, D.J.).[23]

Kumaran does not allege a single fact that would enable a court to make a finding that the corporate forms of High Ridge or VIA should be ignored to reach their affiliates or owners; instead, Kumaran makes conclusory assertions regarding the ownership and control Boshnack, Rothman and Felag (who is not alleged to own any corporate Vision Defendant) exercise over the Vision entities, and that those entities share facilities, servers, and computers. (¶ 41.) Kumaran fails to plead any fact even suggestive of the notion that High Ridge or VIA operated as the mere alter egos of VFM, VBS, High Ridge Holding, Rothman, Boshnack, or the Family LLCs. Thus, each of these defendants should be dismissed.

## IV.    Kumaran's Claims Fail for Additional Reasons.

Besides the fundamental, independently fatal deficiencies stated above, each of Kumaran's causes of action also fail for the additional reasons set forth below.

---

[23] To the extent that New York law applies (VBS is organized in New York), the law is the same. "It is well-settled that New York courts are reluctant to disregard the corporate entity," *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989), "and thus that a party seeking to do so bears a 'heavy burden,'" *MWH Intern. Inc. v. Inversora Murten, S.A.*, 1:11 Civ. 2444-GHW, 2015 WL 728097, at *11 (S.D.N.Y. Feb. 11, 2015) (Woods, D.J.) (quoting *TNS Holdings., Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998)). New York law requires the party seeking to pierce a corporate veil to make a two-part showing: "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (citation omitted). Notably, "[w]hile complete domination of the corporation is the key to piercing the corporate veil, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required." *Id.*

18

A.    **Count I, Common Law Fraud.**

Count I of the Complaint asserts a claim of common law fraud against all Defendants, premised upon various alleged misrepresentations and omissions. "To state a claim for common law fraud under New York law, 'a plaintiff must show [(1)] a material misrepresentation or omission of fact, [(2)]made with knowledge of its falsity, with scienter or an intent to defraud, [(3)] upon which the plaintiff reasonably relied, and [(4)] that such reliance caused damage to the plaintiff.'" *Alpha Cap. Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2019 WL 146993, at *12 (S.D.N.Y. Mar. 30, 2019) (Woods, D.J.) (citing *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 372 (S.D.N.Y. 2010) (Griesa, D.J.)).

"Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)," which "requires that the complaint 'state with particularity the circumstances constituting fraud.'" *Schentag v. Negben*, 17 Civ. 8734 (GHW), 2018 WL 3104092 (S.D.N.Y. June 21, 2018). "To satisfy that requirement, the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000).

1.    Fraudulent Misrepresentation

Despite the Complaint's prolixity, the apparent factual basis for Kumaran's fraudulent misrepresentation claims is quite simple: Kumaran alleges that ***after*** NRCM opened accounts at ADMIS, Lazzara made misrepresentations concerning Felag's identity and High Ridge's relationship with ADMIS to conceal the fact that High Ridge and, thus, Vision Defendants, could access NRCM's accounts and thereby steal STORM. (¶¶ 243, *see* 232–42.) According to Kumaran,

Lazzara did so because he stood to gain financially by securing for Vision Defendants access to NRCM's accounts (¶¶ 70-73.)

### i. Vision Defendants

Kumaran does not identify any representation made by any Vision Defendant to her (or to NRCM), let alone one that forms a basis for this claim. Accordingly, this claim should not lie. *ATSI Comms., Inc.*, 493 F.3d at 99 (Fed. R. Civ. P. 9(b) requires plaintiff alleging fraud to specify the alleged fraudulent statement and identify the speaker).

### ii. Lazzara and LCI

Kumaran's fraudulent misrepresentation claims against Lazzara and LCI are also deficient. Kumaran identifies three misrepresentations in particular: that Lazzara (1) "used deceptive terminology that he was speaking to '***one of the risk guys***'" when referring to Felag, (2) referred to High Ridge as the "dev" and "tech teams," and (3) referred to himself as working with "a division of ADMIS," thereby hiding High Ridge's involvement. (¶ 243.) *First*, even assuming that any of these statements were made to Kumaran individually, and not just in her capacity as managing member of NRCM, the statements are a wholly inadequate basis on which to rest a claim of fraud. The statement that Felag is a "risk guy" is not a misrepresentation. As Kumaran admits, Felag was responsible for overseeing High Ridge's arrangement with ADMIS to provide risk-management services for certain introducing brokers. (¶ 231, *see ¶* 54.) Moreover, Kumaran does not allege that Lazzara was referring to High Ridge or its employees as the "tech team" or "dev team"; she assumes so. The only allegation she pleads in support of that connection are nondescript, selective, one-line excerpts of emails, set forth in footnotes to the Complaint, purportedly sent by Lazzara on January 30, 2017 that "[t]he tech team is looking at this now" and "[t]here was a new patch added by the Dev team." (¶ 243 & n.10, 11.) And as for Lazzara allegedly

20

referring to working with a division of ADMIS, it is clear from the face of the Complaint that High Ridge did not and could not have provided its services in isolation – it did so under an arrangement **with ADMIS**.

*Second*, Kumaran fails to plead a "strong inference of fraudulent intent," and thus, scienter on the part of Lazzara and LCI. A strong inference of fraudulent intent "may be established either by (a) alleging facts that show that the defendants had both motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Schentag*, 2018 WL 3104092, at *22 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.)). Kumaran misses both targets with only conclusory allegations concerning Lazzara's motive and state of mind. (*See, e.g.,* ¶ 79 (alleging without more that "Lazzara [and] LCI in accrual of their financial benefits, knowing[ly] deceived" Kumaran), 243 (alleging without any supporting facts that Lazzara made purported misrepresentations "to intentionally mislead" Kumaran that he was speaking to High Ridge).)

To establish motive, Kumaran intimates (but does not expressly allege) that Lazzara and LCI stood to gain financially in return for misrepresenting the true identity of High Ridge and Felag, namely, that (1) "Vision's owners" provided LCI with a "risk free credit line" to keep LCI "alive" and (2) LCI retained "the concrete benefit of being affiliated with a large brand name like [ADMIS]." (¶¶ 70–73.) Kumaran's failure to allege the nexus between these benefits and the misstatements is fatal in and of itself. *SEC v. Egan*, 994 F. Supp. 2d 558, 565 (S.D.N.Y. 2014) (Pauley III, D.J.) ("Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."). Kumaran does not even attempt to explain how Lazzara and LCI's misstatements relate to LCI's continued association with ADMIS. She does not allege, for example, that Vision Defendants had the capacity to sever LCI's

relationship with ADMIS if Lazzara and LCI failed to conceal High Ridge's presence, or that ADMIS had an interest in the concealment as well. Kumaran's allegations with regard to a line of credit are nonsensical and implausible. As best one can tell, Kumaran is merely casting unfounded aspersions upon an above-the-board, industry-wide business relationship – without objection by the NFA – by using sinister language.

To attempt to establish conscious misbehavior or recklessness, Kumaran alleges that after her initial conversation with Lazzara, he "promptly contacted Kumaran's *direct competitors*, options traders, and risk service providers, persons at the Howard Rothman, Robert Boshnack, John Felag, HRF, HRHC, and their affiliates, former disbarred Vision Financial Markets, LLC" to inform them that "a newcomer competitor was forming a commodities options trading hedge fund, which would be of particular competitive interest to them." (¶ 197.)  In this egregious lump pleading, Kumaran fails to allege **which** of the Vision Defendants Lazzara purportedly spoke to, in contravention of Rule 9(b). Moreover, the notion that any Vision Defendant and NRCM were "direct competitors" is simply counterfactual and not borne out in the Complaint itself. As discussed again below, in December 2016 when Lazzara purportedly warned Vision Defendants that NRCM and STORM sought to enter the market, no Vision Defendant operated a CTA. The High Ridge Referral Program was *not* a CTA; Kumaran's suggestion otherwise conflicts with her own repeated references to High Ridge as a "non-trading" unit. (¶ 48). VIA registered with the NFA as a CTA in 2018 in addition to its longstanding securities and stock options advisory work, but even then Kumaran fails to allege any fact to lend plausibility to her conclusory claim that VIA and NRCM were direct competitors. (*See* Arg. Sec. F.2 (noting allegations that VIA and NRCM traded entirely different commodities).)

*Finally*, Kumaran fails to allege reasonable reliance on any misstatement that ADMIS did not outsource its risk-management services. Kumaran admits that Lazzara provided her with certain disclosures. (¶ 164.) As a matter of course, this would have included the Privacy Policy. Indeed, Kumaran's Complaint makes clear that she possessed and was familiar with the Privacy Policy. (¶ 328 (stating an ADMIS employee "***resent*** a copy of ADMIS's Privacy Policy").) The Privacy Policy at that time *expressly* provides that ADMIS is permitted to share account information with third parties. The Complaint never alleges that the Privacy Policy prohibits sharing information with third parties; instead Kumaran alleges only that an ADMIS employee told her so six months *after* opening NRCM's account.  (¶¶ 327–28.)

Put simply, Kumaran's fraudulent misrepresentation claims against Lazzara and LCI rest on infirm ground.

### 2.   Fraudulent Omission

In addition to the "usual elements of fraud," a fraudulent omission claim must also allege "that the defendant had a duty to disclose material information." *Anhui Konka Green Lighting Co.*, *Ltd. v. Green Logic LED Electrical Supply Inc.*, 18 Civ. 12255 (PAE), 2019 WL 5498094, at *11 (S.D.N.Y. Dec. 3, 2019) (Engelmayer, D.J.). Because Kumaran fails to establish any such duties owed to her by Defendants, her fraudulent omission claims also fail for these additional reasons.

### i.  Vision Defendants

Kumaran claims that Vision Defendants "had a duty . . ., independently[,] not to conceal their involvement [in performing risk management services for ADMIS] from Kumaran" pursuant to the anti-fraud provisions of the CEA, 7 U.S.C. ch. 1 § 1 *et seq.* (¶¶ 66.) The CEA does not impose upon third parties a duty to make any disclosure even to an introducing broker's ***customers***; Kumaran, who does not cite to a specific provision of the CEA, does not allege any such

requirement. Nor does Kumaran allege any other independent, stand-alone duty owed by any Vision Defendant to NCRM – much less to her individually – by contract or as fiduciary. Indeed, "[o]nly a broker operating a discretionary account in which the broker determines which investments to make is viewed as a fiduciary." *Commodity Futures Trading Comm'n v. Heritage Cap. Advisory Servs., Ltd.*, 823 F.2d 171, 173 (7th Cir. 1987); *Stewart v. J.P. Morgan Chase & Co.*, 02 Civ. 1936 (MHD), 2004 WL 1823902, at *13 (S.D.N.Y. Aug. 16, 2004) (Dolinger, D.J.) ("The courts have consistently held that where a brokerage client has a self-directed account, the broker ordinary has no legal responsibilities beyond the prompt and accurate carrying out of any transaction directed by the client." (citing, *inter alia*, *Press v. Chem Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999)). High Ridge and Felag, with NFA's knowledge, performed risk management services for ADMIS; they did not exercise any authority over NRCM's trading accounts. Accordingly, the fraudulent omission claim against Vision Defendants cannot stand.

### ii.  Lazzara and LCI

Kumaran alleges that Lazzara and LCI had a duty under regulations promulgated by the CFTC, the CEA, and the rules promulgated by the NFA to disclose material aspects of ADMIS's risk management procedures, including that it outsourced those obligations to High Ridge. (¶¶ 157–59.). None of the numerous rules, regulations and statutes to which Kumaran cites actually establish such a duty, and overwhelmingly they relate to a ***futures commission merchant ("FCM")'s*** duties, not an introducing broker like LCI. (¶ 159.)[24] And although CFTC Rule 33.7

---

[24] In particular, Kumaran cites: (1) CFTC Rule 1.11, 17 C.F.R. § 1.11 (sets forth the requirements for risk management procedures ***an FCM*** must employ, and does not require disclosure of any kind); (2) CFTC Rule 1.55(k), 17 C.F.R. § 1.55(k) (lists the material information about which ***an FCM*** must discuss); (3) CFTC Rule 1.55(i), 17 C.F.R. §1.55(i) (provides ***FCMs*** "shall adopt policies and procedures reasonably designed to ensure that advertising and solicitation activities by . . . . introducing brokers . . . are not misleading to its FCM Customers in connection with their

contains an omnibus clause that requires an introducing broker "to disclose all material information to existing or prospective option customers even if the information is not specifically required," Kumaran does not allege why it would be material information that a third-party with risk-expertise is performing risk-management services for a FCM. Nor did Lazzara or LCI owe Kumaran (or NRCM) a fiduciary duty, as they were given no discretionary authority over NRCM accounts. *See Stewart*, 2004 WL 1823902, at *13.

In any event, the Privacy Policy, which Kumaran as NRCM's Managing Member received from Lazzara, ***did disclose that fact***.

### B.      Count II, Fraudulent Inducement of Contract.

Count II of the Complaint asserts a claim of fraudulent inducement of contract against Lazzara and LCI. In addition to Kumaran's failure to adequately allege fraud of any sort, *see supra* Arg. Sec. I(A), this claim also fails for a simpler reason: "in order to state a claim for fraudulent inducement, 'the person making the representation must be, or acting on behalf of, the other party to the contract. Fraud by a third party is not effective to vitiate contractual obligations.'" *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 n.3 (S.D.N.Y. 2009) (Rakoff, D.J.) (citing *Nat'l Union Fire Ins. Co. v. Worley*, 257 A.D.2d 228, 233 (1st Dep't 1999); *Navigant Consulting, Inc. v. Kostakis*, No. 07 Civ. 2302, 2007 WL 2907330, at *3 (E.D.N.Y. Oct. 4, 2007) (same). The Complaint alleges only a contract, or a series of contracts, between NRCM and ADMIS; it does not allege a contractual relationship between Kumaran (or NRCM) and Lazzara or LCI, or that Lazzara or LCI were acting, effectively, as agents of ADMIS. Thus, this claim fails.

---

decision to entrust funds to and otherwise do business with such futures commission merchant"); (4) CFTC Rule 33.7, 17 C.F.R. § 33.7 (obligates an introducing broker to, among other things, furnish customer with a disclosure statement appended to 17 C.F.R. § 1.55); (6) NFA Rule 2-26 (obligates NFA Members and Associated Persons to abide by CFTC Rule 1.55); and (7) CEA § 4(b) (prohibiting fraud in the contract or sale of any commodity in interstate commerce). (¶ 159.)

### C.     Count III, Aiding and Abetting Fraud.

Count III of the Complaint asserts claims of aiding and abetting fraud against *all* Defendants. To muster a claim for aiding and abetting fraud, a plaintiff must establish "(1) an underlying fraud, (2) the defendant's actual knowledge of the fraud, and (3) the defendant's substantial assistance to the fraud." *Silvercreeek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 482 (S.D.N.Y. 2018) (Oetken, D.J.). Because Kumaran has failed to plead an underlying fraud, this claim, too, must fail. *See supra* Arg. Sec. I(A).

### D.     Count IV, Conspiracy

Count IV of the Complaint alleges a civil conspiracy claim against all Defendants. "New York does not recognize an independent tort of conspiracy, *see Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006), but does allow a claim for civil conspiracy to 'connect the actions of separate defendants with an otherwise actionable tort.' *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986)." *ACR Sys., Inc. v. Woori Bank*, 232 F. Supp.3d 471, 478 (S.D.N.Y. 2017) (Keenan, D.J.). "Thus, a claim for conspiracy may stand only if it is connected to a separate underlying tort." *Id.* As best one can tell, Kumaran's purported underlying torts are "violations of the CEA," unspecified violations of "[f]ederal law," and fraud. (¶ 431.)  Kumaran utterly fails to make the required threshold showing. As explained above, Kumaran has failed to plead an underlying fraud because she cannot identify any misrepresentations, any actionable omission, or plead with sufficient specificity fraudulent intent. Nor can Kumaran rely on the other alleged underlying torts as she does not even attempt to plead that any Defendant violated the CEA, and the Complaint gives not even a hint as to the identity of the other "[f]ederal law" that apparently has been violated.

Accordingly, Kumaran's civil conspiracy claim fails.

E.      **Counts V & VI, Civil RICO and Civil RICO Conspiracy.**

Counts V and VI assert that all Defendants violated, and conspired together to violate, the RICO statute. 18 U.S.C. § 1962(c), (d). To state a claim for a civil RICO violation, a plaintiff must plausibly allege (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of the RICO statute. *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018) (citations omitted). The RICO statute makes it "unlawful for any person employed by or associated with an enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §1962(c). "The elements of a § 1962(c) violation thus are (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *See Buhannic v. Am. Arbitration Assoc.*, 18 Civ. 2430 (ER), 2019 WL 4735005, at *5 (S.D.N.Y. Sept. 27, 2019) (Ramos, D.J.). "Thus, claims under both § 1962(c) and (d) require that the plaintiff adequately allege *a pattern* of racketeering activity." *Id.*(citing *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 533 (S.D.N.Y.) (McMahon, D.J.). A "pattern of racketeering activity" requires a plaintiff to plausibly allege that each defendant engaged in at least two predicate acts." *Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 214 (S.D.N.Y. 2016) (McMahon, D.J.).

Kumaran's RICO claims fail because she does not even plausibly plead that each defendant engaged in but one predicate act. Kumaran has pled RICO predicate acts only in a conclusory manner, such as "Defendants each individually playing a role, engaged in a scheme with [ADMIS], Visions owners, employees and affiliates and a network of IB's from Vision, and key insiders at the [NFA], Tom Kadlec . . ., formed an association-in-fact enterprise" and "over a pattern of continuous conduct commencing from September 2014 through present" or Defendants "us[ed]

predicate acts of wire fraud, mail fraud, and fraud to steal, misappropriate and use [STORM]." (¶¶ 438–40.) Kumaran's attempt to allege other predicate acts is even more cursory, as she cites to "hundreds of other customers and CTAs" who Defendants purportedly engaged in a "scheme to fraudulently obtain accounts and conceal their ongoing enterprise," without citing a single particularized fact. These sorts of threadbare, conclusory allegations simply cannot support a RICO claim. *Palatkevich*, 152 F. Supp. at 214  ("[f]ailure to plausibly plead [a 'pattern'] alone requires dismissal").

Because a claim of conspiracy to commit a RICO violation under 18 U.S.C. § 1962(d) may stand only where a predicate violation of 18 U.S.C. § 1962(c) has been adequately plead, both Counts V and VI should be dismissed.

F. **Counts VII & VIII, Misappropriation of Trade Secrets under State and Federal Law.**

Kumaran claims that *all* Defendants misappropriated a trade secret – STORM – in violation of federal and state law. Although Kumaran has divided her claims in two, the elements of a claim of misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1) "are fundamentally the same" as a misappropriation claim under New York law, *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (Pauley D.J.), and thus will be addressed together here.[25]

The DTSA provides a private cause of action to the "owner of a trade secret that is

---

[25] The lone distinction is how "trade secrets" are defined. Because Kumaran alleges that STORM takes several inconsistent forms, *see infra* at 4 (noting Kumaran alleges STORM is a "fund," "program," "algorithm," and "strategy"), it is impossible to determine on the face of the Complaint whether STORM qualifies as a trade secret under either federal or state law.  This deficiency alone merits dismissal.  However, for the purposes of this motion to dismiss and, more specifically, for analyzing whether Kumaran has alleged a plausible (and cognizable) theory of liability for misappropriation (she has not), Defendants assume *arguendo*, and without waiver,  that STORM constitutes a trade secret under the DTSA and New York law.

misappropriated." 18 U.S.C. § 18336(b)(1). "Misappropriation" is the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent." 18 U.S.C. 1839(5). "Improper means" under the Act includes "theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy," but excludes "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6). "The DTSA, thus, contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *AUA Private Equity Partners., LLC v. Soto*, 17 Civ. 80355 (GHW), 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (Woods, D.J.).

Kumaran fails to satisfy any of these three theories of liability with respect to either group of Defendants. Indeed, she does not once allege that Lazzara acquired, disclosed, or used STORM. Rather, under her theory of the case, assuming *arguendo* it is factual (it is not), Lazzara targeted, solicited, and enabled the alleged schemes to take hold; it is not alleged that he ever acquired STORM nor is it alleged that he used STORM for his own trading purposes. Kumaran generally fails to allege that STORM's contents were disclosed.

With respect to the Vision Defendants, as best one can tell, Kumaran asserts an "acquisition" theory of liability against High Ridge and Felag, and a "use" theory against VIA.

1. "Acquisition" Theory Against High Ridge and Felag.

Kumaran's misappropriation claim against High Ridge and Felag are based on her allegations that by virtue of their role in monitoring margin levels and providing risk management services for ADMIS, High Ridge and Felag could access proprietary information she calls "STORM," and the conclusory allegation that High Ridge and Felag not only scrutinized and inspected it, but "downloaded" it onto VFM's servers.

Kumaran's failure to allege **what exactly** STORM was, **how** it was stored on NRCM's ADMIS trading account, or **how** one could access and "download" what she claims to be sophisticated and highly confidential intellectual property simply by access to a trading account, renders it virtually impossible to assess whether Kumaran's allegations regarding acquisition are even plausible. To be clear, the Complaint is simply too threadbare to satisfy the pleading requirements one must establish to successfully assert an "acquisition" theory of liability. This is not a situation like in *Soto*, 2019 WL 1684339, at *2, where a plaintiff corporation successfully pled an "acquisition theory" upon allegations that the defendant, prior to her termination, began uploading the company's proprietary files on to her personal "Google Drive" account. Nor has Kumaran pled facts similar to *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, where it was alleged that a former employee downloaded the employer's customer list to a personal thumb drive without permission. 813 F. Supp. 2d 489 (S.D.N.Y. 2011).

What is entirely devoid from the Complaint is any description of how alleged access to NRCM's trading accounts equates to alleged access and capability to download STORM. Kumaran does not allege that the code constituting, or a file containing, the STORM algorithm was stored in NRCM's accounts (or if that is even technologically possible).[26] Nor does Kumaran allege, for instance, that High Ridge had access to her own computer and files. What Kumaran is really asking the Court to believe is that High Ridge, through Felag, studied and reverse-engineered NRCM's trades based on the documents provided to it by ADMIS for risk-management purposes to crack STORM's code. (¶ 48 (alleging High Ridge "stud[ied]," "replicat[ed]," "test[ed]," "scrutinize[ed]," and "modif[ied]" NRCM's "trading strategies"). Even if it were true that High

---

[26] Kumaran does not even adequately allege that STORM is susceptible to "downloading"; as best one can tell from the Complaint, STORM could be nothing more than Kumaran's trading preferences, as opposed to some sort of computer program.

Ridge and Felag viewed NRCM's accounts for anything other than risk management services, this outlandish theory of liability, without more, cannot support a misappropriation claim predicated upon the acquisition theory. Mere access cannot serve as the touchstone of liability under this theory; there must be some aspect of control and possession of the trade secret, which is not the case here.[27] *Soto*, 2018 WL 1684339, at *6–7 (opining that "possession" as opposed to mere access is required to establish liability upon a theory defendant improperly acquired a trade secret).[28]

What is more, Kumaran fails to put forward plausible allegations that High Ridge or Felag accessed (or acquired) STORM *improperly*. As noted above, High Ridge and its Chief Risk Officer, Felag, received information about NRCM on margin reports and could view NRCM's accounts as needed to perform the requisite risk management functions for ADMIS, such as on May 12, 2017, when NRCM's margin levels fell below requisite thresholds. Indeed, by signing on behalf of NRCM its account opening papers, Kumaran did, in fact expressly consent to ADMIS outsourcing certain risk monitoring to third parties, including High Ridge, pursuant to the Privacy Policy.

### 2. "Use" Theory Against VIA

Kumaran next claims that VIA "incorporated" and deployed similar tactics to STORM in developing its own trading program, the SSP Program.

---

[27] (*See* ¶¶ 8 (ADMIS gave Vision Defendants "unlawful access to their confidential trading accounts"); 10 (Vision Defendants "acquire access to their competitor[s'] CTA's trade secrets, while simultaneously using the information"); 91 ("Vision Defendants failed to disclose their access to NRCM's accounts").

[28] Kumaran's deficient allegations regarding the uploading or downloading of STORM is equally fatal to her claims of misappropriation under New York law. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38 (2d Cir. 1999) (to adequately plead a claim of misappropriation under New York slaw, a plaintiff must show, *inter alia*, that defendant "***possessed*** a trade secret").

"[A] claim for misappropriation based on copying can be established by showing access and substantial similarity." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 15 Civ. 211 (LGS) (SDA), 2020 WL 1442915, at *10 (S.D.N.Y. Jan. 27, 2020) (Aaron, M.J.) (*quoting Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, 04 Civ. 3531 (LTS) (HBP), 2009 WL 7133660, at *19 (S.D.N.Y. Aug. 5, 2009) (Report & Recommendation) (Pitman, M.J.), *adopted in relevant part*, 2010 WL 4780772 (S.D.N.Y. Nov. 22, 2010) (Swain, D.J.)). "Therefore, a plaintiff can establish misappropriation by demonstrating either a substantial similarity between the two products or that defendant's technology is substantially derived from plaintiff's trade secret." *Advanced* Analytics, 2000 WL 7133660, at *19.

As best one can tell based on the Complaint, NRCM traded only in crude oil and gas options. (¶¶ 248, 250 (alleging NRCM traded in crude oil market)). Kumaran does not intimate, let alone aver with any specificity, that VIA traded in the same commodities (and, in fact, it did not). (*Compare id. with* ¶ 34 (alleging VIA traded in nondescript "S&P options programs").) The Complaint does not contain a scintilla of factual matter showing that STORM and the program allegedly deployed by VIA were substantially similar in any way, shape, or form. The conclusory allegations the Complaint puts forward regarding such similarity quickly cave in under even the less rigorous Rule 8 plausibility standard. (*See* ¶¶ 37 (alleging VIA "modified, scrutinized, copied, replicated, [and] incorporated a directly ***similar*** short term options program"); 132 (alleging VIA's SSP Program "also uses short term options strategies and directly competing options positions and have duplicated timeframes, positions, volumes, strikes, and execution, front-running the STORM Program[.]").)[29]

---

[29] Kumaran also attaches VIA's "Disclosure Document," but does not cite to anything therein that demonstrates that its trading strategies have been copied from STORM, in no small part because she also fails to adequately describe STORM in any manner whatsoever. (Compl., Ex. 7.)

Put simply, Kumaran asks this Court to accept her unsupported assertions that VIA engaged in similar trading as NRCM, and that VIA must have therefore copied "STORM" – whatever it may be – from NRCM's trading accounts that had been inactive for eight months, had been the subject of numerous margin calls, and had otherwise performed unremarkably. Indeed, if the term "use" as it must be interpreted for Kumaran to prevail were adopted, then there would be an immeasurably large class of commodities futures traders that Kumaran would have *carte blanche* to pursue in a DTSA action.

G.    <u>Count IX Aiding & Abetting in Misappropriation of Trade Secrets.</u>

In Count IX, Kumaran asserts a claim of aiding and abetting misappropriation of trade secrets against all Defendants. This claim is dead on arrival. "Where, as here, a criminal statute establishes what is a crime and specifies the punishment for committing the crime, it is not enforceable in a private civil action, unless Congress specifically so provides[,] because private citizens do not have the right to enforce federal criminal statutes absent specific authority from Congress." *Steves & Sons Inc. v. Jeld-Wen, Inc.*, 252 F. Supp. 3d 537 (E.D. Va. 2017) (holding that because the DTSA does not provide a private right of action for conspiracy, the court could not read such a claim into the statutory scheme). Nor does aiding and abetting misappropriation of trade secrets appear to be an independent claim under New York law. Even if such a claim were recognized, Kumaran's failure to establish any underlying misappropriation is fatal.

H.    <u>Count X, Unfair Competition.</u>

Kumaran next brings claims of unfair competition against Vision Defendants. "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either though fraud or deception, or an abuse of a fiduciary or confidential relationship." *Bytemark, Inc. v. Xerox*

*Corp.*, 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018) (Gardephe, D.J.). Kumaran claims that Vision Defendants, "using [f]raudulent misrepresentation, deceit and other morally reprehensible conduct," "wrongfully acquired [Kumaran's] competitive confidential information [STORM]" without having paid for it. (¶¶ 496–500.)

Kumaran's claim has no legs. As explained above, *supra* Arg. Sec. I(A), Kumaran's claims of fraudulent misrepresentation (and fraudulent omission) against Vision Defendants (and Lazzara and LCI) are baseless. Kumaran's assertion of "deceit" falls flat where High Ridge and Felag appropriately accessed NRCM's account information provided to it by ADMIS in order to provide risk-management services, consistent with ADMIS's Privacy Policy. And Kumaran does not allege that Vision Defendants owed her a fiduciary duty, nor could she. *See supra* at I(A).

## I.      Count XI, Unjust Enrichment.

Kumaran also brings claims of unjust enrichment against the Vision Defendants. To plausibly allege such a claim, a plaintiff "must show that '(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Graham v. Take-Two Interactive Software, Inc.*, 19 Civ. 2183 (GBD)(SDA), 2019 WL 8111915, at *2 (S.D.N.Y. Nov. 25, 2019) (Aaron, M.J.) (Report & Recommendation) (quoting *Citibank, N.A. v. Walker*, 12 A.D.3d 480 (2d Dep't 2004)), *adopted*, 2020 WL 408408 (Jan. 24, 2020) (Daniels, D.J.). "While 'a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' there must exist a relationship or connection between the parties that is not 'too attenuated.'" *Id.* (quoting *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (2007). "[T]he relationship is too attenuated if the parties were not connected in a manner that 'could have caused reliance or inducement,' or if they 'simply had no dealings with each

other.'" *Id.* (quoting *Marks v. Energy Materials Corp.*, 14 Civ. 8965 (GHW), 2015 WL 3616973 at *6 (S.D.N.Y. June 9, 2015) (Woods, D.J.)).

As an initial matter, Kumaran's allegations that VIA was enriched by STORM at Kumaran's expense are entirely conclusory. Her only averments that VIA used her trade secrets are threadbare. (*See* ¶¶ 37 (alleging VIA "modified, scrutinized, copied, replicated, [and] incorporated a directly *similar* short term options program"); 132 (alleging VIA's SSP Program "also uses short term options strategies and directly competing options positions and have duplicated timeframes, positions, volumes, strikes, and execution, front-running the STORM Program[.]").) Kumaran does not provide enough factual information for this Court to infer that VIA used STORM, let alone that VIA profited from it. In and of itself, this deficiency in pleading is fatal. *See supra* Arg. Sec. I(F).

Furthermore, the relationship between Kumaran (individually or as managing member of NRCM) and any Vision Defendant is simply "too attenuated" – indeed non-existent – for an unjust enrichment claim to lie. Kumaran had ***no relationship*** with VIA, VFM, VBS, High Ridge Holding, Felag, Rothman, Boshnack or their Family LLCs: she did not do business, communicate, or otherwise involve herself with those Defendants. Similarly, although High Ridge monitored risk on thousands of accounts for ADMIS, including NRCM's, Kumaran's failure to allege that she and High Ridge "had any dealings with each other or any sort of actual relationship" is fatal. *Marks*, 2015 WL 3616973, at *7 (citing *Georgia Malone & Co. v. Reider*, 19 N.Y.3d 511, 514 (2012)).

## J.    Count XII, Interference in Economic Advantage.

Kumaran brings claims of tortious interference with prospective economic advantage against the Vision Defendants, on the conclusory ground that Kumaran had "a reasonable

expectation of deriving income from acting as a CTA," but Vision Defendants allegedly "obstructed and otherwise irreparabl[y] harmed Plaintiff CTA's and Kumaran [sic] from fully maximizing its economic advantage as a CTA." (¶¶ 516–22.) As an initial matter, this claim relies exclusively upon purported (but unspecified) injury *to NRCM*, not Kumaran individually; as stated above, *supra* Arg. Sec. II, Kumaran cannot simply plead her way around the fact that this is a derivative claim that she lacks standing to assert. But even if this were a direct claim, it would still fail on the elements.

"Under New York law, a plaintiff suing for . . . tortious interference must prove that '(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) defendant acts with the sole purpose of harming plaintiff, or, failing that level of malice, uses dishonest, unfair or improper means, and (4) the relationship is injured.'" *Hadami S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587 (S.D.N.Y. 2017) (Engelmayer, D.J.). "[C]onduct constituting tortious interference with business relations is by definition, ***conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship***." *Id.* (emphasis added) (citing *Carvel Corp. v. Noonan*, 3 N.Y.3d 182 (2004)). Kumaran's claim fails because she does not allege any wrongful conduct directed at any third party with which Kumaran (or NRCM, for that matter), had a prospective economic advantage. *Id.* (dismissing claim on identical ground). For example, Kumaran does not even allege that any Vision Defendant communicated with ADMIS regarding NRCM's account, other than conclusory references to ADMIS as a co-conspirator. Kumaran's allegations, assuming *arguendo* that they are true (they are not), fall squarely outside the ambit of the type of conduct and injury encompassed by a claim of tortious interference, and therefore, this claim, too, must fail.

### K.  **Count XIII, Tortious Interference with Contract.**

Kumaran asserts a claim of tortious interference of contract with ADMIS against Vision Defendants (¶¶ 525–27), but does not allege that she, individually, was a party to any agreement with ADMIS. Rather, Kumaran blatantly asserts the claim on the conclusory basis she is a "successor in interest to the [agreement between NRCM and ADMIS]." (¶ 526.)

Again, Kumaran has no standing to bring this derivative claim, which alleges a contract right belonging to NRCM. *See Backus*, 2017 WL 3600430, at *16. She cannot cure this blatant deficiency through a meager allegation that she is the successor-in-interest to NRCM or an assignee. *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 92 (2d Cir. 2008) ("[A] litigant may not appear *pro se* to pursue a claim that a corporation has assigned to h[er].")

Even if this claim were direct, it still fails. "Under New York law, the elements of tortious interference with contract are '(1) the existence of a valid contract between plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of contract without justification, (4) ***actual breach*** of the contract, and (5) damages resulting therefrom.'" *State St. Global Advs. Trust Co. v. Visbal*, 431 F. Supp. 3d 322, 348 (S.D.N.Y. 2020) (Woods, D.J.) (emphasis added) (quoting *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019)). This claim fails for a simple reason: Kumaran wholly fails to allege a breach of contract governing the relationship between NRCM and ADMIS.

Kumaran's lone allegations with regard to "actual breach" are conclusory and parroted recitations of the law.[30] Kumaran theorizes that ADMIS breached its contract by farming out risk-management services to High Ridge. (*See* ¶ 348 ("As the risk management services performed

---

[30] *See, e.g.* ¶ 535 ("Defendants, willfully and in bad faith, initiated and procured breaches of the agreements and engaged in illegal activities, to materially interfere with Plaintiff[']s provisions under the agreements and cause material breaches under the agreements . . . .").

were unauthorized, illegitimate, not approved by the CFTC, they were unnecessary, unlawful, prohibited an express breach of contract . . . .")). But Kumaran cites to no contract or provision thereof that this arrangement breached. Indeed, to the extent that the agreements incorporate ADMIS's obligations under the relevant law, the arrangement is not only lawful under the CEA and the CFTC regulatory scheme, but it was known to the NFA and subject to NFA audit. Furthermore, the arrangement between ADMIS and High Ridge pre-existed NRCM's accounts with ADMIS. Accordingly, it cannot be that High Ridge – taking no further actions – intentionally procured breach of the agreement.

## L.  Count XIV, Breach of Implied Covenant of Good Faith and Fair Dealing.

Kumaran asserts a claim of breach of the implied covenant of good faith and fair dealing against all Defendants but she fails to allege Defendants are anything but **third parties** to the agreement between **NRCM** and ADMIS. The implied covenant of good faith and fair dealing "does not create duties" between parties "which are not fairly inferable from the express terms of [a] contract." *JPMorgan Chase Bank, N.A. v. The IDW Grp.*, 2009 WL 321222 (S.D.N.Y. Feb. 9, 2009) (Gardephe, D.J.)  (citing *Interallianz Bank AG v. Nycal Corp.*, No. 93 Civ. 5024 (RPP), 1994 WL 177745, at *8 (S.D.N.Y. May 4, 1994) (Patterson, Jr., D.J.)). Indeed, the implied covenant "arises out of the known reasonable expectations of the other party **which arises out of the agreement entered into**." *Id.* (emphasis added); *Trahan v. Lazar*, 457 F. Supp. 3d 323, 359 (S.D.N.Y. Apr. 30, 2020) (Woods, D.J.) Because Kumaran fails to allege that Defendants were parties to any contract giving rise to obligations to her, this claim must fail. *Ohio Players, Inc. v. Polygram Records, Inc.*, 99 Civ. 33, 2000 WL 1616999, at * (S.D.N.Y. Oct. 7, 2020) (Duffy, D.J.) (dismissing claim as "there was no contract in existence, and subsequently no implied duty."); *Kogan Law Group, P.C. v. Brace*, 20 Civ. 1012 (GHW), 2020 WL 503764, at * (S.D.N.Y. Aug.

26, 2020) (Woods, D.J.) ("[T]here can be no breach of contract claim against a non-signatory to the contract.").

### M.    Count XV, Negligent Misrepresentation/Breach of Duty of Care.

Finally, Kumaran brings claims of negligent misrepresentation against Lazzara and LCI based on the misrepresentations discussed above in Arg. Sec. I(A).  "To state a claim for negligent misrepresentation under New York law, a plaintiff must allege '(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" *Flatiron Acquisition Vehicle, LLC v. CSE Morg. LLC*, 17 Civ. 8987-GHW, 2019 WL 1244294, at *16 (S.D.N.Y. Mar. 18, 2019) (Woods, D.J.) (quoting *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014)).  Negligent misrepresentation is governed by Rule 9(b)'s heightened pleading standard.

Kumaran fails to allege that she – as opposed to NRCM – had a special relationship with Lazzara and LCI that gave rise to a duty to provide information to *her*. Moreover, for the reasons stated above, the statements identified by Kumaran either were not incorrect, not reasonably relied upon, or both. *See supra* I(A).

### CONCLUSION

For the reasons set forth herein, the Defendants respectfully request that this Court dismiss Plaintiff's Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, strike, in

whole or in part those portions of the Complaint that are redundant, immaterial, impertinent, pursuant to Fed. R. Civ. P. 12(f).

Dated December 1, 2020

Respectfully Submitted,

WIGGIN AND DANA LLP

 _/s/ Jenny R. Chou_
Jenny R. Chou
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Phone: (203) 498-4302
Fax:  (203) 782-2889
E-mail: jchou@wiggin.com

*Attorneys for Vision Financial Markets LLC; Vision Investment Advisors LLC; Vision Brokerage Services LLC; H. Rothman Family, LLC; Boshnack Family, LLC; High Ridge Holding Company, LLC; High Ridge Futures, LLC; Lazzara Consulting Inc.; Howard Rothman; Robert Boshnack; John Felag; Gerard Stephen Lazzara.*