IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMANTHA SIVA KUMARAN, | |
| Et al | Case No:1:20:CV:03871-GHW-SDA |
| *Plaintiffs,* | |
| | Related Case:  1:20:CV 03668 |
| | Related Case:  1:20:CV 03873 |
| -against- | |
| | **KUMARAN'S SECOND** |
| Vision Financial Markets, LLC | **AMENDED  COMPLAINT** |
| Et al | **JURY TRIAL DEMANDED** |
| *Defendants* | |

Pursuant to Federal Rules of Civil Procedure ("FRCP") 3, and FRCP 15, and incorporating by reference the exhibits both attached to this Complaint, and also filed on the docket in related cases,  under FRCP 10(c), and under FRCP 9(b) for heightened pleading standards of fraud and filed under the Federal RICO statute, Plaintiff Samantha Siva Kumaran ("Kumaran") *Pro-Se*, alleges for its second amended complaint  ("SAC") as follows:

## SECTION 1 -  PRELIMINARY STATEMENT

1.  By this Complaint, and as detailed in each count set out below, Plaintiff brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) misappropriation of trade secrets; and (5) unjust enrichment. The Complaint meets the detailed and heightened pleading standards of a RICO Civil complaints, with extensive details of facts and overt actions in furtherance of the fraud. Kumaran has Article III standing, is the owner of the trade secrets and the CTA/trader on the accounts.

2.   This action involves a wide-spread, fraudulent scheme, perpetuated by all Defendants and its Conspirators in related case for more than five (5) years to defraud and induce commodities futures customers (including Plaintiff) to open accounts and disclose trade secrets at ADMIS, from which they would wrongfully engage in unfair market competition and other conduct prohibited by the Commodities Exchange Act ("CEA"). This conduct includes multiple predicate acts of wire fraud, mail fraud and misappropriation in the theft of monies, property, assets, and intellectual property and trade secrets, in interstate commerce– to divert among other things property, moneys, assets, intellectual property from Victims including Plaintiffs for the illegal use, benefit and profit of the Vision Enterprise. It also pleads the improper acquisition, dissemination and use of their competitors trading records, trading strategies,

and trade secrets, tortious interference in their competitors' trading advantage, unlawful deduction of unauthorized fees from their competitors accounts.

3.   The unlawful conduct is also violation of the CEA. The predicate acts of theft, misappropriation include a ongoing pattern of concealment and fraud,  all of which are not disclosed to customers.

4.   Defendants used predicate acts of wire fraud, mail fraud and repeated violations of the Defend Trade Secrets Act, in interstate commerce, without Plaintiffs' knowledge, consent and permission, to disseminate and divert Plaintiffs' business, asserts, money and property trade secrets and competitive advantage to the Enterprise, and withdraw monies in direct unfair competition.

5.   The Association Enterprise for which Lazzara and LCI continued day-to-day fraudulent concealments, engaged in other predatory conduct, that included affirmative misrepresentations and material omissions, a sham risk services contract to improperly disclose Plaintiffs account transaction details and trades and took overt actions to harm traders – including reducing profitability on the accounts, and deflating  margin calculations to restrict trading execution of its competitors – all to procure unfair competitive advantage to Vision Enterprise.

6.    Since the trade secrets, trading strategies, and other proprietary information were disseminated to and utilized in Stamford, Connecticut, and other branch offices across the U.S., their actions violated the Defend Trade Secrets Act which provides for a federal, private, civil cause of action for trade-secret misappropriation in which "[a]n owner of a trade secret that is misappropriated may bring a civil action ,, . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §§ 1831 *et seq*.  It also constitutes a predicate act for a RICO violation.

7.   Defendants which include the owners, employees and affiliates of the disbarred FCM, Robert Boshnack and Howard Rothman and their alter-ego affiliates listed herein, operated a criminal enterprise, Vision Enterprise to secure unfair market place advantage in the futures industry after their serial-compliance-violating futures clearing merchant Vision was disbarred in 2014. They also formed an Association Enterprise, with other Defendants in this case and related cases, by which their day-to-day operations would be fraudulently concealed their ongoing market participation and used to divert moneys, asserts, property, trade secrets and other thefts from new customers and Plaintiffs. The scheme involved a network of *Vision brokers*. In the instant case, a broker called Trey Lazzara and his unregistered associate Julie Villa, located in Austin, Texas, used fraudulent sales and solicitations to

induce Plaintiffs to open a futures account, without disclosing Boshnack and Rothman's or their alter-ego's ongoing involvement and direct unfair competition.

## BACKGROUND

8.   Boshnack, Rothman and Felag are long reputed as bad actors in the futures industry. Vision Financial Market's profiles on NFA Basic Website shows the entity was subject to an extensive 172 CFTC Reparations against it as Defendant – resulting serial predatory cases brought against Vision, its management and owners by harmed customers - a firm with a serious disciplinary track record of violations, that traders, including Plaintiffs would never have chosen to do business.

9.   Also attached and incorporated by reference hereto is a synopsis of disciplinary conduct and customer complaints again Vision, Rothman and Boshnack that the CFTC provided related to about 134 of the 172 complaints, over 85% of them cited claims of "*misrepresentation*" and "*non-disclosure*" and "*unauthorized trading*" with fraudulent activity dating back to 1993. (**See Exhibit 25**)

10. In June 2014 Vision Financial Markets was disbarred and told to exit the futures clearing business (See **Exhibit 2**). In October 2014 public announcements showed it entered into an arrangement to transfer its clearing business to ADM Investor Securities (**Exhibit 1**) Unknown to Plaintiff and the public, various agreements, including G&F Agreement were executed by ADMIS, and the owners Boshnack, Rothman and a new entity High Ridge Futures on August 28, 2014. (*See* ECF58.1 in related case 20-Cv-03668). The G&F Agreements as well as black letter CEA laws, required that disclosures are made to customer and traders about the arrangements and fees being charged and expressly forbids the sharing of confidential business records. The parties were required to get

11. After being disbarred, Boshnack and Rothman simply pierced the corporate veil and formed new entities, their multiple new alter-ego High Ridge Holding Corporation ("HRHC"), which owns a shell corporation High Ridge Futures "HRF". HRHC own and operate directly competing "CTA referral business". The Vision Enterprise uses the corporate form and alter-ego to perpetrate the fraud. (*See* Section VI below).

12. On perpetrating the fraud, Vision used its alter-ego entities, to enter into several impermissible and fraudulently conceal arrangements and fee withdrawals that under the black letter law of the CEA, were required to be disclosed to be traders (and Plaintiffs) prior to opening futures accounts. The concealed arrangements included but were not limited to a Guarantee and Fee Agreement (20-CV-3668, ECF58.1)

and what is believed to be an "oral" risk services agreement, that expressly violates the CFTC Regs 1.11-1.14, and under black-letter law was required to be disclosed to Plaintiffs.  A complete list of laws and regulations that mandate disclosure includes CFTC 1.55, CFTC 33.7, 7 USC 6, NFA 2-26, NFA2-2, NFA 2-3 NFA 2-4 9005, NFA 2-37(g), 7 USC 6(b). 7 USC 13 and compliance with exchange rules for margin CME 982, 980 ,932, 930, 901, 984A  and are incorporated by reference in related complaint Ver.Fac.03668, Exhibit 16)

13. Boshnack, Rothman, Felag and the Vison Defendants then morphed their relationship to engage in new schemes to engage in unfair trade practices – this time finding new victims and customers to harm. Defendants upon encroaching on ADMIS, engaged in concealed and sham services agreements, to now gain unauthorized disclosure and acquisition to their competitors (including  Plaintiffs') trading records, transaction history, positions, trading data, "trade secrets" and acquire non-public information all their competitors (Plaintiffs') accounts, without seeking consent. Their predatory conduct includes overcharging fees  - estimated to total $10 million a year from unsuspecting customers and traders -  as well as other predatory conduct to reduce profitability and suppress performance in their trading.

14. Using alter-ego entities, Boshnack and Rothman then remained in the futures industry, essentially hiding behind the scenes of ADMIS, but continued to perform impermissible functions that were not lawful under the CEA, or under their registrations as IB"s and having being permanently disqualified and expelled. These illegal activities included (among other things) having discretionary authority on their competitor traders (Plaintiffs) transactions, withdrawing trailing fees and commission without consent, providing material rogue risk services, and violating exchange margin rules, to tamper with the CME Span, and the unlawful acquisition of non-public confidential and trade secrets of their competitors (Plaintiffs) for their unlawful gain. The Defendants used a consistent pattern of overt acts of concealment, deceit, wire fraud, theft and misappropriation, including violating the anti-fraud provision of the CEA under 7 USC 6(b).

15.  In all cases Defendants were required to disclose the activities and seek Plaintiffs consent. Instead, Defendants used well document pattern of fraud and misrepresentation, and overt acts to conceal the entire involvement of Vision Enterprise, and as alleged carefully in 20-CV-03668 the conduct was illegal and impermissible, and also put forth in the RICO Exhibit 14 and 15.

16. Supported by the disciplinary track record of Vision Defendants, no contract or commitment to abide by market place rules lasts long. (*See* Exhibit 25, Exhibit 10 and 12).

17. Shortly after being re-registered as NFA members, they quickly breached their own G&F Agreements, set up new oral and sham service provider agreements to attempt to end-around their registration requirements under the CEA, and became predators to a new class of participant- start up CTA's and traders (Plaintiffs), who are direct competitors of their HRHC CTA Referral business.

18. This time Vision Defendants have alleged that NFA were participants and authorized their violations of the rules and full knowledge of the conduct, and by failure to enforce the rules, NFA was a participant.

19. NFA's alleged involvement (brought in related case 20-CV-3668) however does not absolve Vision Defendants and LCI Defendants from their own fraud and misrepresentations, and thefts of assets, moneys, property, intellectual property and trade secrets. Defendants are independently liable for engaging in predicate acts of wire fraud, mail fraud and misappropriation to damage and divert Plaintiffs money, business and property.

20.    Since the conduct  was illegal under the CEA,  all persons engaged in active concealment, which in itself is a predicate act under RICO. Concealment of RICO predicate crimes is itself a predicate crime pursuant to 18 U.S.C. § 1961. Here many of the RICO Defendants' acts of concealment were orchestrated and directed through wire and mail communications, violations of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. §1343 (wire fraud) and misappropriation and theft of trade secrets under 18 U.S.C. § 1831 el seq using fraud, misrepresentation and deception, and, hence, instances of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) as well as through theft and concealment of the fees and itemized withdrawals and transfers to the Vision Enterprise, which as of concealment are predicate crimes as itemized in **Exhibits 14 and Exhibit 15.**

21. Since associated persons of a disbarred FCM, Boshnack, Rothman and Felag were not permitted to engage in the guarantees, margin and extension of credit on traders accounts, or act as an FCM, the sham risk agreements are illegal and void under law. Neither were they lawfully permitted to purloin monies, steal profits and acquire or obtain disclosure Plaintiffs trade secrets or non-public business records without consent and disclosures, and these constitute criminal acts under RICO.

22. Vision defendants, Lazzara defendants and their co-conspirators, have defrauded not just Plaintiffs, but dozens of other customers and CTA's, who, since September 2014, have been injured by defendants' scheme to fraudulently obtain accounts and then conceal their ongoing enterprise and association in fact to deplete profitability and damage the trading performance of CTA's that compete with Vision; unlawfully disseminate and transfer the competitive trade secrets of CTA's and Plaintiffs' to Vision, and

to withdraw unauthorized fees to Vision estimated to exceed $10 million dollars; and then to use their trade secrets in direct competition, in various CTA business arms, in and also in their own trading programs in violation the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1691 el seq. ("'RICO'"), the Defend Trade Secrets Act 18 U.S.C. §§1831 et seq, the Commodities Exchange Act, and New York General Business Law section 349.

23. The tortious acts, directed, enacted and supervised in the scheme, by Robert Boshnack, Howard Rothman, and John Felag, the instigators of the scheme, were in direct unfair competition in the commodities futures markets and have harmed Plaintiffs and other customers (a) theft and misappropriation of property and trade secrets – by improperly acquiring, disseminating and using, the confidential and proprietary trade secrets of trading strategies, records, and risk management strategies of their competitor Plaintiffs CTA's and customers, <u>without disclosure and consents</u>, for use in interstate commerce, and then, in direct competition for HRHC CTA referral services and later forming a computing CTA called Vision Investment Advisors, Inc, ; (b) theft, diversion and misappropriation of moneys, profits and fees from Plaintiffs and Victims accounts <u>without disclosure and consents</u> and (c) diversion for use and profit of Plaintiffs trade secrets, through the trading of numerous proprietary accounts under the family offices of Rothman, Boshnack and other affiliates named as defendants, used and incorporate the proprietary trading strategies and risk management strategies in direct competition;

24. The systematic Diversions of Plaintiffs business, assets, monies, property and trade secrets  to procure unfair competitive advantage of Vision Enterprise included (among other things) taking materially actions to harm their competitors CTA's  (i) deplete the performance history of their competitor CTA's, including Kumaran, to diminish their profitability of as much as 18% in return a year, by the diversion; (ii) using non-exchange *margin allowances* to create an unfair playing field; (iii) theft and diversion of trade secrets and competitive advantage which is used to harm prospective business of Plaintiffs and CTA to divert Assets Under Management "AUM" by having direct acquisition of their trade secrets, diverting capital raise away from their competitors, (iv) theft and withdrawal of unauthorized fees from the account to front load the account; and (v) theft and improper acquisition and disclosure to all their confidential and proprietary trading record for use and scrutiny in their competing HRHC CTA referral business and later VIA, and enter into direct competition with front-running trading programs.

25. The scheme, is well orchestrated to deceive small customers and traders Plaintiffs, entering the markets,  to extract an amount estimated to be over $10 million in dollars of unauthorized fees a year (over all Victims), steal and deplete the profitability of competing traders by 6-18%, and destroy the trade secrets and competitive advantage, and to divert money, assets and property to the Vision Enterprise. The fraud and deceit  has destroyed at least on of Plaintiffs' entities NRCM.

26. This conduct violates the heart of the Commodities Exchange Act, which is to protect market integrity, and to promote principles of fair and equitable trade, and promote fair market competition, and constitutes fraud and deceptive trade practices.

27. As a material part of enacting and covering up the fraud, Defendants and Conspirators claim they relied upon insiders at the NFA and NFA board members, to rubber stamp audits and not to enforce the CFTC and CEA Rules.  Defendants have stated they curried favor and utilized at least two long standing insider NFA Compliance Officers, Wahls and Kiela, and but according to Defendants own accusations, by NFA's own participation in not enforcing their rules and regulations, for which claim is brought under Section 22 of the CEA. NFA's own knowingly participated in the fraud to violated NFA Compliance Rules to permit Vision Enterprise to obtain disclosure of and acquire customers and CTA's trade secrets, confidential trading records and privacy laws, and withdraw fees without consent is a violation also of the CEA. The illegal scheme generates millions of dollars of revenue.[1]

28. Defendants and Conspirators have been able to perpetuate the fraud for over five years which started in September 2014 and mail fraud, wire fraud, and concealment and misappropriation and is the "regular way of doing business" to fraudulently conceal Vision Enterprise. The blackletter law of the CEA requires these fees, guarantees and risk services be disclosed and traders have a right to opt out.

29.  Plaintiffs fell victim to the scheme in December 2016, became suspicious that the risk services were *replete with errors and omissions*, and gross negligence, and documented margin miscalculations that violated CME Rules and it closed the account in June 2017. It then detected unauthorized fees and withdrawals exceeding $1,000 which constitute grand larceny in August 2017. It finally uncovered the fraud on September 29, 2017 when Lazzara finally admitted that an unknown entity Vision affiliates

---

[1] December 1, 2020 Vision has stated NFA signed multiple audits with knowledge of the scheme.

HRF had been involved in the account. The involvement of NFA in the scheme was later uncovered in February 2019 when Defendants passed blame on the NFA's conduct to approve the scheme.

## SECTION II -  JURISDICTION AND VENUE

30. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*. and under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831, *et seq* because they arise under the laws of the United States.

31. This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

32. This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

33. Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

34. Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Southern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred;

## SECTION III -  PARTIES

35. Vision Financial Markets, LLC is a Limited Liability Company with main offices at 4 High Ridge Park, Suite 100, Stamford, CT 06905 United States. Its membership with the NFA was terminated in or around June 2014, however it remains in operations and its recent filings with the SEC show that it is still active in business.

36. Vision Investment Advisors, LLC is a Limited Liability Company, located 120 Long Ridge Rd, 3 North, Stamford, CT 06902, United States and is a registered Commodities Trading Advisor and is a direct competitor of Plaintiffs. It is owned by Howard Rothman, Robert Boshnack and their family offices.

37. Vision Brokerage Services, LLC is a Limited Liability Company, located 120 Long Ridge Rd, 3 North, Stamford, CT 06902, United States and is a registered Commodities Trading Advisor and is a direct competitor of Kumaran, NRCM, NAM and other CTA's that were defrauded. It is owned by Howard Rothman, Robert Boshnack and their family offices.

38. John Felag is an individual and resident of Stamford CT. He provides risk management services, and CTA services and is a direct competitor of Plaintiffs. He is a principal of High Ridge Holding Corporation, that acquired, used and profited from the trade secrets hereunder. Upon information belief, John Felag is the risk manager and has power of attorney on all Vision owners and affiliates trading accounts listed as Defendants herein.

39. Howard Rothman is an individual and resident of Stamford CT. He is a principal and owns more than 10% of Vision affiliates that acquired, used and profited from the trade secrets hereunder. He provides risk management services, and CTA services and is a direct competitor of Kumaran, NRCM and NAM.

40. Robert Boshnack is an individual and resident of New York City, NY. He is a principal and owns more than 10% of Vision affiliates that acquired, used and profited from the trade secrets hereunder. He provides risk management services, and CTA services and is a direct competitor of Kumaran..

41.  Boshnack Family LLC, is a family office and trading firm located at 631 Long Ridge Rd, Unit 56, Stamford, CT, 06902 that improperly acquired, used and profited from the trade secrets of Plaintiff, and as listed on NFA Basic, owns more than 10% and has a direct financial interest in Vision Investment Advisors. Boshnack Family LLC maintains proprietary trading accounts in direct competition to Plaintiff ant is STORM Program  Kumaran.

42. H Rothman Family, LLC, is a family office and trading firm located at 4 High Ridge Park, Suite 100, Stamford, CT, 06905  that improperly acquired, used and profited the trade secrets of Plaintiff, and as listed on NFA Basic, owns more than 10% and has a direct financial interest in Vision Investment Advisors. H Rothman Family LLC maintains proprietary trading accounts in direct competition to Plaintiff and its STORM trading strategy.

43. High Ridge Futures, LLC is an Introducing Broker located at 4 High Ridge Park, Suite 100, Stamford, CT, 06906. It is wholly owned by High Ridge Holding Corporation which is its parent corporation. was incorporated in or around September 2014, shortly after Vision Financial Markets, LLC was effectively disbarred in June 2014, and by piercing the corporate veil, essentially is the same company, new name as Vision, that remains on Vision Financial Markets servers, owned and operated by Boshnack, Rothman and Felag and the same management team.

44. High Ridge Holding Corporation, LLC ("HRHC") is a Limited Liability Company located at 120 Long Ridge Road 3, North, Stamford, CT 06902. It was incorporated in or around January 2015, after

Vision Financial Markets was effectively disbarred, and wholly owns High Ridge Futures. HRHC also runs a directing completing CTA referral service. Defendant John Felag's interest is vested with HRHC, and owns over 10% interest in High Ridge Futures, LLC.

45. Gerard Stephan Lazzara also uses the name Trey Lazzara, "Lazzara", is an individual located in Austin, TX, and is the introducing broker, involved in the fraudulent conduct in this complaint and upon belief is majority owner and has dominion and control over Lazzara Consulting, Inc.

46. Julie Villa is an individual located in Austin TX. During the period July 11, 2014 until May 2015, Villa was a registered AP of LCI. During the activities in the Complaint, Villa also worked for LCI and Lazzara as a contractor and/or employee.

47. Lazzara Consulting Inc, "LCI" is a introducing broker located at 11610 Fm 2244, Suite 210 Austin, TX 78738. It operates the website TradeProFutures.com and is owned and operated by Gerard Stephan Lazzara. LCI is a former Vision broker that used to clear through disbarred VFM.

48. Samantha Kumaran is a resident of New York City, NY within this judicial district. In May 23, 2017 Kumaran became a registered member of the NFA as a Commodities Trading Advisor. Prior to that she was a customer . NRCM opened an account as a customer to trade commodities futures in January 2017.

49. Nefertiti Risk Capital Management, LLC was a single member LLC in New York, NY that was a registered CTA between May 23, 2017 and July 20, 2020 and became un-operational as a result of the fraud. It was filed to be dissolved in September 2020. NRCM was dissolved and made unviable because of the fraud perpetrated by Defendants hereunder.

50. Nefertiti Asset Management, LLC is a Delaware LLC that was formed in May 14 2018. It is a G.P. of various hedge funds and is wholly owned, managed and controlled by Samantha S. Kumaran and Nefertiti Holding Corporation. It is a CTA/CPO and direct competitor of VIA.

## SECTION IV  - VISION TRADE SECRETS

51. Samantha Siva Kumaran ("Kumaran") is a British born, US Citizen residing in New York City, NY. Kumaran earned a First Class Masters and Bachelors, in Applied Math and Theoretical Physics from the University of Cambridge, UK.

52. The Commodities Exchange Act defines and acknowledges that a traders "transaction history, trading records and trades", collectively trading strategies, are the trade secrets of a CTA. (*See* NFA 2-4, 9061). The trade secrets in this case, are the "transaction history, trading records and trades" of

Kumaran. Included in the transaction history is a difference between "end-of-day transaction history" and the "real-time transaction history"

53. Specific components that provide the trade secrets of the trading strategy, are the *type of option strategy, combination of options trades placed, volumes, strikes, premiums, delta, gamma, vega,* and *times to expiration, and the combination and integration of the foregoing*. The trade secrets also include the *timing and execution of the trades* as well as the *risk management strategies* to mitigate risk. There are very few CTA's offering dedicated short term options strategies in commodities futures. CTA's do not disclose or share their transaction records, unless specific permission or consents are granted. (*See* NFA 2-4 9061)

54. The actual composition of the trade secrets (and details of the positions) need not be made public in the pleadings stage, though it is industry standard that the details of the trades, positions, timing and execution and transaction records are trade secret and derive economic advantage in the returns they can generate.

55. CTA's usually give their trading strategies a name, which they call a trading program. This does not mean "program" in the literal sense such as software program, but the name of the trading strategy. Example of "trading programs" provided by CTA's listed in the CTA Expo publicly available brochures. Plaintiffs' name of the trading strategy is STORM, and is specifically a short term options strategy which is designed to work on Crude Oil, S&P and Gold.

56. Plaintiffs transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, formulae, compilations, programs, methods, techniques, or processes, that give them an economic advantage, and are trade secrets and are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use. of the information.

57. Plaintiffs trade secrets, include without limitation its trading strategies and risk management strategies and constitute competitive commercially sensitive information, including trade details, transaction history, trading records, trading executions, strategies, timing, formulae, compilations, methods, techniques, or processes, that give them an economic advantage and that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

58. The NFA Rules specifically recognizes a CTA's transactions records, and trading strategies as a trade secret, and that the trading strategies, and performance records of a traders and CTA fall under the definition of "trade secret".  NFA rules, including NFA 2-4 9061 acknowledge the competitive value of a CTA's transaction records, stating it is expressly forbidden for an NFA Member to obtain those records without a CTA's written permission, that NFA is required to enforce.

59. Plaintiffs have maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information. Plaintiff derive substantial economic advantage over their competitors who do not know how to use it and who do not have knowledge of it. Plaintiffs took and take reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1) limited access to confidential information; (2) requiring third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

60. The trading and risk management strategies, for the Plaintiffs CTA, were borne from substantial investment of time and significant investment, cost, time  and development by Kumaran. They were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, and to generate the options trades to give Plaintiff  a commercial competitive analytical advantage. Its competitors Vision were not able to develop these independently or successfully as is documented by their substantial prior losses in options trading for which they were disbarred, and their documented errors and omissions in risk management services.

61. A substantial investment of time, money, cost, development over a long period of time, was invested by Plaintiff Kumaran to develop the trading strategies, risk management strategies that gives Plaintiffs a valuable, unique competitive advantage to compete as a trader in the commodities futures industry and a  risk management professional. Kumaran also invested substantial capital, money and time to register as a CTA and CPO, and start commodities hedge funds under the name Nefertiti, from which to derive substantial economic advantage as an entrepreneur and small business owner in NYC.

62. At all times Kumaran has protected this information under strict Non-Disclosure Agreements, non-compete and non-reverse engineering provisions, requiring the signing of express confidentiality agreements, and protecting its use and dissemination, and further took steps to rarely disclose the information. Plaintiffs do not disclose the trade secrets, except under the express rubric of its own

restrictive non-disclosure agreement. Further Plaintiffs restrict access to all its Confidential Information on its servers, including but not limited to password access, restrictive access to drives.

63. At no time, either prior to, during or subsequent to the events hereunder did Kumaran assign ownership, right, title or interest to the IP to any person, corporation or legal entity. Kumaran in her individual capacity remains the sole owner in all IP interests.

64. Kumaran's CTA trading and risk management strategies can be summarized as quantitative commodity options trading strategies that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage, for both S&P Options, Crude Oil and Gold. Successful performance enables the investor to accumulate returns by reinvesting over a longer period, as well as take profits in shorter period. Plaintiffs fully disclosed their application to S&P Options as they launched their CTA.

65. Kumaran is also the owner and independent develop of a Top 10 award winning ETRM and risk software analytical tool, designed for commodities options and risk in the futures markets. Kumaran's extensive consulting experience in risk services spans two decades including clients such as Credit Suisse First Boston, AIG, Spectron Oil, FEA, Niagara Mohawk Energy Marketing, Nomura Securities, Manitoba Hydro, ABN Amro, JPMorgan, Duke Energy Field Services, Enron, Bristol Myers Squibb, Louis Dreyfus Commodities, Nexant, Fuji Securities, Market Arts Software, Risk Advisory Canada, Blue Rock Energy, Giro Credit, UMS Advisory and Winhall Consulting.

66. HRHC are also direct competitors in their provision of risk management services and software. HRHC and Vision affiliates are also direct competitors in options trading, run a registered CTA and CPO in direct competition with Plaintiffs, and also engaged in direct competition with a vested business interest in a HRHC CTA Referral service. NFA was required to protect CTA's from participation that invokes unfair competition requiring disclosures at all times.

67. Kumaran had never heard of Vision before entering the futures business. She was an outsider and a newcomer and like many of the other victims, new to the industry

68. During the period 2011 until present date Kumaran, is the sole owner and inventor, of trading algorithms, the STORM trading and risk  strategies, specifically designed for the commodities options markets, and are designed to give her a competitive advantage both in risk management as well as a CTA. The options modules are in direct competition with the programs that Vision was disbarred for. The STORM trading strategy offers programs in multi-commodities including but not limited to S&P

options, in direct competition to the S&P options programs offered by the new Vision Investment Advisors, LLC ("VIA"), also a CTA.

69. Kumaran's STORM CTA trading strategies can be summarized as quantitative commodity options trading strategies that seek accelerated capital appreciation in short time frames, through the active trading of exchange-traded commodity options and provide a competitive advantage. Successful performance enables the investor to accumulate returns by reinvesting over a longer period, as well as take profits in shorter period.

70. The STORM trading and risk management strategies, for the CTA, were borne from substantial investment of time and significant investment, cost, time  and development by Kumaran. They were designed and built over decades by Kumaran, and substantial time, money, research, development and highly-specialized skills, that are not easy to find, and to generate the options trades to give Plaintiff  a commercial competitive analytical advantage.

71.    In 2018, just eight months after the tortious interference and improper acquisition of the STORM trading strategies, by Vision Defendants in 2017, and their willful depletion of its trading performance by 3.45% every 60 days, (approximately 18% a year,) in direct competition, Boshnack, Felag, Rothman, VIA, Rothman Family, LLC,  Boshnack Family, LLC registered as CTA's, and are modified, scrutinized, copied, replicated, incorporated a directly similar short term options program

72.    Defendants are now using and profiting from in direct unfair competition, a directly competing short options program SSP, that replicates many of the program components, strikes, volumes, prices, time to expiration, and options types – in a directly front running competing manner – <u>only after</u> they improperly learned, acquired and fraudulently acquired from Plaintiffs in their improper acquisition of its trading history and trade secrets.

73.    Vision Enterprise together with Conspirators forced Plaintiffs to close its account in 2017. In March 2018 Vision Investment Advisors registered as a CTA to offer its directly competing SSP program. Nefertiti CPO to launch STORM just registered in September 22, 2020 after being set back several years by the fraud.

74.    After review of dozens of CTA program, only a very small number offer similar short options trading program in the futures markets. STORM also offers S&P, Crude Oil and Gold.  VIA, Boshnack, Rothman, RF, BF, and its alter-egos only conceived, launched and released their CTA, after the improper

acquisition of Plaintiffs trade secrets directly competing in the same space and now front running their program just eight months after taking hostile actions to damage Plaintiffs.

75. Plaintiff includes by reference Section IV on Trade Secrets ¶26-¶57 that was filed in related Complaint 20-CV-3873 and attached as Exhibit 17 to the extent not included herein.

## SECTION V - -HOW THE SCHEME WORKS

**76.** The Vision Enterprise, which is owned and controlled by Boshnack and Rothman, the same owners of an FCM Vision Financial Markets, LLC ( a disreputable FCM with a litany of compliance violations) that was supposed to be "disbarred", for bad faith and predatory conduct, have engaged in a predatory scheme, starting in September 2014 – and ongoing, and have and are using a series of sham, illegal and undocumented risk service agreements, and improper breaches and illegal terms in a G&F Agreement, that gave them the ability to "secretly" place individual guarantees on their competitor traders accounts and then use them to overcharge excessive unauthorized fees to suppress their performance, and tamper with their account and divert and obtain their competitors trade secrets transaction records, while not seeking traders consents,

**77.** Defendants willfully engaged in fraudulent market participation to conceal their agreements to gain unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis **and** to their competitors accounts.

**78.** They engaged in other wrongdoing  - including purloining moneys and fees without consent, depleting their competitors performance, tampering with the margin outside of CME Exchange rules, exert discretionary authority on their ability to place traders, and misappropriating/diverting their moneys, and property to divert  it to the Vision Enterprise.

**79.** As a result they have and do engage in unfair trade practices, and to steal monies, asserts property, intellectual property and trade secrets, to divert business and competitive advantage to obtain and unfair competitive advantage to the Vision Enterprise.

80.    Commencing in or around November 2014 and continuing until present date, the RICO Defendants (defined below), each individually playing a role, engaged in a scheme with ADM Investors Services, Tom Kadlec, and key insiders at the National Futures Association, named as Defendants in related cases 20-CV-3873 and 20-CV-3668, called herein "Conspirators", over a pattern of continuous and ongoing conduct, formed an association-in-fact enterprise (the "Enterprise").

81.    The Enterprise carried out and continues to carry out a multi-year fraudulent scheme by which they stole monies, purloined funds, assets, intellectual property, confidential and proprietary information, and trade secrets, depleted their competitors performance, and engaged in other tortious acts to divert business opportunities,  diminish their competitors and divert their assets and property away from the businesses and livelihoods of customers,  traders, CTA's and Plaintiffs collectively the "Victims".

82.    They diverted first to HRF (wholly owned by HRHC) and Felag who used secret guarantee agreements from Boshnack, Rothman and HR, and *sham* illegal oral risk services arrangements, not permitted under the CFTC Regs to improperly overcharge fees and reduce profitability of the Victims, and to improperly acquire their competitors trade secrets accounts, tamper with the margin on their accounts, extend and reduce credit, and purloin monies profits and fees without Victims and Plaintiffs' consent. ("Diversions").

83.    All the foregoing not only violated common law and federal law, thefts and misappropriations, they conduct was also illegal under the CEA. The scheme was perpetrated without compliance with the black-letter laws of the Commodities Exchange Act and CFTC Rules for which many of the RICO Defendants purported to be members, bound by strict anti-fraud and participation rules. (See Ver.Fac.3668) They then diverted the misappropriations, thefts, of business, property to Boshnack and Rothman and the trading arms of Vision RICO Entity Defendants who converted, used and profited from the stolen property to benefit HRHC CTA Referral service and launched directly competing businesses VIA and other Vision RICO Entity Defendants RF, BF, VBS, VFM as outlined in Section VI below.

84. The details of how the scheme came about, which are common facts to the Complaint are included by reference the Sections 1-9, Section 14 of the NFA Verified Amended Complaint, attached hereto as Exhibit 16  and the G&F Agreements (20-CV-3668, ECF58.1) filed in the related case 20-CV-3668.

## SECTION VI  – VISIONS CORPORATE UMBRELLAS
## A- USE OF CORPORATE FORMS TO CREATE ALTER-EGOS

85.  After Vision Financial Markets, LLC ("VFM"), was effectively disbarred as an FCM from the futures industry Boshnack, Rothman and Felag, used an array of shell corporation and alter-egos LLC's and use their corporate form to remain in the futures business, and perpetuate the schemes alleged herein.

86.  First they set up a "front end corporation" called High Ridge Holding Corporation "HRHC", wholly owned and controlled by Boshnack and Rothman, which public records show the simply transferred all the futures business from VFM by virtue of a Settlement Agreement under which they paid NFA $1.5 million dollars. (*See* Exhibit 11, Pg. 54)

87. VFM simply changed its name to HRHC, and transferred its business to a new entity with a difference name.  Boshnack and Rothman then created other alter-ego and shell LLC's to now try to register as an Introducing Broker. This second LLC was and is called High Ridge Futures, LLC ("HRF"). Public disclosures filed in this docket also show that HRF is a wholly owned subsidiary of HRHC. (*See* ECF39).

88. This type of registration as an IB, prohibits any participation as an FCM, to either margin, extend credit or guarantee accounts. *See* VerFac.03668 ¶98-¶104 has pled in detail that the registration of Boshnack, Rothman and Felag, was permanently revoked to ever participate again as FCM's.

89. To achieve the objectives of the scheme, which included improper market participation by Boshnack, Rothman to continue to "guarantee" traders accounts, and extend margin and credit, and also to provide the sham risk services through HRF, that were expressly prohibited under CFTC Reg 1.11, Boshnack and Rothman set up other corporate form LLC's so that the fraudulent and illegal conduct could go undetected and to acquire substantial unfair commercial benefit to their alter-ego commercial entities.

90. Even though new entities were formed, listed as defendants in the Complaint, Rothman and Boshnack are the dominant persons that own and control all the companies. In order to perpetrate a fraud on the markets, VFM, that remains in existence, still remains a dominant entity that owns, controls the infrastructure, office space and computer networks that all Vision alter-egos rely upon in their day to day operations.

91. Boshnack, Rothman and Felag use the corporate forms of the different LLCs, to perpetrate the fraud and illegal and unfair trade practices on the market, to shield liability from the numerous trading corporations that would acquire and use and profit from the misappropriated trade secrets, and misappropriated information from its competitors CTA's.

92. The common control and ownership of Rothman and Boshnack is also publicly reported in FINRA "Common Control" disclosures - which mandate companies disclose all their related entities - the almost seamless operations, between the several Vision defendants shows that all affiliates operate from the same address 120 Long Ridge Road, in Stamford CT, and states that Vision Financial Markets, LLC ("VFM"), Vision Brokerage Services, LLC ("VBS"), Vision Investments Advisors, LLC ("VIA"), and High Ridge Futures, LLC ("HRF")  (*See* Exhibit 11, Pg. 22)

93. All the alter-ego corporations listed as Vision Defendants herein are solely owned, controlled and dominated by Boshnack and Rothman. (*See* Exhibit 11, Pg22)

94. The numerous alter-ego entities are also identified on Exhibit 11, Pg54 whereby the VFM discloses that it transferred all its customers through a process of restructuring to a holding corporation, High Ridge Holding Corporation, LLC ("HRHC") and the directly competing CTA Referral business. Therefore these corporate entities, are almost indivisible in purpose, operations, and with absolutely no firewall between the risk and trading activities, and essentially operate as a single entity.

95. The Rule 7. 1 Corporate Disclosure Forms filed in this action on December, 9 2020 (*See* ECF38) states that High Ridge Futures is a wholly owned subsidiary of High Ridge Holding Corporation. Because Boshnack and Rothman also own HRHC, NFA's website list all three Boshnack, Rothman and HRHC as the owners of HRF. (*See* Exhibit 17)

96. Boshnack and Rothman are both were associated persons and the sole owners exerting dominion and control of Vision Financial Markets, LLC and its reincarnated entity High Ridge Holding Corporation, LLC and HRF.

97. Even though on paper VFM was told to exit the futures business, Vision Financial Markets, LLC is still in existence and operation, continues to be subject to other fines and grievances of misconduct from the SEC[2] and CFTC [3]and is also wholly owned, controlled and dominated by Howard Rothman and Robert Boshnack. It still maintains the firm's operations, and most recent SEC filings show-it maintains headquarters, computer assets, networks, servers, and other business operations, which are shared with its affiliates, all affiliates named in this Complaint upon which the trade secrets and other financial compensation alleged in this complaint.

---

[2] https://www.goodetrades.com/2019/04/sec-fines-clearing-firm-vision-financial-markets-llc-625000-for-failures-to-file-sars-about-penny-stock-deposits/
[3] https://www.cftc.gov/PressRoom/PressReleases/7973-19

## Material Conflicts of Interest in Competing Business as HRHC CTA Referrral

98. HRHC also has directly competing businesses in its CTA Referrral business. Public NFA documents have also admitted "A substantial part of Vision's business involves recommending commodity trading advisors ("CTAs") to its customers." *(See Ver.Fac.03668* Exh2 Pg.3 ¶7). HRHC therefore then owned and acquired by virtue of the restructuring a directly competing CTA Referral business.

99.  It was clear that HRHC had a primary competing CTA Referral line of business that put them at substantial conflicts of interest in any improper disclosure or acquisition of other CTA's trading records. Since they were now disbarred and permanently expelled from ever operating as an FCM again, their revenue stream was now focused on a competing CTA business which was run by HRHC.

100.   HRHC is essentially the reincarnation of Vision Financial Markets, LLC, ("VFM") who perpetuates the conduct, as it is guarantees trades and performs essentially the same functions VFM did, but operating behind the scenes, and through its owners.

101. However the purpose of the various alter-ego LLC's entities and the corporate form was for Boshnack and Rothman to perpetuate the fraudulent scheme, which was deliberately unfair to other traders and customers as it involved using one set of LLC's to engage in sham services (such as the impermissible under Reg 1.11 risk services agreement through its wholly owned subsidiary, HRF) and then transfer the thefts and property to other LLC's which would then use and profit from them.

102.  In order to conceal the conflicts of interest in HRHC's real business revenue line, which was in the CTA business, they set up further alter-egos and shell LLC's – this time another called High Ridge Futures, LLC. ("HRF").  It was HRF's name, by use of the corporate form, that would appear on various contracts and documents, such as the G&F Agreements (ECF58.1). The G&F Agreements, were also individually guaranteed by Boshnack and Rothman who directed and controlled the "enterprise" of corporate forms, using agreements under one arm of the enterprise, to funnel an unfair competitive advantage to the alter-ego LLC.

103.    Boshnack and Rothman used the various alter-ego LLC's to create injustice, fraud to propagate unfair trade practices and illegal conduct which included (i)  setting up sham services agreements in one of the LLC's to wrongfully and improperly acquire trade secrets and then transfer them to the other alter-ego's (ii) use their secret and concealed *individual* guarantees on trader accounts, to gain an unfair competitive advantage and monopoly in their alter-ego businesses – namely the HRHC CTA referral business well as their prop trading activities either in their own accounts, or those of RF, BF, VIA or

other alter-egos; (iii) obtaining unfair and illegal fees from customers and traders account, without their knowledge and consent to both reduce their profitability and again create inequity – amounts which were used to fund the Vision Enterprise, estimated to be $10 million a year; (iii) use tampering with the performance of their competitors performance and track record – again illegal; (iv) interfering with the margin activities to reduce competing CTA"s ability to compete also violating CEA rules; and (v) and improperly acquiring their competitors non-public confidential and trade secret information, and Plaintiffs trade secrets to perpetuate fraud. (*See* also Exhibit 16)

104.    The inequity and injustice was deliberate, as Boshnack and Rothman used the shell corporations and alter-egos to fraudulently acquire an unfair competitive benefit, and transfer the illegal benefits from HRF (a wholly owned subsidiary of HRHC) to the other affiliates which are "trading arms'". They also used the corporate forms, for other inequitable purpose – to continue to operate in a prohibited form in the futures industry and to be compensated without the necessary registrations as an FCM or consent from customers and traders, and therefore to perpetuate a fraud, injustice and inequity, essentially continuing as Vision did, but  concealed and behind the curtain – white-labeled as ADMIS. This conduct is illegal and fraudulent.  (*See* Ver.Fac.3668, Section 11)

105.    This activity required customer and traders consents, and the perpetrators failed to obtain those consents.

106.    Further the corporate form of "HRHC was used to perpetuate a scheme of fraud, by which Boshnack, Rothman and Felag could remain in the futures business, and operate "behind-the-scenes" of another FCM, ADMIS - without registration – yet perform most of the same functions that are only permissible under an FCM registration – and use HRF as a front person to execute contracts. HRHC also would use the corporate structure, to maintain a directly competing businesses as a CTA referral business – without disclosing it.

107.    Therefore HRHC and HRF for purposes operate as a single economic entity, where HRF obtains and facilitates the wrongdoing and injustice, and HRHC, Boshnack and Rothman improperly acquire and transfer the benefits to either the Vision alter-egos HRHC CTA referral business or the trading arms, the other alter-ego entities.

108.    However, by virtue of the G&F Agreements, which were also executed individually, and the necessity for Boshnack and Rothman to place individual guarantees and act, as a quasi-FCM, behind the scenes, securing margin and extending credit on traders accounts activity that was expressly forbidden

under the rules of the CEA) – they created other alter-ego LLC's to perpetuate the fraudulent and illegal activity.

109.    Boshnack and Rothman's dominion, ownership and control is also individual guarantors of the obligations to secure the traders (including Plaintiffs accounts) in the G&F Agreements (See ECF58.1).

110.    Even though wholly owned by HRHC, HRF was used as the front façade on the G&F Agreements and the sham risk services agreements – again to perpetuate the fraud and illegalities in the market place.

111.    The façade of corporate form between the commonly owned corporate entities was also designed to give Boshnack and Rothman an unfair and illegal competitive advantage, and perpetrate a scheme to harm other CTA's, traders and customers, including Plaintiffs entering the futures business, and to maintain an unfair monopoly of the Vision Enterprises' interests in the trading place.

112.    The scheme involves intentional fraudulent and illegal conduct to conceal both the G&F Agreements and the rogue risk services agreements, so that HRF (owned by HRHC) and Felag can acquire the competitive information, and also engage in predatory conduct to harm competing traders accounts, and perpetuate an unfair commercial advantage to HRHC (at the expense of other traders).

113.    Since the conduct knowingly violates the CEA Defendants intended to engage in fraud and deceit to conceal the activities from customers and Plaintiffs. This conduct also violates their market participation rules and registration rules, and express rules of the CFTC and CEA.

114.    HRF also relies upon the individual guarantees of Boshnack and Rothman to perpetrate the scheme. The reliance on "individual guarantees" in ¶2.2. and Exhibit B of the G&F Agreements,  further supports that corporate form is under-capitalized and relied upon the Boshnack and Rothman personal contributions which penetrates all the corporate entities.

115.    The fraudulent acquisition rely on the improper in the G&F show that they rely upon capitalization of the owners Boshnack and Rothman however was both a new and an under-capitalized wholly owned subsidiary, that would be the name sake on the agreements, the contracts show that it was also undercapitalized, is that the actual credit and guarantees and financial substance of the guarantees and fees needed to come from Boshnack and Rothman individually.

116.    If HRF had its own capital or sufficient capital it would not have needed Boshnack and Rothman's individual guarantees. Therefore ¶2.2 of the G&F Agreements and Exhibit B, are material to the use of the alter-ego corporate forms to perpetrate the fraud and injustice and Boshnack and Rothmans' dominion and control over the enterprise

## B - HOW THE SCHEME WORKS OF MISAPPROPRIATION

117.    The purpose of the separate alter-ego- entities, was to facilitate the fraudulent transfers of intellectual property. competitors' information and trade secrets from one entity to the other, so that the "entities" using and profiting from the misappropriation, owned and controlled by Rothman and Boshnack are not same as those on the names of the contracts that illegal acquire or manipulate (r deplete the performance of their competitors). It was also done to conceal the directly competing activities of the parent corporation HRHC and its CTA referral service, and the trading arms of VIA, BF, RF, VBS, VFM, from the clearly unlawful tampering with other CTA and customer accounts.

118.    With full knowledge of the fraud, misappropriation and concealment to the customers and CTA's, using Felag as the front person to perpetuate the day-to-day operations of the scheme, Boshnack, Rothman used corporate servers – which remained in the name of Vision Financial Markets – vfmarkets.com – to transfer, download, transfer, copy, replicate, study and illegally misappropriate their competitors trade secrets, after having granting server sharing to by the same perpetrators of the fraud alter-egos – and then  use and profit in the direct unfair competition.

119.    By operating entities, with  different names, but with the same personnel, computers, servers, platforms, tools, software and key personnel who are executing risk and trading, the various entities are simply "alter-ego" and shell-corporations sharing the same infrastructure to knowledge and information of Boshnack, Rothman and Felag, with no distinction in "decision makers" on the human resources, and running as stated supra directly conflict businesses in the CTA and trading space, making substantial revenue from the trading arm, between affiliates.

120.    The purpose of this scheme was simple – to use the alter-ego corporate forms and enterprise, to perpetuate criminal activity and to transfer, steal, and improperly acquire the assets, property, trade secrets, funds, moneys of its competitors, and other traders, without their knowledge and consent – generating unlawful revenue of over $10 million a year, and also stealing their trade secrets so they could convert their use for Vision Enterprises improper commercial advantage, including later use and profit in their competing CTA's businesses.

121.    All these actions created an unfair economic advantage and anti-trust market participation to Boshnack, Rothman, Felag, HRHC and its trading affiliates,  hile simultaneously engaging in other wrongful acts – uploading, downloading, studying, copying, replicating, analyzing, testing, scrutinizing, dissecting, using, modifying, incorporating the misappropriated trading strategies.

122.   These are material conflicts of interest, that were required to be disclosed by Lazzara as the registered broker and Rothman, Boshnack and Felag on conditions of their registration at the NFA. Among other CEA rules, LCI, Lazzara, Rothman, Boshnack, Rothman had a duty to not deceive any customer in any manner  (*See* 7 USC 6(b), NFA 2-2) and their own G&F Agreements, required disclosures and consents be acquired.

123.   The alter-ego and reverse-corporate veil piercing was intended and designed to perpetuate the fraud on the Plaintiffs and customers, to shield the alter-ego entities, the "trading profits centers" – Vision Investment Advisors, LLC ("VIA"), Vision Brokerage Services ("VBS"), Vision Financial Markets, LLC, Rothman Family, LLC, Boshnack Family LLC and the individuals who perpetrate the scheme, Boshnack, Rothman and Felag who then improperly used, incorporated, replicated, studied, adapted, for their profit and benefit in trading, where they are directed to the "trading centers".

124.   Under the scheme, the "non-trading" units, HRF, HRHC, Felag, Boshnack and Rothman, would improperly acquire "real-time" acquisition and disclosure of Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis and disclosure and acquisition of the details and inner workings of execution of their competitors' CTAs trade secrets.

125.   The entities that "acquire" the trade secrets, are specifically not listed as trading divisions, but the same individuals using the alter-ego other affiliates, dominated by the same individuals, Felag, Rothman and Boshnack run estimated to be over $250 million dollars of prop trading funds and/or customer funds, through the other LLC's, namely Vision Investment Advisors and also Vision Financial Markets, LLC and also direct and control the trading affiliates and the directly competing HRF CTA Referral business, which is a substantial revenue.

126.   Once the trade secrets are improperly acquired, they are downloaded and transferred onto the same computers and servers and other office infrastructure of VFM which are shared  with the other affiliates. Upon information and belief, the primary computer network and server, that maintains and download the misappropriate the trade secrets, is owned and controlled by VFM, the original entity that was disbarred, but is still in existence, participating and perpetrating the fraud on the use of its computer servers and networks.

127.    The transfer happens once the trade secrets, trading statements, positions are improperly disclosed, downloaded and converted by HRF (Owned by HRHC) and Felag, onto the Vision Financial Markets servers.  The trade secrets are then with HRF and Felag's possession and control to perform additional risk analytics, including those on proprietary systems, many of which were shown not to be in compliance with CME Span, demonstrating that they were unlawfully transferred.

128.    In addition Vision obtain "real-time" disclosure granted to the trading platforms being used by their competitors, for unlawfully Rothman, Boshnack and Felag to also execute "voyeurism" on their competitors real-time disclosure of trading execution, watching behind the scenes. This is the highest level of trade secret misappropriation and being able to gain disclosure to competitors real-time execution.

129.    To facilitate the fraudulent scheme, and misappropriate the trade secrets, and create inequity in the trading market place, the day-to-day operations and improper acquisition is conducted through both HRF and by an individual John Felag, who is actually employed by another shell operation High Ridge Holding Corporation, LLC ("HRHC") and lists himself, depending on which corporate brochure or disclosure documents, as the risk manager and director of all the Vision affiliates, including Vision Investment Advisors, Vision Financial Markets, High Ridge Holding Corporations,  H Rothman Family Office, Boshnack Family Office, LLC and Vision Brokerage Services, LLC and High Ridge Futures, LLC, to shield liability.

130.    The scheme works so that the trading arms of Vision, unlawfully procured an unfair trading advantage and commercial advantage to the Enterprise, all without the customers, and traders and Plaintiffs knowledge and consent.

131.    After unlawfully acquiring, dozens of their competitor CTA's trading strategies, including but not limited to Kumaran's STORM trading strategy, and illegally acquiring all the inner workings of their trades, transaction details, trading records, and risk management procedures, all considered trade secrets, VIA, Boshnack, Rothman, Felag, RF, BF, HRHC, VFM, VBS, and the other trading arms, then used, incorporated, profited and procured other leverage and benefit from them, for their own use of their own competing operations in their directly competing CTA, provision of risk management services,  and competing trading books, in direct competition with  Plaintiffs.

132.    The entities that profit and use from the misappropriation trade secrets, are HRHC, VIA, VFM, their owners Boshnack, Felag, Rothman, Rothman Family, LLC and Boshnack Family, LLC. With

scienter on shielding liability and using the corporations as a scheme HRF does not maintain trading arms, and its key role is as the misappropriator  and acquiror of the trade secrets.

133.   The same personnel, Felag, Rothman and Boshnack, (and potentially other employees), the misappropriators who use these guarantee agreements and sham risk services agreements, <u>that do not obtain traders consent,</u>  and do not comply with the black letter of the law of the CEA to disclose the risk services, fees and guarantees, to then illegally, using fraud deceit and misrepresentation, to improperly acquire their competitors trading strategies, have Power of Attorney on the Vision Investment Advisors accounts, as well as on other RF, BF, VFM and VBS, including but not limited to all Vision defendants named herein, and their family office proprietary trading accounts.

134.   The Vision Enterprise would also use the corporate form of the alter-egos to create other market place inequity and injustice to traders. HRHC, Boshnack and Rothman, through direction of Felag and HRF. then actively engaged in other morally reprehensible behavior to harm their  competitors, including but not limited to (a) charging and front loading excessive fees, impermissible under the blackletter law of the CEA and undisclosed and unauthorized by traders (as was experienced in Plaintiffs account on May 2, 2017 to front load its competitors CTA's strategies; (b) depleting the profitability of their competitors accounts by 6%-18% a year with tampering with their fees, willfully and maliciously took actions to reduce their competitors and CTA's performance record; (c) using non-exchange compliant margin rules and violating the CME Span (as was experienced in Plaintiffs account on ay 12, 2017) and taking other deliberate action to interfere in their economic advantage, including violation exchange margin rules, and otherwise impede their ability to transact in the markets

## C – ALTER-EGOS HAVE NO FIREWALL OR SEGREGATION OF DUTIES

135.    The fraud and injustice and inequitable market competition occurs, as HRF and HRHC are being used a corporate shell, to propagate the anti-competitive trading activities in direct competition with the alter-ego affiliates. There is a clear lack of firewall or segregation of duties between the core officers who conduct "risk management" and the "trading operations" of the trading entities. As is industry standard, when corporations have departments that engage in competing activities with conflicts of interest, there are strict firewalls and segregation of duties between the employees and servers of the competing business units.

136.    The failure of HRF and HRHC to have implemented any segregation of duties or distinct corporate employee roles with a firewall between the "trading arms" and "risk management" services a high degree of moral turpitude and failure to perpetuate the fraud with material conflicts of interests.

137.    Given the complete overlap in management, executives, directors, ownerships and decision makers in risk management and traders of Howard Rothman, Robert Boshnack and John Felag, there can be no firewall, and no segregation of duties, and there exists a complete lack of separation from the trading entities and affiliates, and the HRF shell corporation, which is being used to improperly acquire and steal customers' and CTA's trade secrets, and confidential information.

138.    Because of the lack of segregation of duties between employees, officers, directors and managers, and computer systems, network servers, backup-servers, and office facilities being shared, between the so-called different "arms" of the Vision alter-ego affiliates, it was rendered completely impossible to maintain any segregation of duties or firewalls of independence between information improperly acquired by one entity and another.

139.    All the corporations operate out of the same address, same office space, share the same human resources, have the same executive management and decision control, namely the main individual perpetrators John Felag, Howard Rothman and Robert Boshnack, and most importantly they all share the same network infrastructure and mainframes, and webservers, all of which are owned and controlled by Vision Financial Markets, LL C("www.vfmarkets.com")).

140.    With the exact overlap of ownership, directors, officers and personnel, common office space, address and telephone numbers, dominion and the same discretion in management by Felag, Rothmand and Boshnack, the complete absence of arms-length dealing, and the coincident personal guarantees of debt and obligations by Rothman and Boshnack on the "acquisition of trade secrets  contracts, and most importantly, the same computer servers and laptops and hard-drives that are shared and used between the individuals and entities and affiliates as a single Vision entity, is a material conflict of interest.

141.    The Enterprise perpetrates the fraud whereby HRF (behind the scenes owned by HRHC) and Felag are the front persons of the scheme to engage in the improper acquisition of customer accounts but Felag works simultaneously for all other alter-egos and both Felag and HRF's acquisition

142.    Another linchpin of the fraudulent scheme is the shared office and infrastructure. Since corporate form of a scheme is a façade to facilitate the scam, they all share the same office space, the same

ownership structure, the same officers, executives and principals, the same accounting firms, the same and most importantly the same servers, facilities, servers, networks, computers, employees, back-up drives, and other primary office infra-structure. Once the trade secrets are improperly acquired they are transferred, copied, uploaded, downloaded using interstate wires onto servers, owned, controlled, and remote hosted by Vision Financial Markets, LLC. operated and owned by High Ridge Holding Corporation and Vision Financial Markets, LLC.

143.    Through a network of file sharing, and corporate veil piercing, all Vison Defendants in this complaint, and affiliates, including those that operate directly competing trading arms, namely Vision Investment Advisors, H Rothman Family Office, Boshnack Family Office, High Ridge Holding Corporation, High Ridge Futures, and the individual named individually as Defendants, wrongfully acquire illegal and unfair competition benefits for the Vision Enterprise to deplete Plaintiffs and their competitors rights to fair market access.

144.    Further, there is no firewall of sharing of human resources and personnel between the trading defendants and the multiplicity of corporate entities, all veil pierced by Rothman and Boshnack. The very same key individuals, John Felag, Robert Boshnack and Howard Rothman, oversee, direct, control, operate and execute decision making on all the Vision affiliates and cannot execute a firewall between their own simultaneous duties.

145.    Felag, the key individual for improperly acquiring Plaintiff's trade secrets, also engages in directly competing trading and risk management activity for  Felag is also simultaneously employed as risk management by Vision Financial Markets, LLC, H Rothman Family Office, LLC, Boshnack Family Office, Vision Brokerage Services, LLC and the other trading arms. Felag upon information and belief also trades his own proprietary funds. Felag's publicly listed profile admits his dual role, between the non-trading arms and also the trading arms, rendering an absolute and material conflict of interest stating "Mr. Felag is responsible for risk management for both customer and proprietary trading activities".

146.    Simultaneously, Felag also works for Vision Financial Markets, LLC and also has a management role in Vision Investment Advisors, LLC (a directly competing Commodities Trading Advisors, and also as publicly listed "directs" prop trading for his own funds, as well as the H Rothman Family LLC, and Boshnack Family LLC, and the numerous "HRF CTA Referrals"which as acknowledge supra, is a significant part of the Vision umbrella business.

147.    Felag, the key individual, who perpetrates the fraud and misappropriates the trade secrets, is (simultaneously listed as working for entities HRHC, HRF),is also listed as an employee of VFM, VIA and other entities. Therefore there is no separation in the operations of employees, officers and directors.

148.    For example, and without limitation, John Felag is still currently listed as Chief Risk Officer for Vising Financial Markets, LLC with shared emails with High Ridge Futures, and simultaneously his employment and vested financial interests is with High Ridge Holding Corporation, vested with the management authority. His shared roles and resource also directly impacts trading on Rothman Family, LLC and Boshnack LLC and Vision Brokeage Services, and Felag is responsible for risk management for both customer and proprietary trading activities, which includes decision making authority on all Vision defendants trading activities.

149.    Felag was also the key individual and employee responsible for the improper acquisition of Plaintiffs and all CTA's in this Complaint, and has shared duties, with all Vision defendants. Upon information and belief, all trading strategies and risk management strategies are shared on the same infrastructure, servers, networks and computers, used and disseminated by shared capital and human resources by all Vision affiliates, who have a vested trading interest. with trade secrets improperly obtained by the same key personnel in directly competing activities.

150.    HRF, Rothman, Boshnack, Felag, HRHC the key "persons" or perpetrators of the fraud and misappropriation, not only had common law duties under both State and Federal to not steal, and violate Plaintiffs property, trade secrets and business rights, they were also registered brokers,.and had duties to comply with the statutory obligations under the Commodities Exchange Act.

151.    CFTC and NFA rules, among other things expressly prohibit registered members from acting in a manner to cheat and deceive customers in any manner whatsoever (NFA 2-2 NFA 2-24 and 7 USC 6(b). The CFTC sets forth clear standards for the conduct it deems unlawful. (e.g. 7 USC 13)

152.    As incorporated by reference from Ver.Fac.03668 ¶359-¶415 Section 11, the conduct of the registered member Defendants, Rothman, Boshnack, Felag, HRF and VIA, was illegal. For the non-registered members, they acted in conspiracy to use the alter-egos, to perpetrate the sche,e

153.    HRF, Boshnack, Felag, HRHC Rothman, knew they were direct competitors, and/or ran a directly competing HRHC CTA Referral business, knew there were material conflicts of interest, knew their conduct violated the express rules of the CEA and as described herein, persistent, and repeatedly acted with scienter to deceive, and conceal their tortious interference and wrongful gained unauthorized

disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis.

154.    NFA rules **_not_** to disclose a competitors trading accounts and transaction records without their authorization and consent. Therefore Boshnack, Felag, Rothman, HRF, HRHC and VIA the frontline misappropriators also had independent affirmative statutory duties to disclose their involvement in Plaintiffs' account as a CTA, and seek directly Kumaran's request.

155.    As discussed above, the shame, and oral rogue, risk services agreement, which permitted HRF to acquire its competitors trading strategies, is also in violation of the exchange rules, is not documented or disclosed in the RMP as mandated under the CFTC rule 1.11 and allows for unauthorized margin and credit activities, discretionary authority, all of which were fraudulently concealed, and all parties, had a statutory obligation, to disclose this authorization.

156.    Moreover the black letter law required the they disclosed to Plaintiffs there extensive fees, and also their provision of risk services, and not engage in any conduct that is considered bad faith NFA 2-4 9005, NFA 2-2, Rule 33.7(b), NFA 2-29 etc.

157.    Therefore as registered members, Boshnack, Rothman, Felag, HRF and VIA had and have independent duties to Plaintiffs to not engage in any conduct that violates exchange rules.

158.    Felag, Boshnack, Rothman, and HRF, the parties exerting dominion and control over the Vision enterprise, and association, that are also members of the NFA, had a statutory duty also to request permission from Kumaran directly, (*See* NFA 2-4, Int Notice 9061 which makes it impermissible for any Member or Associate that knowingly obtains or seeks to obtain confidential information or trade secrets of another Member or Associate **without that person's permission**).

159.    Therefore Defendants Felag, Boshnack, Rothman, HRF, HRHC, willfully, wantonly, participated in the fraud (by omission and concealment), and violated exchange rules, and knowingly failed to disclose they were gaining unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis. Under the exchange rules, independently from the FCM and the IB, therefore had an independent affirmative duty to disclose their request to obtain Kumaran's trade secrets, and duty to seek Kumaran the CTA"s permission.

160.    Their knowing, fraudulent and deceitful conduct throughout the timeline of this Complaint, demonstrates a high lack of moral turpitude and a willful intent to deceive,  and to purposefully, with intent to harm, "not seek Plaintiffs' consent, so they could continue to misappropriate trade secrets, continue to wrongfully gain unauthorized disclosure and acquisition to  Plaintiffs' "trade secrets", for their possession, control and analysis on their competitor's account. Vision defendants used fraud and misrepresentation to continue to benefit at Plaintiffs' expense.

161.    Boshnack, Rothman and Felag, under the rules of the exchange had duties to not engage in unfair market competition, and had to seek consents from Plaintiffs to have discretionary authority on Plaintiffs account,  or improperly acquire or obtain disclosure of its trade secrets.

162.    Felag is one of the key individuals of the enterprise, and an acquisitor of the trade secrets, willfully and wantonly with the misappropriations, while simultaneously holding principle roles in all the trading affiliates. He obtained possession and control of the trade secrets by virtue of transfer of the positions and independent analysis performed on his systems and servers, and also transferred into Vision and HRHC's systems, which resulted in miscalculations of margin as documented for instance on May 12, 2017 and other dates.

163.    Felag, Boshnack and Rothman have discretionary authority, as documented in audits by Nicole Wahls the NFA on the accounts. (See Exhibit 16, Ver.Fac.03668¶263,¶393, ¶490-¶494))

164.    During the life of Plaintiff's account Boshnack and Rothman played direct supervisory roles, perpetuated the fraud, and also maintained full acquisition and disclosure and knowledge on a real-time basis to their competitor CTA"s trading account, in express violation of the Commodities Exchange Act and without the  knowledge, consent and authorization of the CTA and Plaintiffs. Boshnack and Rothman also gained unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis.

165.    Evidence of this includes on or around May 16, 2017 when Lazzara admitted in emails and telephonically he was speaking to the "owners" of risk. BLUE At all times Lazzara and LCI facilitated in and participated in the unauthorized disclosure of Plaintiffs trade secrets across interstate lines.

166.    Later, once Plaintiffs found out about the unauthorized involvement of the Vision umbrella, Lazzara was in fact speaking to Rothman and Boshnack, who are the "owners", and who were directly

involved in the scrutinizing and unlawful acquisition in direct competition of Kumaran's CTA trading records and had been instrumental in placing trading restrictions on its competitors accounts.

### D  - HRHC's DIRECTLY COMPETING CTA BUSINESS

167.    In furtherance of the scheme to perpetrate fraud and market place injustice to traders, Boshnack and Rothman the Principal and Owner of HRHC who simultaneously serves as the  "individual guarantor" on the directly competing CTA accounts, had demonstrated a long standing motivation to dominate and create monopolies and financial advantage in the CTA space.

168.    Therefore the scheme of "alter-egos" had specific and pecuniary benefit to conceal the real motivation of Boshnack and Rothman, in their competing HRHC CTA referral business.

169.    Further Boshnack (and the affiliates HRF, HRHC, Felag, Rothman) who all have direct financial interests in the HRRC CTA activities, generate substantial revenue and profit from the success of their directly competing CTA referrals program, and direct motive to reduce the performance records of their competitors such as Kumaran's and Nefertiti's STORM.

170.    To conceal the conflicts of interests, and direct disclosures, they used the  corporate forms  to run the HRHC CTA referral not through the HRF. As publicly stated,  "A substantial part of Vision's business involves  recommending commodity trading advisors ("CTAs") to its customers." *(See* Exhibit10, Pg.3¶7). Thereby acknowledging the direct conflict of interest, competitive business lines, and substantial economic interest Boshnck, Rothman and their affiliates had in CTA programs, generating substantial revenue.

171.    That CTA referral business was transferred directly to HRHC and HRF, Boshnack, Rothman, Felag and other affiliates and as admitted by the NFA, is a "substantial" part of revenue, and to cover up and conceal the unfair market participation, used the alter-egos to create inequity and create and unfair market participation advantage in its other arms.

172.    Therefore HRHC. HRF, Felag, Rothman, Boshnack and all Defendants knew that there were material conflicts of interest in HRF's disclosure of and improper acquisition of Kumaran's CTA/CPO STORM trading strategies, trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", and a direct economic competitive interest, that needed to be disclosed to Plaintiffs. Plaintiffs never authorized this activity, that was part of the motive for improper acquisition of non-public confidential and trade secret information.

173.   As a direct part of the scheme Lazzara, LCI and Villa, acted in bad faith and in direct anti-trust and unfair competition, to turn over its trusted customers and CTA's proprietary accounts, to its competitors HRF, Felag, Boshnack. Rothman HRHC, and VIA. The conduct was willful, wanton and intentional part of the scheme,  for the commercial benefits of the Vision Defendants knowing their were material conflicts of interests, and the parties were direct competitors.

### Scienter and Motivation to Defraud Plaintiffs

174.   Boshnack and Rothman the principals and Owners of HRHC who simultaneously serve as the "individual guarantors" on the directly competing CTA accounts, to acquire and monitor their proprietary trading strategies, the other alter-ego affiliates named as defendants, without their consent (including Plaintiffs CTA competing STORM strategies) makes the introductory opening note directly recommending his CTA's and advisors his investors to place 10%-30% of capital with CTA's, showing the direct, involvement, dominance, control and vested interest in the CTA referral program as a active part of HRF"s business lines and arms.. (*See* Exhibit 5, Pg 2-3)

175.    Further Boshnack (and the affiliates HRF, HRHC, Felag, Rothman) who all have direct financial interests in the HRF CTA activities, generate substantial revenue and profit from the success of their directly competing CTA referrals program, and direct motive to reduce the performance records of their competitors such as Kumaran's STORM.

176.   The HRHC directly competing CTA business, are also not disclosed on the literature and documents Plaintiffs reviewed when Lazzara and LCI referred the account to ADMIS, all of which would have been material in Plaintiffs choice of FCM, which under the express rules of the CEA, and CFTC disclosure requirements ADMIS was obligated to disclosure (See CFTC 1.11-1.15, CFTC 1.55. CFTC 1.55(k)(l)(i), Rule 33.7(b)(2), NFA 2-4 9005, NFA 2-29, NFA 2-26 noting without limitation, the IB must not engage in any type of fraud, deception, scheme or material omission in his communications (See e.g. NFA 2-2, 7USC 6(b), NFA 2-4, 7 USC 13)

177.   Key operators of the scheme Boshnack, Rothman, Felag, VFM and HRHC have demonstrated a long standing competitive interest in obtaining CTA records, profiting from other CTA's performance. Their directly competing business model includes a portfolio of acquiring  and managing  as well as executing and having a research and market penetration advantage to the CTA's to create a monopolistic advantage and receiving upfront fees from their CTA' performance.

178.   Therefore HRHC (which in turn wholly owns HRF), have direct financial incentives to compete and deplete performance of their competitors CTA's, and maintain directly competing business lines.

179.   In direct competition with Plaintiff, HRF's website also acknowledges that it operates a directly competing CTA referral program, whereby they attract, and divert capital (AUM) to CTA's in their "preferred CTA" program which in turn diverts capital away from competing programs such as Plaintiffs' STORM CTA. (*See* **Exhibit 3**).

180.   Without limitation the CTA's currently in *direct competition* with Plaintiff that are financially vested with HRHC, HRF, Boshnack,  Felag, HRHC and Rothman, are White River Group, LLC, AG Capital Management, LLC, Diamond Capital Management, LLC, Buckingham Global Advisors, LLC, Carbide Capital, LLC and Opus Futures, LLC of which Carbide and Buckingham, all trade directly competing programs to STORM in options trading programs. (*See* **Exhibit 3 and 5**)

181.   As part of this ***directly competing*** line of business by HRHC and HRF works with other competing affiliates, such as Three Lakes Advisors (owned by Boshnack's son Justin Boshnack) and another CTA referral service called Commodities Futures Trading, Utah. Both these companies, make public in literature HRF's direct pecuniary competitive business as a "CTA" Referral service – that quotes. *"On an ongoing basis, High Ridge Futures monitors the potentially successful CTAs and Professional Traders in order to find the best possible trading talent*."

182.  Upon information and belief, Boshnack frequently approaches CTA and traders, requesting he "monitor" or "scrutinize" their trades real-time, with his various business promising he can raise for them $10 million dollars in AUM, and requiring they front-load their fees, meaning pay a high front fee deduction of about 6% for life to Boshnack and his affiliates, regardless of the profitability of their accounts. Many traders refuse such as high premium of fees, yet his directly competitive interest to acquire and scrutinize CTA's accounts has been long standing, demonstrating a wanton conflict of interest in their involvement in their competitor's account.

183.   However, Plaintiffs as a directly competing CTA/CPO's however had **never authorized** HRF, Felag, Boshnack, Rothman, HRHC to be part of such as scheme or allow Boshnack and Felag "monitor" its trade secret proprietary trading program STORM, never agreed to have them deplete profitability by 18% a year, and with full scienter, willful and wanton intent to improperly acquire its competitors trade secrets, HRF, Felag, Boshnack, Rothman, HRHC, intended to deceive, in line with their competing mandate to monitor their competitors performance.

184.   Their  commercially unreasonable business practices, have led Vision to acquire a significantly tarnished reputation, including from the fact their entity was disbarred, not only do they force upon customers and traders extreme free charges, upfront penalties to traders and CTA's, as high as depleting profits as much as 6% (Noting Plaintiff have documented fees as high as 18%) and have led to a nicknames in the business that a contract had been "*Visioned*" – meaning that traders and IB's were stuck in unviable, illegal contracts, to forfeit all their upside and trading profits for Boshnack and Rothmans' control. During Vision's expulsion included citations that "they have a long standing tenure of supervisory problems" and "have failed to uphold high standards of commercial honor and just and equitable principles of trade"  and reputation of bad faith conduct. (*See* **Exhibit 10 and 12**).

185.   While concealing their improper competitors acquisition, Vision even publish their directly competing business as a CTA Referral service also boasts "Our selection process *spares no expense or effort in finding CTAs* with the best possible risk adjusted returns." (Emphasis added,  **Exh 5, Pg 16-17**).

186.   In this action, all the Vision defendants through their front line perpetrator, Felag, Boshnack Rothman, HRF and HRHC,  have resorted to fraud, deception and illegalities to ruthlessly acquire and demolish their competitors –certainly sparing "no expense" of effort to illegally fulfil their mission of dominating and controlling the CTA market, and where competitors exist, using the unlawfully gained disclosure and acquisition of its transaction records, to diminish and squash their account profitability, and misappropriate their trade secrets. They obtained no authorization.

187.   The rogue, unlawful, risk services agreements set up, that the CFTC and CME have admitted are not disclosed or approved in compliance with the Commodities Exchange Act, or  CFTC Reg 1.11 are in expressly in violation of the CEA, and were being operated as part of the Enterprise, for Boshnack and his affiliates and entities fulfilled their illegal Enterprise, and economic espionage to acquire trading strategies and deplete the advantage of other CTA's and use, profit from and disseminate their intellectual properties for their directly competing CTA businesses.

188.    Boshnack, Rothman and their alter-ego affiliates, have a persistent obsession to 'monitor' and "acquire" young CTA's trading performance, includes decades long (long standing, directly for years even before the merger with ADMIS) attempts to "watch his competitors trade" further supporting their direct infiltration of the ADMIS' accounts and Association Enterprise to acquire, destroy and misappropriate competitors such as Plaintiffs business.

189.    As explained by other CTA's and IB's at various CTA Expos, Boshnack, Rothman and their affiliates' busines model is *centered upon* the real-time acquisition and monitoring of CTA programs, and Boshnack would offer or solicit his "AUM CTA referral services" – luring them into promises he could raise AUM of over $10 million dollars,  from which  demand CTA's allow he "watch them trade" and "monitor their trading activities real-time".

190.    Therefore Boshnack and Rothman had demonstrated a long standing motive to improperly acquire, dominate and control the CTA markets, and engage in predatory conduct,  showing a clear motivation of engage in misrepresentation and fraud to gain competitive advantage, and past conduct to acquire his competitors advantage and target start-up CTA's, before they rise up through the ranks.

191.    Further Boshnack, Rothman and their alter-ego affiliates have repeated an obsessive pursuit and conquest, to acquire, profit from, and invasively inject themselves into the trading strategies, of specially start-up CTA's. This long-standing business model, instigated and directly perpetrated by Boshnack, and his son Justin Boshnack, is a key driver of profits for the enterprise. The scheme and Enterprise found a new way, to circumvent fair market participation rules violate the commodities exchange act, to improperly deplete their competitors performance while maintaining conflicting interest of profit with other CTA's.

192.    Boshnack, Rothman, Felag, HRF, HRHC. and the Vision affiliates, entered into "relentless" efforts to improperly acquire CTA strategies, using the Association Enterprise scheme, to funnel unfair competitive advantage not just to their trading affiliates, but also to their HRHC CTA referral.

193.    The conduct to misappropriate and acquire their competitors' CTA's trading programs, and acquire their transaction history was unlawful, and not just violates the Defend Trade Secrets Act but also is prohibited under the rules of the CEA and other statutory laws.

194.    Deliberately not seeking consent, Boshnack, Felag, Rothman, HRHC and HRF unlike the CTA's who conceded to participate in the HRHC CTA Referral program, Plaintiffs with vested interest in the CTA STORM program, never consented to this activity, and Lazzara in conspiracy with Defendants willfully, wantonly and malicious transferred its proprietary CTA accounts and trading strategies, to its direct competitors, HRHC Boshnack, Rothman, Felag and HRF, with material conflicts of interest and full knowledge of the directly competing businesses

SAC Vision  - Page 36

195.    The CTA referral business which directly completes with the AUM of Plaintiffs is also of substantial profit incentive to Boshnack, HRF, Felag, Rothman, HRHC, and all the Vision affiliates who had direct stakes and therefore were motivated to deplete their competitors performance.

196.    Boshnack, Rothman, and the foregoing HRF affiliates make substantial revenue from this line of business, as reported by other CTA's who spoke at CTA expos, "Vision" or Boshnack unfairly front-load their referral fees, charging upwards of 6% per year withdrawal of all capital raised to their CTA referrals, as a management fee,  and actively and aggressively solicit and raise capital.

197.    This front loading leaves little upside to CTA's who concede to this arrangement, forfeiting upfront management fees, at steep upfront premium, relying heavily on making their bread from the "incentive fees". (See **Exhibit 5, Pg 17,** noting the HRF disclaims *THE MAJOR SOURCE OF INCOME FOR THE MAJORITY OF HIGH RIDGE FUTURES' RECOMMENDED CTAs IS AN INCENTIVE FEE THAT CAN ONLY BE EARNED BY PRODUCING ONGOING NEW PROFITS FOR AN ACCOUNT NET OF ALL COSTS.".* This supports that Boshnack and HRF, front load and remove all the CTA management fees, a pattern of predatory conduct that is the trade craft operation of the HRF model, and demonstrates the directly competing businesses.

198.    Therefore Boshnack, Rothman and their alter-ego affiliates have direct profit incentives in depleting, front loading, interfering with, improperly acquiring, their competitor CTA's trading accounts – which translates to direct profits of Boshnack, Rothman and HRHC affiliates in their competing business. They used the corporate forms, this time to illegal gain an unfair CTA Competitors

199.    After a few months of unlawfully monitoring its competitors Plaintiffs STORM trading account and after it started to prove out its profitability by April 2017, showing returns of approximately 12% in 60 days, Boshnack, Felag, Rothman, HRF and HRHC, willfully,  wantonly and with scienter interfered in the fee arrangements, and on May 2, 2017 unlawfully added more fees to Plaintiff's account (for the credit of HRF, Boshnack, Felag, Rothman), deducting profitability by approximately 3.45% every 45 days, an annualized depletion of its competitors performance of approximately 18% a year.

200.    This conduct was part of the Enterprise's scheme to divert profits, and steal monies, assets, property and intellectual property, trade secrets, Boshnack, Felag and the HRF affiliates have direct financial motivations in this competing business, and motivation to harm Plaintiffs.

201.    Therefore the upfront and excessive unauthorized fees – in this case – estimated in Kumaran's account of over 3.45% per 60 days (18% annually) far exceeded the overcharges, further demonstrating the willful, wanton, malicious and aggressive actions of Boshnack, Felag, Rothman and its HRF CTA

affiliates to deliberately thwart and reduce the performance of the Plaintiffs Kumaran's track records and STORM program, The Defendants operated with scienter, deception and fraud, and went as far, as to exerting unauthorized discretionary authority to unlawfully manipulate margin on Plaintiff's account, causing an account lockout, and MTM losses of over $75,000 to interference as reported on ADMIS screens, by Boshnack's ability to force traders out of execution without abiding by fair market participation rules, misstate CME margin,  and conceal their involvement. The conduct was willful, malicious and designed to harm Plaintiffs.

202.     Their scheme which not only allows for the front loading and depletion of the profitability of the trading program (far more than the 6% they charge their own CTA's) but because its competitors at HRF, HRHC, Felag, Boshnack, Rothman were unlawfully given discretionary authority on Kumaran's and other CTA's trading programs. As such, as part of the unfair competition and anti-trust scheme, not only  HRF were able to interfere with, downgrade, deplete and manipulate to intentionally reduce their profitability, going as far as to lock them out of their trading accounts to create drawdowns, thereby monopolizing the CTA playing field, to give their "preferred CTA's" and unfair competitive advantage. This direct anti-trust and unfair market participation is a direct violation of the Commodities Exchange Act.

203.     HRF, Rothman, Felag, Boshnack and HRHC are therefore have directly motivation to target, and unfairly tamper with, deplete performance of their competitors  CTA's trading advantage and track records,  and also all directly profit from, and have direct, actual pecuniary interests and receive financial benefits in <u>directing competing</u> CTA activities through its "CTA Referral program", placing a direct conflict of interest in their improper acquisition, and tortious interference with Kumaran's STORM Trading program.

## E – USE, PROFIT AND DIRECT COMPETITION WITH STORM BY VIA

204.    In addition to taking over acts to harm their competitors performance, and obstructing, tampering, pillaging, interfering, and directly damaging their competitors CTA performance and track record, programs', HRHC, HRF, Boshnack, Felag and Rothman, use misrepresentation, fraud and deceit, willfully malicious and predatory conduct to improper acquire, disseminate, and use for profit their competitors trade secrets. by setting up even more affiliates, all owned and controlled by Boshnack, Rothman, VIA, H Rothman Familly, LLC, Boshnack Family LLC, HRHC (which profits from the directly competing CTA Referral busines). (the Vision "trading arms") in further direct unfair competition, antitrust and unjust enrichment.

205.   On or around March 13, 2018, after the wrongful and improper acquisition of Plaintiffs' competitive CTA's proprietary trading [records] and strategies, including all the inner workings of Kumaran's STORM trading strategy, Boshnack, Rothman and their affiliates registered yet another trading arm at the NFA, called Vision Investment Advisors, LLC ("VIA") as a Commodities Trading Advisor.

206.   Just a short nine months, after their improper acquisition of the STORM trading strategies, Boshnack, Rothman, Boshnack Family LLC, Rothman Family LLC. registered and launched a directly competing CTA, VIA,  with substantially similar commodities options trading strategy, that replicated the core strategy of Plaintiffs, including features of *volumes, strikes, option profiles, premiums, time frames and short term risk profile.*

207.   There are a limited number of options trading strategies in the market – and only after the acquisition of STORM, did VIA come up with and launch their competing CTA program that mirrors the profile and offers a directly competing program to investors.

208.    VIA was now operating in direct competition with Kumaran and NAM, as CTA's to raise assets and divert assets from their programs, with directly replicated and substantially similar misappropriated options trading programs.

209.    The registration with the participation and  approval of ADMIS CEO Tom Kadlec who participated in the scheme to defraud his Kumaran and other customers and CTA's, to improperly and unfairly transfer their competitors trading strategies to Felag, Rothman and Boshnack,HRHC,

210.    The NFA website lists VIA as owned more than 10% and managed, and under the same ownership, control and direction again by the same Defendants, operating out of the same office address of 120 Long Ridge Road, and owned, managed and controlled by Boshnack Family, LLC, H Rothman Family, LLC, Rothman and Boshnack. (***See* Exhibit 6**).

211.    Other corporate documents show that Rothman has direct authorization to trade the account and Felag also plays an executive management role, in a directly competing nature to Plaintiffs.

212.    Having wrongfully acquired, disseminated across interstate lines, VIA, and its owners, Rothman, Boshnack, Felag, and their family offices, then copied, replicated, studied, downloaded, uploaded, modified, incorporated, strategies, and used, in direct competition to launch a directly competing options trading program from STORM, on March 13, 2018, also listed on the High Ridge Futures website as a

"CTA Program", and in direct competition, misappropriated the STORM program to incorporate into a directly comparable options trading program called "SSP"".

213.    On September 20, 2017 Plaintiffs and on behalf of Nefertiti Asset Management, attended a CTA Expo conference disclosing the launch of their Nefertiti STORM Commodities Options fund. (**Exhibit 24** is a true and accurate copy of the Nefertiti marketing literature used in September 2017).

214.    The unique offering is specifically catered to three commodities S&P, WTI and Gold.

215.    Just six months later, after improper acquisition on March 13, 2018, Vision Enterprise launched a directly competing program the SSP program, also uses short term options strategies, and directly competing options positions, and have duplicated, *timeframes, positions, volumes, strikes, and execution*, front-running the STORM program, as direct competitors, having been tainted by, improperly acquiring the trade secrets of Kumaran, and launching a similar directly competing products in commodities options trades on the S&P. (*See* **Exhibit 7, Exhibit 4**)

216.    By willfully, wantonly, setting back and tampering with the STORM program, VIA, to this date, continues to operate, manage, sell the SSP strategies, front running the STORM strategies as its own, in direct unfair market competition. Nefertiti was substantially set back by the fraud, economic interference and tortious conduct in this complaint.

217.    VIA, and its owners and directors, continue to use, market, and profit from their improperly tainted programs in direct competition today, and raise capital to divert business away from STORM. STORM also has S&P options programs.

218.    Kumaran who owns the STORM trading strategy, registered STORM, at the NFA as a pool,  on or around September 22, 2020 as this Complaint was being filed, and has been set back by an estimated three and a half years (3 years) and Plaintiffs livelihood, competitive advantage, and rights to the exclusive use, profit, and disclosures to its directly competition options programs.

219.    Instead, its competitors, Rothman, Boshnack, Felag, HRF, HRHC, and all Vision Defendants have profited, wrongfully benefitted and gained an unfair competitive advantage, including by, gaining unauthorized disclosure and acquisition to Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis and subsequent use in front running directly competing trading strategies that wrongfully incorporated and were conceived only after improper acquisition of their competitors trade secrets.

220.    The damage caused by Rothman, Boshnack and their affiliates, to shutter their competitors, stall their companies, deplete their trading performance, has cased substantial economic value losses to Plaintiffs and irreparable harm.

221.    In addition to VIA"s misappropriation, use and profit, the other trading affiliates, and trading arms, both the HRHC CTA Referral business, and the proprietary trading arms of each of the Vision defendants has unlawfully profited, in obtaining the inner workings of its competitors trade secrets.

222.    The enterprise relies on the fact the victims are small, have potentially innovative ideas and new trading strategies that are ripe for misappropriation and legally unsavvy to perpetrate the scheme, and are at the early-stage of the capital-raise cycles – meaning they most likely do not have sufficient funds or capital to detect the fraud or sustain their businesses once attacked. Therefore Boshnack, Felag and Rothman's attack on Plaintiffs account was willful, malicious, wanton and with the moral turpitude that warrants an award of punitive damages.

223.    The literature promotional material offered by Boshnack and its family members, show they understand the direct competitive nature and cycle of a start-up CTA, understanding that the first two years requires raising of capital form friend and family and operating capital, and the "seedling" or young CTA are usually under-capitalized, and short on resources. Therefore with scienter and malice to deplete their capital, performance records and create their own monopoly of the CTA markets, upon information and belief, VIA, Felag, Rothman and Boshnack, willfully attacked and tortiously interfered with Nefertiti's business willfully and maliciously tampered with its performance (for example on May 2, 2017), willfully and as is consistent with their CTA business model, directly target as "victims" of the scheme start-ups, and newcomers, who will be most vulnerable to the attack on their business, and most likely to not perpetrate the scheme.

### F – ROLE OF THE BROKERS IN THE FRAUD

224.    The Enterprise uses the multiple alter-ego affiliates to shield liability from each of the corporate forms and also as part of the day-to-day operations uses the Vision brokers, such as Lazzara, LCI and Villa to be the speakers of the fraud in order to fulfil its common RICO and illegal purpose.

225.    The fraud is perpetuated by a ring of about 80-100 former Vision Introducing Brokers that were transferred over to ADMIS from the former Vision Financial Markets, LLC, in or around September 2014, collectively called *Vision brokers,* that are located over the United States, that includes without limitation Defendants LCI, Trey Lazzara and their associated persons and representatives Julie Villa.

Incorporated by reference in related case 20-CV-03668 ECF1 Exhibit 2**,** is a list of some of the *Vision brokers* upon information and belief participating in the fraud.

226.    The *Vision brokers* including Defendants Lazzara, LCI, and Villa named in this Complaint,  with the full participation and knowledge of the co-conspirators, ADMIS, Vision, use interstate wire and telephonic communications to aggressively solicit customers to open futures trading accounts at ADMIS, providing them no options of another FCM, and willfully, wantonly, intentionally provide fraudulent information about the commission and fees, and  who by omission and fraudulent concealment then distribute them to Vision's owners, employees and affiliates. The scheme is perpetuated with scienter to deceive. Vision IB's together with ADMIS and Vision conspire on the overcharges to be passed through to customers – ultimately to generate revenues for Defendants.

227.    A well-orchestrated part of the scheme, is that front-facade of the scheme are the Vision IB's, including Lazzara, LCI and Villa, who, are the main communicators with the customers and CTA's. By placing a "shield" between the customers and Vision and the customers and ADMIS, both Vision defendants and ADMIS defendants knowingly and intentionally reduce their risk and liability of being caught in the scheme, and reduce their liability in not being the speakers of fraud.

228.    By hiding behind the brokers, like Lazzara, to be the "sole communicators", the other conspirators in the fraud, could plausible deny that they didn't commit fraud, as they weren't the speakers of the fraud. This is an intentionally part of the scheme, especially perpetrated by Boshnack, Rothman and Felag, and ADMIS who with scienter, misappropriate and conceal their acquisition of their competitors trade secrets, and use the brokers to make the misrepresentations to the customers.

229.    However, their intentional ploy to "hide behind the broker" and use Lazzara as a shield, is contradicted by the statutory requirements under the CEA, whereby, since Howard Rothman, Robert Boshnack, John Felag and HRF are members of the NFA,  they had an independent duty to Kumaran, as a registered trader, and also as a CTA. Vision defendants however, had a duty however, independently not to conceal their involvement from CTA's and Kumaran. The Commodities Exchange Act imposes obligations on fraud, as well as duties not to acquire another CTA's records without their express written consent..

230. Therefore regardless of whether they actual spoke, they omitted by fraud, and directly and knowingly participated in the fraud, to conceal their unlawful acquisition of trade secrets.

### G – LAZZARA'S MOTIVATION FOR FRAUD

231.  Vision IB's including LCI, Lazzara and Villa had a clear motive for the fraud. Former Vision IB's, including LCI defendants, that transferred to ADMIS are usually one or two man sole props, small businesses who upon information and belief, do not have sufficient credit worthiness or financial capital to clear their commodities futures trades independently through ADMIS. Therefore, they were motivated to receive an interest-free and risk free credit line from Vision's owners and affiliates, and get to "stay alive" and in business after Vision Financial Markets was disbarred.

232.  The  free "Guarantee and Fee Agreements" also provide LCI defendants, inequitable benefits in trade, and unfair commercial business practices. Since  Lazzara and LCI, obtain the "risk-free" ability to clear through a large FCM, in exchange, they willfully defraud their customers and convert their CTA's accounts, to be turned over to directly to the HRHC competing entities,  CTA's, which they are motivated to do, while they maintain "free" credit lines and credit worthiness. In addition, Lazzara, LCI and other Vision brokers' participate in the scheme to conceal the agreements, and also gain inequitable financial benefits as all fees and the cost, are passed on to the customer and withdrawn from profits from the trader again, without their knowledge consent or authorization. (instead of the broker). Therefore Lazzara and LCI obtain direct financial motivation in defrauding.

233.  Lazzara, LCI and other Vision IB's derived concrete benefits,  an in order to get a free $0 credit pass, an in  exchange, directly engage in a direct conversion of customers, CTA's and Plaintiffs' property, funds, assets and trade secrets, for improper acquisition by HRF and its affiliates.

234.  Vision IB's, Lazzara and LCI, also received the concrete benefit of being affiliated with a large "brand" name  ADM, which, during sales and marketing promotional tactics they boast  as the 8th or 9th largest FCM in the world – all the while fraudulently concealing that in reality ADMIS's clearing business is backed by guarantees and credit lines from the notorious owners disbarred Vision, an entity disbarred with scores of disciplinary violations. Their ability to "hype" a Fortune 100 name, is also of profit motive to Lazzara, LCI and other IB's to intentionally, willfully and wantonly participate in the fraud, as their use of the "ADM" name, substantially improves their profit. Lazzara, LCI and other Vision IB's too are motivated to conceal the association with Vision, as they also know that many customers, including Plaintiff would *never* open the account with ADMIS, if they knew truthfully about HRF's competing CTA Referral business and other unauthorized activities. This would in turn cause loss of business and direct financial profits reduction to Lazzara and LCI

235.  Further ADMIS, as also a director of the day-to-day operations of the scheme, also enacted and participated in the fraud, upon belief, instructed the LCI, Lazzara and other Vision IB;, to participate in the scheme  to conceal Vision or threatening them with severing their relationship. (See Exhibit 16 ¶204). Nonetheless Lazzara and LCI, had their own independent ethical duties to not defraud their customers, and so knowingly participated and enacted the scheme for their own financial interest.

236.  In turn, as full day-to-day- operators of the Enterprise, Lazzara, and LCI, and other Vision brokers, with full knowledge, participation of the illegal scheme, would go out and fraudulently solicit numerous unsuspecting customers, in exchange for large commissions sharing on the transactions generated through trades in accounts opened through ADMIS, using fraudulent sales and solicitations, also partaking in the deliberate concealment that the accounts would be disseminated and damaged by Vision. All Defendants knew and intended to deceive customers and Plaintiffs would not have opened accounts if they had found about disbarred Boshnack, Rothman and HRF's material role.

237.  By participating in the fraud, Lazzara, LCI and other brokers also were rewarded with the concrete benefit, not only interest free credit lines, but the brand name ADMIS, a large global firm, whose parent company is a Fortune 100 company to their customers. This in turns gives brand name credibility to these tiny one-or-two-man former Vision IB's remotely scattered around the US.

238.  The most tangible benefit of all, was that Lazzara, LCI and Vision IB's were given a non-industry standard credit-line free -pass into ADMIS – a substantial financial motivation. As a result of the fraud, to induce the victims, such as Plaintiffs to disclose their assets business information, property, proprietary and trade secret information, which in turn was disseminated to directly competing entities, with multiple lines of conflicting businesses, Vision employees, owners and affiliates Vision IB's as concrete benefit from participating in the scheme, would secure the direct and tangible financial benefit, where Vision IB's were required zero credit to support their business.

239.  IB's having zero credit worthiness of financial guarantees is highly unusual in a competitive IB environment, and completely dissimilar to other IB's who open with ADMIS. Upon information and belief, all other IB"s under ADMIS are required to post substantial financial guarantees and demonstrate substantial credit-worthiness. Vision IB's including Lazzara received  a "free pass" of a zero credit and were unusually required to make zero deposit– to support the business they brought to ADMIS.

240.  In exchange however the financial and concrete benefits, Lazzara, LCI and other brokers, flouted their compliance laws, independent duties under the CEA, hiding under the ADMIS umbrella, and

instead intentionally deceived and defrauded their customers and CTA's; (i) secretively transferring their trading strategies and confidential account information; (ii) participating in unfair market competition for Vision to deplete their performance records; (iii) securing significant overcharges to be transferred to compensate Vision, and other conduct alleged herein.

241. Lazzara, LCI in accrual of their financial benefits described supra, knowing deceived their customers, CTA's and Plaintiffs – to stay themselves in business – instead significantly destroying Plaintiffs' company, their performance track record, reducing their trading strategies by up to 18% a year, disseminating their trade secrets for wanton use and profit and acquisition of their competitors

242.  As part of the ongoing fraud, Lazzara and IB's in a continuing pattern, propagate the fraudulent concealment through misstatements, "risk guy at ADM", and when or if Plaintiffs inquire or ask questions, Lazzara and LCI repeatedly and persistently continued to make false statements, overtly, and to persistently defraud their customers and traders, with a wanton disregard for their rights to mislead and deceive they are speaking solely to ADMIS.

243. LCI and Lazzara are independent members of the NFA and bound independently by the Commodities Exchange Act, had their own independent duties to not cheat, defraud or in anyway deceive their customer, including Plaintiff, which has caused significant damage to Plaintiff as described herein.

### SECTION VII - FACTS SPECIFIC TO PLAINTIFF
### A.  JULIE VILLA SOLICITS ACCOUNT

244.    On or around December 11 2016, Kumaran while reviewing equities trading software programs, spoke to a Julie Villa, ("Villa") who represented herself solely as an equities broker for Garwood. Plaintiff indicated it was starting two hedge funds, one in securities (equities trading) and the other in commodities futures and options trading.

245.    Villa represented to Kumaran only her employment as an equities broker and fraudulently concealed and materially omitted in the conversation her long and extensive role in the commodities futures business, as well as her intimate knowledge of the scheme and enterprise to transfer ADMIS accounts to Vision, and her long standing Associated Person relationship with Lazzara.

246.    According to NFA's membership records, Villa was registered as an AP of Lazzara from July 11, 2014 until May 18, 2015, which meant she was part of the sales force and LCI representatives that was transferred from Vision, after the firm was disbarred for manipulative trading practices in 2014, resulting in over $2 million in customer losses, and the transfer of Lazzara to ADMIS.

247.    Villa, as an AP required to make full disclosures, therefore had material knowledge of the Vision Enterprise, and while associated person of LCI after November 1, 2014 after the transfer was completed, and also receiving the Welcome Packet had full knowledge of the risk services, and therefore had full knowledge of the HRF Risk services, Felag's involvement and had been an actively knowledgeable in disseminating customer accounts to Vision employees and affiliates, and knew, when she referred the account to Lazzara, that it would be diverted to Vision.

248.   To propagate this deception (and to conceal her knowledge of Vision/LCI and the futures markets), Villa willfully provided links to only one of her two distinct LinkedIn Profiles, where Villa maintains two distinct profiles to materially conceal her roles and active involvement with the futures markets, and affiliation with an Introducing Broker ("IB") and omit customers knowledge of her role in the Commodities Futures Markets as well as the disbarred entity Vision.

249.   On or around December 16 2016, Villa, by telephone conversation from her offices in Austin Texas, during a phone call about equities options software prices at Garwood, instead solicited Kumaran in New York City, a newcomer to the futures industry, to open a commodity futures account for trading commodities futures and options through her former employer through former Vision IB Gerard Stephen Lazzara ("Lazzara"), of Lazzara Consulting ("LCI") located out of Austin Texas. Lazzara individually also conducts his business under a pseudonym of "Trey".

250.   At the time of Villa's solicitation, Villa was unregistered as an Associated Person ("AP") and was not permitted to be soliciting telephonically or marketing commodities futures accounts.  Villa was careful not to make any referrals or solicitations in email or in writing.

251.    Villa during the telephonic solicitation, at no time disclosed her long standing, in-depth employment and contractual relationship with Lazzara, her participation in the fraud with Vision, nor his ongoing open and active dialog with the disbarred Vision management team, materially and fraudulently concealed from Plaintiff that she was in fact a former employee of LCI, concealed that she was no longer and/or had ever been registered as an AP, and therefore was not permitted to be soliciting commodities futures accounts.

252.   Villa at the time of the solicitation, given her role as an AP during the exact September 1, 2014 – November 1, 214 transfer period,  had direct, actual and material knowledge that if Kumaran as a CTA, opened an account with Lazzara and ADMIS, its CTA trading records and trade secrets would be

disseminated for use and profit across interstate lines to HRF Defendants and Vision, and as stated supra, that risk services were being outsourced to Vision.

253.   Upon information and belief, Villa, is compensated for her referrals and maintains an financial interest in relationship with LCI and Lazzara, even though "unregistered". Of no coincidence during the exact 45 days that substantial damages and theft of funds occurred from Plaintiffs account during April 25, 2017 – until June 19, 2017, Villa in fact mysteriously showed back up for full-time work (again as an unregistered rep) at Lazzara. (*See* Exhibit 22). Over $1,000 of unauthorized fees started to be added on May 2, 2017 and purloined during the exact 45 day period, and Plaintiffs account experienced substantial interference after the May 2nd withdrawals started.

254.   Villa admits she returned to work for Lazzara on April 25, 2017 working directly on plaintiffs account, and then, of no coincidence left LCI on June 25, 2017 after Plaintiffs closed the account. Exhibit 22 shows she had a work emails address and was in a customer facing role, accessing customer accounts, and spoke several times telephonically from Hawaii to Plaintiffs with fully disclosed access to the trading accounts. Villa also through Lazzara, therefore improperly acquired and was disclosed non-public confidential and trade secrets information without consent.

255.   Villa also materially failed to disclose her long standing active participation with Vision and Vision IB's to disseminate customer and CTA's confidential and proprietary commodities trading accounts to Vision. If Villa had disclosed her role as an AP, Plaintiff would not have pursued business dialog. Villa's conduct violated amongst other laws, including those under the CEA, that mandate disclosures and nonfraudulent sales and deceptive marketing. [4]

256.   Upon information and belief, Villa was compensated for her referral and acquired personal financial benefit from Plaintiff's accounts she solicited to be opened at LCI and ADMIS, even though she was not registered as an AP in violation of the exchange rules, and accrues financial benefits and incentives from her ongoing relationships with Lazzara and Vision defendants.

### B.  LAZARRA KNEW PLAINTIFF WAS A CTA TARGET

257.  On or around December 12,  2016, after referral and solicitation from Villa, Kumaran entered into conversations with Introducing Broker ("IB") who called himself "Trey" Lazzara but whose real name

---

[4] NFA  Rule 2-29(b)  , NFA Rule 2-26 / CFTC Regulations 1.55 Part (l) , 1.55 Part (i), NFA Bylaw 301(b).

is Gerard Stephen Lazzara, in Austin, Texas regarding opening a Futures Clearing Merchant ("FCM") account.

258.  During communications using interstate wires and telephonic communications, from his offices in Austin Texas, to Plaintiffs offices in New York City, Lazzara made material representations that he would be the ***sole*** Introducing Broker "IB" on any futures clearing account, and promptly referred Kumaran to open an account at ADMIS.

259. Lazzara's online broker profile at the National Futures Association and his website www.TradeProFutures.com made (and continues to make) no disclosure that Lazzara is in anyway affiliated with a third party broker, or that his accounts are financially guaranteed by another Introducing Broker. The concealment of this financial information, and commitment to disclose all his customers accounts to a *direct competitor* third party High Ridge, (who were previously a disbarred Vision),  is material in customers and traders decisions to do business with Lazzara.

260.  Lazzara as a registered broker, had an independent duty to disclose any information that would be material to a customer or trader doing business with him, and to not cheat, defraud or anyway lie to his customers or traders, as well as all the other obligations listed herein under the CEA. Lazzara knew he was independently obligated, had mandatory ethics training, to maintain his own independent standards of compliance as a broker, and yet willfully, independently from ADMIS and under his own independent obligations, knowingly participated in the fraud to deceive his customers.

261.   As part of the scheme, as is consistent with the operation of the Enterprise, Lazzara at all time represented to Kumaran, in telephonic communications that he was an independent broker, operating as a ***sole*** practitioner, to knowingly, and fraudulently conceal the involvement of HRF, Boshnack, Rothman, Felag, and HRHC and other employees and affiliates he interfaced with, and knowingly, intentionally, willfully, wantonly fraudulently omitted is material financial relationship with HRF< and misrepresented and concealed that he was without any affiliations or material financial obligations of any kind to any other third parties,

262.  Also, unknown to Kumaran,  in or around November 2014 after Lazzara transferred his IB business to ADMIS, Lazzara received documents from ADMIS that contained <u>written notification</u> to Lazzara, LCI that HRF, Felag and other employees would be materially involved on an ongoing basis on the handling of risk management on behalf of ADMIS, and Felag and HRF would be his "point of contact" for ongoing risk management policies at ADMIS. (See e.g. Exhibit 16, Ver.Fac.3668¶417)

263.  Therefore Lazzara had material knowledge that the *risk procedures* at ADMIS, involved HRF and Felag on an ongoing basis, and under the black-letter law of the CEA, including but not limited to CFTC1.55(k)(l)(i), NFA 2-2, NFA 2-29, 7 USC 6(b),  Lazzara had a statutory duty to disclose to his customers and traders, including Kumaran and NRCM, ***all*** information about the risk management procedures at ADMIS, prior to opening the account.

264. Given Kumaran's extensive professional risk consulting background described supra, Kumaran specifically inquired from Lazzara about the risk policies and procedures at ADMIS, if it were to open an account there, asking Lazzara to expand upon in detail on the systems, technologies, procedures, and methodologies used for monitoring risk on options.

265. Plaintiff made specific inquiry into the risk management operations, margin methodology and processes at ADMIS, as well as its capabilities in derivatives transactions. Under the Commodities Exchange Act, including but not limited to NFA 2-2, 2-29,  2-26,  CFTC 1.55. and 33.7, Lazzara and LCI and ADMIS are required in their solicitations, to disclose all their risk management policies and procedures expanding upon anything that would be misleading or could deceive a customer.

266.  At all times, during the sales and solicitation period on dates including but not limited to December 12, 2016, December 16, 2016, December 18, 2016 ,January 12, 2017, January 18, 2017 as part of his role in the scheme and Enterprise, Lazzara using interstate wires and telephone communications from Austin Tx, to Plaintiff in New York, NYC,  knowingly, willfully, wantonly and with intention to deceive and defraud, materially omitted and failed to disclose to Plaintiff HRF, Felag, Boshnack, Rothman, HRHC material role in the risk procedures at ADMIS,

267.   Kumaran specifically requested information from the IB on the risk management technologies being used to monitor options risk, the margin procedures being used to calculate performance bond margin on commodity options were compliant with CME – or if some proprietary options margining was being used -  and for all information related to the options management,

268.   Lazzara again made material misrepresentations that ADMIS had sufficient technological platforms in risk management and were only using margin calculations consistent with CME Span, and also included referral to various "public disclosures" that ADMIS made regarding its compliance with regulatory guidelines. As seen in Exhibit 18 and 19 these statements were false when made as its technological platforms were deficient. Other documents also show that the risk department were not using calculations consistent with CME Span and had been unlawfully outsource to an unqualified risk

group at a disbarred group in Vision. Further Plaintiffs review public disclosure and misstatements of ADMIS is included by reference related Ver.Fac.20-CV-03873 Exhibits 1-5.

269.  Despite the express requirement of Lazzara and LCI to disclose ADMIS risk policies and procedures, Lazzara and LCI, acting together in conspiracy with HRF, Felag, Boshnack, Rothman, HRHC, and other Vision affiliates, fraudulently conceal (and materially omitted) in sales and telephonic communications, using interstate and wire communications, to Kumaran in New York City deliberately, intentionally, fraudulently omitted and materially concealed, the rogue, illegal and outsource risk operations in Stamford, CT as was later uncovered were not authorized or approved in the RMP and being conducted in express violation of CFTC Reg 1.11, Lazzara also knew, and materially failed to disclose at any time, that after his transfer to ADMIS, his IB account was now financially guaranteed by Rothman, Boshnack, and HRF.

270.  Lazzara signed and executed his IB Agreements with ADMIS on or around September 30, 2014. That contract also included specific language to make it commercially favorable for Lazzara to engage in the scheme as it required him to post $0 as a credit or guarantee. (*See* **Exhibit 13**)).

271.  Lazzara, upon information and believe, therefore knew about existence of the Guarantee and Fee Agreements, or in part that the reason he had to post $0 Credit, is because HRF, Boshnack (Individually) and Rothman (Individually) had supported his business by placing individual guarantees on his futures accounts. Lazzara therefore had a risk-free incentive and a clear profit motive to partake in the scheme, as instead of having to post valuable margin and credit at an FCM which is customary, it would have to do if it cleared elsewhere.

272.  Lazzara had intentionally and knowingly participated in the fraudulent scheme for his own financial gain and illegal benefit to receive a $0 credit, but also for his own self-interest. As documented in related complaint, brokers that challenged the arrangements, or the overcharges of fees, had their relationships severed with ADMIS. (See e.g Exhibit 16, ¶204, ¶207). Therefore with intent to procure his own financial advantage, Lazzara, LCI and Villa knowingly propagated the fraudulent scheme. He also knew that Plaintiffs would have closed their account (and not opened one at ADMIS) and taken their business elsewhere if he had disclosed.

273.  Upon information and belief, Lazzara, LCI and Villa received other benefits, and payments in kind and quid-pro-quos for their referral of business to HRF, that incentivized their dissemination of customer accounts and diversion/theft of property, assets, business to the Vision Enterprise.

274.  On or around November 1, 2014 Lazzara and other Vision brokers received a "welcome packet' from ADMIS that disclosed that risk management was being handled by HRF. Therefore Lazzara, LCI and his associated person Villa who are also obligated to make truthful representations knew that the risk services were being handled and outsourced. Among many other duties Lazzara, LCI and Villa had in soliciting account, under NFA 2-4 9005, NFA 2-26, NFA 2-29, NFA 2-30(b), CFTC Reg 1.55(k)(l)(i), Reg 1.56, 1.57, NFA 2-4, NFA 2-2, 7 USC 6(b), was to disclose all information about the guarantees, and risk management procedures at the FCM.

275.  LCI Defendants at all times knowingly concealed and either affirmatively mispresented or materially omitted the involvement of HRF in the risk services.

276.  Further Lazzara, LCI and Villa knew that the trade processing and transaction fees and other fee and commissions were being levied to their customer accounts to pay Vision. They formerly cleared through Vision and therefore were well aware of the clearing cost structure charged by Visions. Lazzara, LCI and Villa also knew about the scienter to differentiate between 0.30cents a trade so that the overcharges would go undetected to CTA's and up to $6.00 being charged to customers. See *e.g.* NFA 2-4 9005, CFTC Reg 33.7(b)(2), 7 USC 6(b), NFA 2-29, NFA 2-2

277.   But despite the express statutory requirements for him to disclose anything that would be material, including but not limited to the Guarantee and Fee agreements, and the risk services being provided by HRF and Felag, the ongoing active and deliberate role by HRF in the traders' accounts, and dissemination of their CTA trading strategies, Lazzara, willfully and wantonly failed to disclose and omitted the true nature of the risk program at ADMIS.

278.  Therefore when Kumaran spoke to Lazzara in December 2016 and subsequently, Lazzara had material knowledge of present facts, of the outsourcing of risk management, and the involvement of HRF, Felag and other employees in the risk, Lazzara and LCI also had direct and actual knowledge of the directing competing businesses being run by Felag, HRF and others, and in direct response to questions, made material omissions and fraudulently represented that ADMIS was acting in its sole discretion.

279.  Kumaran relied upon the false representations, in deciding to open the account.

Initial Disclosures

280.  During the initial conversations, Kumaran notified Lazzara that it had passed its Series 3, the registration standard to become an NFA Member, was in the process of registering as a Commodities Trading Advisor ("CTA") and to form various hedge funds and Commodity Pool Operators ("CPO") for launching a hedge fund under the name "STORM" so that it could leverage its trading programs, in a competitive manner.

281.  Lazzara had direct knowledge of its intention to use its proprietary account to create a track record and was being used to create economic and commercial advantage as a CPO.

282.  Kumaran is the sole owner, inventor of the STORM trading program or strategy, and owns all rights in and to the intellectual property and algorithms therein. At no time did Kumaran assign in any part to the NRCM company, to any other business, the ownership of the IP to the STORM program and the rights are solely owned by Kumaran, individually.

283.  Lazzara was also aware that the real interest, and use of the prop trading account was for Kumaran individually to build a track record as a CTA, and that the longer term business plan, was for a CPO called STORM to be formed, which would be managed, under the typical hedge fund structure by a General Partner (G.P.) called Nefertiti Asset Management, LLC ("NAM"). Lazzara also was informed that NAM, intended to and did have other partners, and persons who would have membership stakes in NAM, and that the STORM Fund, LP would be traded by Kumaran as the CTA.

284.  The STORM trading strategy was owned, invented and developed by Kumaran starting back in 2011, and had been existence prior to NRCM being formed. At no time was NRCM an owner or had any rights, title and interest assigned to it and NRCM at no time had any membership interest into the hedge funds, or the general partner, or NAM, or intended to be any residual beneficiary.

285.  Kumaran exclusive ownership, title and interest to the STORM Program was to derive substantial economic and returns over the long term, for which is owns the sole intellectual property rights in and throughout the world in perpetuity.

286.  Lazzara was also notified, that not only was Kumaran registering the CPO and fund called STORM, that it was forming a General Partner called Nefertiti Asset Management, "NAM", and it was using the prop account, for the purpose and long term benefit of a hedge fund, to derive substantial competitive advantage in options trading, from which Kumaran would derive substantial economic benefit and value.

The disclosures included that Kumaran had already passed the Series 3 and was in the process of registering as a CTA.

287.  Kumaran advised Lazzara at the time of initial dialog, thar she had an extensive background in risk management consulting and software where she had run her own successfully risk consulting business and was the sole owner of various proprietary risk management software programs under a separate business called Timetrics. The intellectual property and algorithms of the risk software are not owned (and were never owned) or assigned in any part to the NRCM company, and are solely owned by Kumaran, individually.

288.  Kumaran licensed use of its technologies to the hedge funds but remains the sole owner and inventor of all trade secrets. Kumaran disclosed to Lazzara that she is a professional risk management services provider, and had derived substantial economic benefit and income from the use and license and access to its risk programs.

289.  Kumaran also advised Lazzara it was the owner, developer and inventor of advanced CME compliant risk management software for quantification of commodities options and futures risk. Lazzara knew, that these capabilities and provision of services, were in direct competition with those of John Felag and HRF, and those who are providing "risk services" to ADMIS.

290.  Kumaran also advised Lazzara, that she had had invested substantial resource, time and effort to develop proprietary commodities futures options trading algorithms, which could give her a substantial competitive advantage in the options on futures, and generating returns for investors, and the purpose of opening which were for launching shortly thereafter.

291.  Therefore Lazzara also knew Kumaran's option trading programs, the STORM trading program, and risk management services, software and programs derive substantial competitive advantage. Kumaran had also invested substantial money and capital to form the hedge funds and entities, for which it intended to compete, and grow a trading business, from which it would derive substantial economic advantage. By virtue of its secrecy of its options trading programs, Kumaran would have unique competitive advantage as a CTA and CPO  in being able to attract capital, register its funds and grow its career as a commodities trading advisor, commodities pool operator.

292. Lazzara knew and had material information that Kumaran's career in both risk management services, consulting, software design as well as Kumaran's options trading algorithms and STORM were in *direct competition* with the competing lines of business of HRF, Boshnack, Rothman, Felag, HRHC

and the trading arms of its Vision affiliates, their owners, employees and affiliates. Despite the material conflicts of interest, Lazzara persisted in the fraud.

*Lazzara's sales and solicitation*

293.  As part of the scheme, to aggressively solicit accounts for ADMIS, using fraudulent and deceptive sales and promotions, Lazzara heavily sold only ADMIS as an FCM and his website only navigates customers to ADMIS. As stated supra, Lazzara is substantially motivated to participate in the fraud, as he received "interest free' credit and "free" guarantees from Rothman, Boshnack and HRF,  in exchange for which he knowingly and fraudulently disseminates their trading programs, across interstate lines, and knowingly and intentionally,

294.  Kumaran was not offered any choices in which FCM it could select, and Lazzara knowingly and intentionally aggressively pursued Kumaran's account opening only at ADMIS.

295. Kumaran reasonably relied on Lazzara's representations, and the numerous public disclosures made by ADMIS (See Related Case 20-Cv-03873 such as the Corporate Brochure, which contained numerous misrepresentations about how ADMIS provided "top technologies" and the "best" in customer service".

## C.  SUMMARY OF FRAUDULENT CONCEALMENT

296.  On dates including December 18, 2016, January 18, 2017, January 22, 2017  January 30, 2017 Lazzara and Villa knowingly, intentionally, willfully, wantonly, fraudulently concealed and materially omitted, that by virtue of opening an account at ADMIS, Kumaran's account would immediately be disseminated to HRF, Felag, Boshnack, Rothman, HRHC and other Vision affiliates that were beneficiaries to the transaction in Stamford CT, and other locations in the U,S who were inherently interested in, and were direct competitors, and had material financial interests in directly competing entities, including launching their own options trading CTA, to unlawfully acquire Kumaran's risk management and options trading strategies.

297.  Lazzara, during the account solicitation process, on dates including but not limited to December 12, 2016, December 18, 2016, January 12, 2017, January 18, 2017, January 22, 2017 maintained active communications with HRF, Felag, Boshnack, Rothman, HRHC and other affiliates that were beneficiaries to the transactions as well as the director of the enterprise ADMIS. Lazzara directly conveyed to HRF, Felag, ADMIS, Boshnack, Rothman, HRHC and other conspirators that Kumaran

was registering as a CTA, and intending to form a directly competing options fund, and that it would be trading options strategies, in direct competition.

298.  On  dates referenced above between December 2016 and January 2017, ADMIS, Lazzara, LCI, in conspiracy with HRF, Boshnack, Rothman, Felag, HRHC and other Vision affiliates who were trading arm beneficiaries, with intention to deceive, during the sales and solicitations even though Plaintiff was requesting specific information about the fees and commission, the policies and procedures of risk management and other statutory disclosures required about material information at ADMIS, Lazzara, LCI and ADMIS.

299.  With the full knowledge and participation of, willfully wantonly, intentionally, and with scienter to deceive, fraudulently concealed and materially omitted to disclose and material information about ADMIS business, operations, fees, guarantees, risks, all of which are material required disclosure under the CEA, and for which Lazzara, LCI and ADMIS had a statutory duty to disclose. ADMIS, Lazzara, LCI had a duty also to disclose the material conflicts of interest in the HRF defendants directly competing options trading business lines.

300. The fraudulent misrepresentation and omissions, included but not limited to fraudulently concealing that  :

that ADMIS had material risk management policies and procedures that required Kumaran's account be handled and fully disclosed to its competitors, HRF, Felag, Boshnack, Rothman, HRHC and other affiliates, owners and employees, in violation of the statutory duties to disclose; [5]

a.       that ADMIS had materially outsourced the handling of margin calls and the CFTC had not approved any outsourcing of risk management duties to its competitors, HRF, Felag, Boshnack, Rothman, HRHC and other affiliates, owners and employees to misappropriate trade secrets, which included delegation of authority to liquidate its account, extend credit on the account and place trades on the account without customers knowledge, consent or permission in violation of the CEA;[6]

b.    that unauthorized fees, would be added after account opening, concealed prior to the account being open and not disclosed or consented to the customer or trader, for the benefit and profit of its direct competitors, to deplete its performance in unfair comeptition.. These fees are being charged in express violation of the CEA. See also CFTC 33.7 and NFA Rule 2-26.

c.    that all Kumaran's STORM CTA trading strategies, confidential and proprietary information, trade secrets, would be disclosed to its competitors and other directly competing NFA Member, in

---

[5] *See* CFTC 1.11, CFTC 1.55, CFTC 33.7, NFA 2-26, NFA 2-29, NFA 2-2;
[6] *See* CFTC 1.11, 7U.S.C.§ 2 (c)(v)(IV),15 U.S. Code § 78g (2)(A),§ 78g (2)(B),  NFA 2-26  17 CFR§1.57 (c.),  NFA  2-26 / 17 CFR § 1.55 Part (k);

unfair competition, without customers and CTA's knowledge, consent and permission, outside of the laws of the CEA and Federal law. [7]

d.   that the owners of the disbarred Vision, Howard Rothman, Robert Boshnack and HRF, with directly competing activities, had extended material personal financial guarantees on Plaintiff's accounts, which were material considerations to which Plaintiffs would have made a decision to not open an account, and chosen to do business elsewhere in violation of the CEA. [8]

301.    The concealment of these authorizations and operations, and policies and procedures on Plaintiff's transactions were material.  Plaintiff reasonably relied to its detriment on the misrepresentations made by and on behalf of the Defendants, and have been harmed accordingly.

302.    Defendants and its conspirators knew that, if Plaintiff, knew of the foregoing concealments, omissions and other misrepresentations and HRF, Boshnack, Rothman, Felag, HRHC Kumaran would chose not to business with ADMIS, so they intentionally concealed, with intention to deceive.

303.    Each of the defendants in the named conspiracy, herein conspired with one another to accomplish and to further the objectives of their fraudulent scheme.

304.    All of the acts and omissions of the defendants described throughout this Complaint  were undertaken intentionally.  The fraudulent scheme perpetrated by the defendants was designed to, and in fact did, result in the Plaintiff entrusting business with ADMIS, disclosing its trading strategies and STORM, under the express laws of the CEA, opening accounts, transferring assets, funds, property and making payments, while it was being defrauded to disseminate its trading strategies to its competitors, and unlawfully depleting its profits and withdrawing  fees to the benefit of and on behalf of the defendants, without consent, authorization or knowledge

305.    Plaintiffs had a right, as expressly provided under the CEA, and the laws and Federal statutes to disclosure of the foregoing information prior to account opening, and accurate, honest and facts about the handling of its account. The anti-fraud provisions of the CEA, specifically prohibit fraudulent and deceptive conduct, and the account were fraudulently induced accordingly.

306.    Furthermore, the far reaching pattern of fraudulent conduct by defendants evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, and materially violated the CEA, NFA Rule and anti-fraud provisions, and merits an award of exemplary and punitive damages.

---

[7] See also in violation of NFA 2-4 Int Notice 9061 and DTSA;
[8] See also NFA 2-26/CFTC 1.55;

### D.  HOW PLAINTIFF WAS DEFRAUDED

307.  Upon information and belief, in or around December 12, 2016 shortly after initiating communications, Plaintiffs communicated with Lazzara both in email and also in telephonic communications specifically about the risk management procedures and policies at ADMIS as well as their methodologies for margin, As required under CFTC 1.55(k)-(i) and NFA 2-29, NFA 2-2, NFA 2-4, and 7 USC 6(b) Lazzara was obligated to not deceive and to communicate, the information about the risk procedures he was aware of. (See **Exhibit 20**).

308.  Lazzara made affirmative misrepresentations that ADMIS had "all the capabilities of risk" including technological platforms, and was only using CME Span, and materially omitted his knowledge that risk management was being outsourced to High Ridge. During those initial conversations, Plaintiff Kumaran disclosed it was a Series 3 and in the process of registering as as CTA and launching various competitive options trading funds.

309.  Shortly thereafter, Lazzara, knowingly, willingly, wantonly and with scienter and malice, promptly contacted Kumaran's *direct competitors*, options traders, and risk service providers, John Felag, HRF, HRHC to perform the options margin test discussed in **Exhibit 20**, and upon belief other persons including Rothman, Boshnack, and their affiliates, former disbarred Vision Financial Markets, LLC, and notified then that a newcomer "competitor", Kumaran was forming a commodities options trading hedge fund, which would be of particular competitive interest to them, and also had advanced risk management strategies for options trading, as a risk services provider.

310.  Over other telephonic communications during the same period and also on January 18, 2017 Plaintiffs followed up again in email and telephone inquiring specifically on the risk management procedures at ADMIS. (*See* **Exhibit 21**). Lazzara and LCI both using telephonic communications and emails affirmatively mispresented that ADMIS were providing risk services, and fraudulently omitted that any margin or calculations were being outsourced to HRF, Felag and others Vision Enterprise.

311.  Lazzara and LCI also made affirmative misrepresentation and material omissions in the foregoing dialog, to conceal that ADMIS were using an orthodox system called margin allowances and were not using CME Span. Disclosures about a *proprietary margin system* were material. (Reg.33.7). Lazzara also intentionally concealed that discretionary authority and extension of margin had been outsourced and non-exchange compliant margin rules were being deployed.

312.    By concealing this material facts, and misrepresenting who he was speaking to (at all time affirmatively misstating he was communicating with ADMIS), Plaintiffs were fraudulently induced to opening an account at ADMIS.

313.    Lazzara's intent was not in good faith, and acted all times with deceit, anti-trust, unfair market competition and fraudulently concealed those communications and who was providing risk services from Plaintiffs. Likewise ADMIS (as argued in related case also provided deceptive and fraudulent sales literature) *See* Exhibit 5, 20-CV-3873. Lazzara and LCI as independent brokers had their own duties to not deceive Plaintiffs.

314.    Plaintiffs also relied upon other documentation provided by Lazzara and available from ADMIS in its public disclosures (Exhibits 1-5 Ver.Fac20-CV-3873). Moreover, any contracts and agreements that were procured by fraud are void, illegal and unenforceable. Defendants intentionally attempted to use a deceptive Privacy Policy to contract their way around the CEA.

315.    The Privacy Policy in no event permitted services that failed to comply with the rules and regulations of the CEA, and did not absolve ADMIS and LCI from their disclosure obligations of fees being paid to Vision, or mandatory disclosure of the provision of risk services under CFTC 1.55(k)-(i). Therefore any Privacy Policy was not only procured by fraud, but was void and unenforceable as it did not comply with the rules of the Act and disclosures specifically for risk services that were being performed by disbarred individuals who were not permitted to be contracting or providing services on behalf of an FCM, while registered members. (*See* Exh16,  Section 14, , See also Exhibit 17, Sec 7 )

316.    Lazzara knew, Howard Rothman, Robert Boshnack, John Felag, HRF, HRHC, had a direct competitive interest in, ran a directly competing HRHC CTA Referral business and Kumaran's trading the STORM options trading program,  and had a directly competitive professional background in risk management services, and knew or should have known there was a material conflict of interest in a competing CTA Referral business gaining unauthorized disclosure and acquisition to the Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums and real-time execution, "trade secrets", for their possession, control and analysis, which Plaintiffs was using to launch a hedge fund and for directly competing commercial purposes.

317.    Under the express rules of the CEA, and since HR, Rothman, Boshnack, HRF, Felag, VIA, are all registered members of the CFTC and NFA, they had independent statutory obligations, which included but not limited to (a) conducting themselves with commercial honor, integrity and fair play; (b)

not acquiring another CTA's trading records without their express permission; (c) not participating or acting in any manner to cheat, deceive or defraud; (d) other strict compliance law prohibiting bad faith or unethical conduct.

318.    The Commodities Exchange Act, also enforces broad statutory anti-fraud provision, to make it illegal and expressly prohibited to engage in any form of deception, and fraud and in any way to cheat another customer or trader. Therefore HRF, Felag, Rothman, Boshnack, HRHC, VIA had independent duties to disclose to Plaintiffs in its intent and request to disclose or acquire its competitors  trading records, and this conduct required the traders' consent to gain unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis including expressly **seeking Kumaran's consent,** prior to its acquisition.

319.  As part of the scheme, in wanton regard of the rules, and statues, the members of the Enterprise, knowingly concealed this dissemination, disclosure and acquisition Lazzara fraudulently concealed his dialog with Vision, its owners, employees and affiliates and conspired to lure Kumaran into opening an account with ADM Investor Services ("ADMIS"), whereby Vision could gain full disclosure and acquisition of Plaintiffs competitive trade secrets without their knowledge and consent.

320.  Upon information and belief, and as the defendants, have now launched a directly competing and substantially similar options trading program as a CTA/CPO, just a few short months after obtaining Plaintiffs' CTA proprietary, competitive commodities options trading strategies, and were of direct and keen interest to and in direct competition with the trading strategies that Vision.

321. Public records show that Vision were alleged to have had of failed supervision and risk management in directly similar options trading strategies and had clear conflicts of interest in improperly acquiring the secret workings of  competitors options trading and risk management and trade secrets,

322. Vision was in fact fined over $1.5 million dollars in similar options trading, providing a clear motivation, to defraud and acquire competing strategies and risk management methods and processes, and clear economic motivation and concrete benefits in acquiring its direct competitors trade secrets.

323. Despite their own independent obligations and duties under the CEA and NFA Rule 2-4 906 all defendants including but not limited to Felag, Rothman, Boshnack. Vision Investment Advisors, High

Ridge Futures, that were NFA Members, it was against NFA Rules, to view a CTA's trading records without their permission.

324.  In wanton disregard for Plaintiffs rights, at no time, did Felag, Boshnack, Rothman or any Vision affiliates make an attempt to unmask themselves, with scienter, and intention to partake in the fraud, to improperly gain disclosure and acquisition of their competitors trading accounts, and trade secrets. Therefore Defendants willfully participated in the concealment and secret background communications. Vision and Lazzara, knew and intended to conceal their involvement to enact the scheme, as Kumaran and NRCM would never had opened the account.

325.  At no time did the foregoing HRF defendants or LCI defendants ever contact or seek  Plainitff's permission to have HRF, Felag, Boshnack, Rothman, HRHC, or any of the other defendants acquire, scrutinize, disclose or "monitor" their highly competitive CTA proprietary trading records, on a real-time acquisition basis,  or notify them of their disclosure. In fact, they took material and overt actions, to conceal, deceive and commit fraud, to perpetuate their scheme, to create an unfair competitive advantage in the CTA markets, and engaged in willful and wanton conduct to ensure  that CTA"s would not find out. Furthermore, the far reaching pattern of fraudulent conduct by defendants evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, and materially violated the CEA, NFA Rule and anti-fraud provisions.

326.   At no time did Plaintiffs consent to or grant permission to disclose their trading strategies, transaction history, gaining unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis confidential and proprietary emails, communications with ADMIS, financial statements, account balances, trading records, nor did they receive any notification.

### E -  LAZZARA HAD A DUTY

327. On or around January 27, 2017 and again on or around January 30, 2017 Plaintiffs were given directives by ADMIS employees that since Plaintiffs' account was solicited and opened by an Introducing Broker, Plaintiffs were not permitted to speak directly to ADMIS, and their only communications should go through be solely with its IB, Trey Lazzara and his business Lazzara Consulting, Inc. ("LCI"). As stated supra, role of the Vision IB's as the "spokesperson", was an integral

l part of day-to-day operations of the scheme, with the purpose of shielding liability from ADMIS and HRF Defendants.

328.    Plaintiff was therefore given specific instructions that *all* day-to-day communications should be handled **solely by the Introducing Broker** and Lazzara would be responsible for handling the day-to-day communications and answering intermediary questions and supplying all information related to the Account on a day-to-day basis and he should be the contact person.

329.   Lazzara had sole responsibility to transfer information to Plaintiffs.  Therefore Kumaran was reliant on the honest and accurate information to be conveyed to the customer through the IB Lazzara, since Kumaran was not permitted to communicate directly to ADMIS.

330.   Therefore LCI and Lazzara were in the business of supplying information for the guidance of others in their transactions, including the risks protocols and margins on his customers' and CTA's accounts. This put LCI and Lazzara in a position of superiority and influence over Plaintiff, since Plaintiff did not have direct access to the information from the FCM, and LCI and Lazzara had superior control over the information and Kumaran and NRCM placed trust, confidence and reliance on Lazzara to be honest.

331.   Lazzara as the Introducing Broker, which is not affiliated with or guaranteed by ADMIS, as a separate and distinct entity, has an independent duty also not to deceive or defraud.

332.   Both Lazzara as the IB, independently from ADMIS as the FCM was under its own independent set of duties and obligations to convey honest and accurate information related to its customers' accounts, including but not limited to those under the CEA. (*See also* NFA 2-2-, 2-4, 2-26, 2-29). In bad faith, despite the many requests for information on the risk procedures, ADMIS knowingly and intentionally continued with the fraudulent concealment and omissions.

333.   Both Lazzara and ADMIS, bound by the laws and duties of the Commodities Exchange Act, Section 4(b) has a duty not to deceive, mislead or convey any fraudulent information to Plaintiffs. LCI as an IB regardless of his directives or clearing relationships, had an independent duty, under the CEA as well as had to undertake mandatory ethics training, which require brokers not to engage in practices of deceit, fraud or misrepresentation. Therefore Lazzara, and LCI, since they were not employees of ADMIS, had an independent obligation to be truthful and make the required disclosures.

334.    In accordance with his independent ethical duties, and independent compliance duties as a broker, Lazzara and LCI as an NFA member, and a registered IB, were obligated to and had a duty to comply

with Commodities Exchange Act, all CFTC and NFA rules and regulations, and a duty not to materially mislead Plaintiff, and was also bound by the anti-fraud provisions of the CEA and NFA rules, which without limitation specifically include NFA 2-2 a provision not to defraud, deceive or mislead others, and disclosures under NFA 2-26 and 2-29.  Further LCI and Lazzara were bound by the all the ethics and compliance duties of other rules and regulations.

335.  Lazzara was aware, due to his position of superiority and influence and control over access to information, that Kumaran, and other similar situated customers and CTA's,  had to rely on him, as the source of accurate information Lazzara had a duty to transfer accurate information to Plaintiffs,  a duty to be honest, had a duty to communicate accurate information to Plaintiffs.

336.  Since Lazzara had superior control over the information, and Plaintiffs reasonably relied upon and placed trust and confidence in the Lazzara to be honest, as is mandated under the laws, rules and statutes. At all times LCI *knew* of the relationship with HRF Defendants and its directly competing HRF CTA Referral program, *knew* that Plaintiffs account would be disseminated to its competitors HRF Defendants, *knew* that risk management services had been outsourced, and *knew* that additional fees would be deducted from Plaintiff's CTA track record to pay HRF – yet he persisted in willfully, wantonly and intentionally continuing to deceive and omit material facts, with wanton disregard for Plaintiffs' rights.

337.  Because of Plaintiffs' expertise in risk management, Plaintiffs' repeatedly questioned LCI for information about ADMIS risk management program. With full knowledge of the directly competing nature of Plaintiffs risk management services business, and Plaintiffs' competitive options trading business, and faced with direct questioning about how the risk management program would be handled at ADMIS, if it opened the account, specific questions on the types of margining, and electronic platforms, LCI, willfully, wantonly and intentionally continued to deceive and defraud and materially failed to disclose that  risk management had been outsourced to HRF Defendants, and that by opening an account ad ATMIS, Plaintiffs' trade secrets would be disseminated to its competitors.

338.  Kumaran was reliant on the accuracy of information to be conveyed to it through the IB Lazzara.. And Kumaran to its detriment did rely upon the information provided by Lazzara.

339.  But Lazzara, LCI, and ADMIS took actions to intentionally defraud Kumaran to open the account, despite direct questions on how ADMIS managed risk, its risk policies and procedures, did not convey accurate and honest information.

340. Lazzara and LCI (with the knowledge, participation and direction from ADMIS, and HRF Defendants) materially omitted in all conversations, that John Felag and owner and employees of Vision in Stamford, CT would be handling risk on behalf of ADMIS.

341.    Only after the account was closed, when Kumaran uncovered the fraud, Lazzara admitted on or around September 29, 2017 that ADMIS had risk management policies and procedures to disseminate Plaintiffs and other similarly situated customers and CTA's confidential trading records to Vision - policies and procedures by admission that Lazzara had materially concealed at account opening in violation of the CEA, and NFA 2-26 and NFA 2-29.

342.    Therefore Lazzara, Villa, LCI's actions and omissions, (with the knowledge, participation and direction from ADMIS, and HRF Defendants) especially in light of the direct questioning by Plaintiffs about the risk management program at ADMIS, during the account opening was willful, wanton and with intent to deceive, and concealed material facts.

343.    Furthermore, the extensive, and far reaching pattern of fraudulent conduct by Lazzara, LCI and Villa (with the knowledge, participation and direction from ADMIS, and HRF Defendants) evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large.

### F -  ACCOUNT OPENING

344.    Lazzara, LCI,  Villa,  (with the knowledge, participation and direction from ADMIS, and HRF Defendants) made overt fraudulent representations or by fraudulent omissions using interstate wire and telephonic communications to induce Kumaran to open the account at ADMIS,  including materially misleading Kumaran on the fees and commissions, on January 30 2017, blatantly lying about the risk management program, policies and procedures, in violation NFA 2-26 / CFTC 1.11, CFTC 1.55 and CFTC 33.7.

345.    On or around January 25, 2017 using interstate wires and communications, Lazzara from his offices speaking in Austin Texas, speaking to Kumaran in her offices in New York City, (with the knowledge, participation and direction from ADMIS and Vision Defendants represented that the only fees and commissions to the account would be ***$1.50 in commissions*** and NFA Fees and Exchange Fees. No other fees were authorized, disclosed or approved, other than NFA Fees and Exchange Fees.

346.    Lazzara in all his telephonic communications and emails communications with Kumaran and NRCM omitted to disclose either the trade processing fees and transaction fees, which he knew would

be tacked onto the account after opening, and willfully, to enable participation in the fraudulent scheme, violated his mandator disclosure obligations to disclosure them. In doing so, Lazzara and LCI violated the anti-fraud provision of the CEA 7 USC 6(B)

347.     Lazzara and LCI also knew that the trade processing fees and/or transaction fees were part of the compensation schedule to HRF and HRHC. It is black letter law under the CEA that fees and charges all other information related to risk management are disclosed to Plaintiffs.

348.     Plaintiff reasonably relied upon the false information and omission that there were no other commissions and fees, and subsequently opened account reliant on the information and have been subsequently substantially harmed as laid out herein.

349.     On or around January 27, 2017 LCI forward to HRF defendants. confidential copies of personal and private information about Kumaran Confidential and private information under the Federal Privacy Act, included copies of her passport, home telephone numbers, address, financial statements, social security numbers, without Kumaran's consent or permission, in violation of privacy laws.

350.     Once Kumaran had opened the account, as part of the scheme, the account was secretly, immediately turned over by ADMIS (including full disclosure to and acquisition by HRF, Felag, Boshnack, Rothman. As more and more errors were documented in the risk services, Vision defendants, gained unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis to unlawfully scrutinize the trading strategies on or around January 31, 2017.

351.     In a repeated and persistent pattern of fraud and deceit, on dates including January 31, 2017 February 1, 2017, March 8, 2017, March 21, 2017, March 23, 2017, and April 10, 2017, Trey Lazzara, using interstate and wire communications from his offices in Austin Texas, to Kumaran in her offices in New York City, to conceal the activity by omission and deception used acronyms such as "risk guy", "dev team", "tech team" to disguise HRF defendants involvement, cutting and pasting emails so as to pretend they originated from ADMIS; masking domain names; making numerous oral and written misrepresentations; deliberately pretending that "*John from risk*" works at ADM; when in fact it was John Felag; materially in some communications deliberately misrepresenting  Vision as "ADM risk" and "ADM" and/or a "division of ADM".

352.   On each instant as itemized in Exhibit 14, Lazzara and LCI  knowingly transferred, disseminated and disclosed  Plaintiffs' trading account, trade secrets and confidential non-public information with its competitors. At all times Lazzara knew that the information was trade secret and commercially sensitive, knew that Plaintiffs were launching various hedge funds and registering as CTA's, knew Plaintiffs had a directly competing risk services and software business from which they made a livelihood – and with wanton disrespect, and without Plaintiffs knowledge and consent, Lazzara continued to forward emails, and participate in HRF, and Visions wrongful and improper acquisition.

353.   Because Plaintiff has also documented to LCI that its strategies were proprietary and being used for a competitive purpose as a CTA and CPO, Lazzara knew that if Plaintiffs found out or learned of HRF, Felag, Boshnack and Rothman they would close the account and take immediate action.

354.   Lazzara with his own independent duties as a registered broker of the NFA, not to cheat, deceive or defraud his customers (7 USC 6B, NFA2-2, NFA 2-29) and his own independent duties to disclose the fees that were being charged to Plaintiffs to pay HRHC (NFA 2-4, 9005, 33.7(b)(2)) and his own independent duties to disclose the risk services that were being provided by HRF ), CFTC 1.55(K)-(l), NFA 2-29), overtly maintained a charade to deceive and lie to Plaintiffs.

355.   The CEA prohibits all forms of artifice, scheme, trickery, fraud and deception. Lazzara (with the knowledge, participation and direction from ADMIS, and HRF Defendants)  at all times, materially omitted and fraudulently concealed HRF's disclosure and acquisition of its account details knowingly deceiving Plaintiffs.

356.   Felag, Boshnack, Rothman, HRF, HRHC, their other its owners, employees, and affiliates now had acquired by fraudulent concealment, full disclosure of and acquisition of all Kumaran's confidential and financial trading data on a real-time basis, to analyze, study and monitor its trading patterns in direct violation of the CEA and Defend Trade Secrets Act Across interstate lines.

357.   The real-time trade secret acquisition of a Kumaran CTA's timing, execution, volumes, prices, strikes, triggers, and markets, especially in an options trading strategy, which not only directly competes with HRF trading affiliates, is the highest level of trade secret misappropriation for traders. It allows its competitors, to misappropriate not just the transactions,  but the exact details, timing and execution. The foregoing defendants acquire inner workings and execution of their competitors advantage, statements, were given a real-time disclosure of trade secret misappropriation.

358.     Lazzara, LCI and ADMIS knew the material conflicts of interest, the direct competitors. At all times Lazzara and LCI facilitated in and participated in the unauthorized disclosure of Plaintiffs trade secrets across interstate lines to Vision Defendants.

359.     Unknown to Kumaran, Lazzara as the broker responsible for handling the account, had now improperly given, without Kumaran's knowledge, consent and permission, full disclosure to each and every proprietary trade, transaction and confidential information. This information constitutes trade secrets. At no time did Kumaran consent to this activity.

## G - INITIAL ERRORS

360.      As soon as the account was open, however, risk management handling under the rogue outsourcing on the account was replete with errors and omissions and gross negligence, and in violation of exchange rule compliance. The services were performed by unqualified  and grossly negligent individuals,  with wanton disregard for their obligations by the illegal and fraudulently concealed risk management group.

361.      These material errors in calculations and unauthorized outsourcing of material risk to the unqualified personnel in HRF, Felag, Boshnack. Rothman, and HRHC,  violated CME Rule 930, CME Rule 982,  CFTC 1.11-1.15.  CFTC 1.55 in violation of CEA and breach of CME rules, including but not limited to as follows:-

   a.    On or around January 30. 2017 Plaintiff documented material errors and omissions, gross negligence, financial fraud and misreporting in the risk department of over 100% of Account Value,  that misreported account value and margin change in M/D was a negative loss of -$31,673 on a $25,000 account within a few hours of trading. The information was false and inaccurate and misleading.

   b.    On or around January 30,2017 Plaintiff documented grossly negligent errors also reported a drawdown of $31,256 dollars (negative/loss) when the account had positive value of around $25,000.

   c.    On or around January 30. 2017 Plaintiff documented material errors and omissions, gross negligence,  financial fraud and misreporting in the risk department and violation of exchange rules in performance bond calculation, erroneously requiring additional margin of $21,325 on a long option transaction  that had a cost and maximum risk of loss of $7.00.

   d.    The performance bond errors, material violations of the CME rules, gross negligence, material errors and omissions, financial misreporting of over 100% of account value.

## H -  INITIAL FRAUD

362.   When Kumaran questioned the material errors and technological deficiencies in the risk department, Lazzara, ADMIS and HRF, Felag, Boshnack, Rothman, HRHC, and its affiliates benefitting from the scheme, for the purposes of this timeline, hereinafter called "HRF Defendants")  and all of whom were knowingly and actively participating in the scheme to defraud Plaintiff attempted to cover up the fraudulent scheme, and continued to propagate the deceit and instead

363.   On or around January 30, 2017 Plaintiffs requested to speak directly to ADMIS. LCI denied the request stating the ADMIS doesn't take calls from customers. Therefore Plaintiff never received the "unparalleled" customer service that ADMIS boated about in its Corporate Brochure, and as part of the scheme to defraud, relied upon the fraudulent and misrepresentations to be made by Lazzara as the front-person propagating the fraud. (See Exhibit 18, 19,  20-CV-3783 – ADMIS FAC Exhibit 1)

364.   Instead Lazzara, despite the material errors in Plaintiffs transactions (*See* Exhibit 18 and 19), with the knowledge, participation and direction from ADMIS, and HRF Defendants, took overt actions to further the fraud and deceit to willfully wantonly deceive Plaintiffs their account was being managed by solely by ADMIS, and to conceal and omit HRF, and Lazzara made willfully misleading statements, instigating a pattern of fraudulent acronyms, euphemisms and terminology such as "risk guy", dev team", tech team" and "my risk guy at ADM" and "John from risk", "HR Risk", to deceive Plaintiff that he was speaking to only employees at ADMIS.

365.   On several occasions, including those cited in ¶378  ¶J, Lazzara and LCI, with the knowledge, participation and direction from ADMIS and HRF defendants made affirmative misrepresentations and/or material omissions which were misleading, incomplete, or dishonest statements to specifically misled Plaintiffs that John from risk worked **_at ADM_**, or risk management procedures was **_at ADM_**. (See **Exhibits 18 and 19, and also telephonic communications discussing the same**).

   a)     On or around January 30, 2017, Lazzara with the knowledge, participation and direction from ADMIS, and HRF Defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, made affirmative misrepresentations and/or material omissions to use deceptive terminology that he was speaking to "*one of the risk guys*" at ADMIS, to intentionally mislead Plaintiff that he was speaking to *risk management employees of ADMIS* while intentionally fraudulently concealed and omitted that he was communicating with  John Felag and others at Vision affiliates, in order to materially mislead Plaintiff by concealment, of Vision's disclosure and acquisition of its account.[9] The communications were both in email and telephonically when Plaintiffs documented errors and omissions in the risk department. This furthered the fraud by deceiving Plaintiffs to believe only ADMIS was handling risk.

---

[9]  Email LCI on January 30 2017 - That was one the risk guys. He could not create the risk scenario in his 3rd party risk tool because it would not bring up those strikes. The tech team is looking at this now..

b) Lazarra, with the knowledge, participation and direction from ADMIS, and HRF Defendants continued to mislead with affirmative misrepresentations and/or material omissions Plaintiff in email on January 30 2017, by referring to John Felag and Vision affiliates as the "*tech team*" [10]  and on January 31, 2017 using misrepresentative acronyms the "*Dev team*". [11] while intentionally omitting, including when Plaintiffs specifically questioned about the risk procedures and being able to speak to the risk department at ADMIS. Lazzara intended to mislead Plaintiffs that his communications were with an IT department of ADMIS, and not disclose that a rogue and unqualified risk services has been outsourced to the disbarred employee s of Vision. Upon information and belief, there was no "tech team" and there was no "dev team" and these statements fraudulently omitted the he was really speaking to HRF, HRHC, Felag, Boshnack and Rothman. This furthered the fraud by leading Plaintiffs to continue to believe only ADMIS were handling risk.

c)      On or around January 31 2017, Lazzara, with the knowledge, participation and direction from ADMIS and HRF Defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, made affirmative misrepresentations and/or material omissions, that he works with "*a division **within** ADM that focuses heavily on managed futures.. this is a good place for you to be*" and misrepresented his business relationship with Vision Defendants as with *a division **within*** ADMIS.  This statement was false and untrue, as his relationship he was speaking of to materially conceal he was working HRF its owners and employees and affiliates of Vision, by overtly and fraudulently referring to them and making material misstatements that were considered  "*a division **within** ADMIS*". HRF and their affiliates are not a *division of ADMIS*, and his statements constitute fraud. [12] This furthered the fraud by leading Plaintiffs to continue to believe only ADMIS were handling risk.

366.      It was now being documented that the so-called sham risk services were replete with errors and omissions (*See* Exhibit 18 and 19) and were material breached of the performance under the ADMIS Contracts. At this time LCI and Lazzara *knew* that Plaintiffs were being deceived, and they had not consented to the risk procedures to be outsourced to Vision defendants, and that under CFTC 1.55.(k)-(i), NFA 2-2, NFA 2-29, and other compliance laws,  he was prohibited from deceiving Plaintiffs in any manner whatsoever about the risk procedures. In those emails, and also telephonically, Plaintiffs also specifically asked to speak to the ADMIS risk guy he was speaking to, and LCI and Lazzara continued to deny that request, withholding information and concealing who was the counterpart.

367.      On or around February 1, 2017 using telephonic and wire communications Lazzara in Texas spoke and emailed to Plaintiffs in NY that he "contacted risk to add buying power to its account". These statements materially omitted that it was HRF, Felag, Boshnack, Rothman who were adding buying power. These action were also procuring material breaches of the ADMIS agreements, and violations of

---

[10] Email LCI on January 30, 2017 - The tech team is looking at this now. .

[11]  Email LCI on January 31 2017 - The issue that you were having is believed to be resolved. There was a patch that was added by the Dev team to OAK and the customer portal login so everything should look normal now.

[12] Email LCI on "January 31 2017 - ADM is the 8th or 9th largest FCM in the world. I work with a division within ADM that focuses heavily on managed futures. This is a good place for you to be. It just may take us more than a day to fix some of the issues with your unique situation.

the CEA rules, as it was expressly prohibited for another IB to add or extend margin or credit on Plaintiffs account. They were also <u>permanently disbarred</u> from such participation and the fraud was material. (See **Exhibit 19, See Ver.Fac.3668 Section 11**)

368.    LCI and Lazzara also continued material omission and to interfere in an procure intentional breaches of the ADMIS agreement and to violate the "sole discretion" provisions in the ADMIS contract, upon which Plaintiffs had relied that decisions in risk management were being made in ADMIS's **<u>sole discretion</u>**. (*See* 3873ECF22 ADMIS customer contract ¶1(e), ¶4,¶5,¶7,¶9,¶26)

369.    The emails on January 30, 31 and February 1 also demonstrate gross negligence and material errors and omissions, rendering impossibility of performance and breaches of the ADMIS agreement cased by the negligent services at HRF. They also breached ¶11 in non compliance with CME rules 980, 982 etc in performance bond calculations which were material errors and interference.

370.    Lazzara, LCI also materially omitted the fee sharing and the explanation of the overcharges in the account, and fraudulently concealed the G&F Agreements. (*See* 33.7(b)(2), NFA 2-4, 9005)

371.    Upon information and belief, the repeated reference to Felag and HRF affiliates as technology providers, computer development teams, and also "building patches on systems", HRF defendants may have had system administrator rights to ADMIS' portals, including but not limited to Members1. The online-customer portal, and various IT portals in the back-office.

372.    With security and administrator rights and ability to fix patches in portals, and also Lazzara, with the knowledge, participation and direction from ADMIS and HRF Defendants, continued to enact in the fraudulent concealment by mislabeling and  representing them as "tech team" or "Dev team", upon belief, HRF affiliates and its employees, were authorized to have computer level back-end administrator rights to all customer and CTA's confidential trading account at ADMIS. LCI's referral to building patches and fixing portals on a real-time basis, were presented as developmental computer department, which allowed them to gain real-time acquisition to all the confidential trading accounts and passwords, as an administrator does.

373.   Upon information and belief, ADMIS risk platforms, were also being developed by and/or outsourced to HRF Defendants, Felag, Boshnack. Rothman ,HRHC, HRF and/or other affiliates, giving HRF and its employees and owners, full administrator and system keys login and password to all ADMIS Members 1 risk management platforms and customers personal financial records.

374.   At all times Lazzara, with the knowledge, participation and direction from ADMIS materially concealed and omitted that competitors HRF, Felag, Boshnack, Rothman, HRHC and Vision affiliates, unqualified  had gained unauthorized disclosure and acquisition and continued to make fraudulent representations related to both the risk management policies, and handling of margin,.

375.   On or around February 1, 2017 LCI and Lazzara, with the knowledge, participation and direction from ADMIS and HRF Defendants, using interstate and wire communications admitted more material deficiencies, that the risk management group did not have intraday options capabilities to monitor transactions where Plaintiff or a customer owned 100% of the Open Interest in the Heating Oil options markets, and then persisted the deceit in failed risk management by claiming "*the margin errors you were having yesterday are resolved*" and again misrepresentations in email on February 1 2017 "*The issue that you were having is believed to be resolved…There was a patch that was added by the Dev team…*"  and "*I believe the patch fixed the problem*."[13] However the statements were materially false when made. (*See* **Exhibit 19**)

376.   The errors were not resolved, there was no "*patch added*", and there was no "dev team", or "tech team".   LCI and Lazzara with the knowledge, participation and direction from ADMIS and HRF Defendants, was instead fraudulently misrepresenting his communications as to be with computer departments, instead of truthfully disclosing HRF Defendants involvement to illegally add margin and tamper with the credit on Plaintiffs account, which is expressly forbidden under their registrations. This conduct violates the black letter law anti-fraud provisions of the CEA 7 USC 6(b).

377.    Rather than be honest, Lazzara, with the knowledge, participation and direction from ADMIS and HRF Defendants, continued to deceive and mislead and omit that risk management was being outsourced to HRF Defendants, in Stamford CT, at all times misrepresenting to Plaintiff that ADMIS was "fixing" the Portal and it the problems would be remedied. Kumaran did rely on Lazzara representations and in February 2017 made the switch to WTI Crude Oil.

378.    But continuing the fraud and ongoing material unsupervised violations of the Commodities Exchange Act, the only "fix" that was being fraudulently enacted in Plaintiff's proprietary account, was that competitors Boshnack and Rothman (owners of the disbarred Vision) and HRF were given discretionary authority to artificially add leverage and "buying power"  in the account, and using a non-

---

[13] Email LCI February 1 2017 - The issue that you were having is believed to be resolved. There was a patch that was added by the Dev team to OAK and the customer portal login so everything should look normal now.

compliant fictional calculation called "margin allowances".  This grant of rights to Boshnack, Rothman, HRF, HRHC, and Felag, was expressly without Kumaran's knowledge and consent, and is an express violation of the CEA. (See 15 U.S.C. 78g(c)(2)(B)], 17 CFR **§ 1.57 (c))**

379.   Lazzara's statements were false when made, and wilful, contained material omissions, wanton disregard for Plaintiffs' rights, intended to continue to induce Plaintiff to remain trading at ADMIS, and continue disseminating their trading strategies, for the direct acquisition, use, benefit and profits of its competitors at HRF Defendants and their directly competing Vision affiliates and various trading arms as described above, for their use, unfair competition and profit.

380.   When Plaintiff reported the errors, LCI continued the fraud that "*ADMIS had fixed it*" and that Plaintiff should switch to Crude Oil, and it was only a problem in Heating Oil.

381.   Kumaran reasonably relied on the representations of Lazzara, that ADMIS computer department were fixing patches on a portal. Kumaran  also reasonably relied on the representations, that switching to Crude Oil would resolve the problem, and it was a temporary glitch.

382.   At all times Lazzara, ADMIS materially concealed and omitted that competitors HRF Defendants, had gained unauthorized disclosure and acquisition and continued to make fraudulent representations related to both the risk management policies, and handling of margin,.

383.   Even though on multiple occasion, Kumaran directly questioned the grossly negligent and material errors and omissions in the risk management, and, material violations of exchange margin rules, Lazzara, ADMIS and HRF Defendants all had a duty to be honest, and not deceive, and under the anti-fraud provisions, to not deceive, cheat or anyway mislead, Kumaran.

384.  Instead, Lazzara, LCI, Felag, Boshnack. Rothman, ADMIS, HRF, and their associated entities, who are registered members of the CFTC, and had independent statutory duties to not mislead, defraud and cheat, or acquire a CTA"s trading strategies,  deliberately, and with malicious intent, continued to deceive conceal, obfuscate, mislead, and make overt fraudulent representations and directly lie, to Kumaran to conceal Felag and HRF Defendant's holding multiple directly competing businesses, gaining unauthorized disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis and directly competing STORM trading strategies..

385.   This pattern of deceit and concealment by the Enterprise, and conspirators, had pervaded for at that time close to three (3) years since 2014, without being caught, and at the time of Kumaran's CTA misappropriation, screenshots from Lazzara's computer, showed that the Conspirators had enacted the same pattern of fraud, to improperly acquire and deplete dozens of his other customers and CTA's trade secrets and trading strategies. Felag, and Lazzara, with the knowledge and participation of ADMIS, and HRF Defendants operated with wanton reckless regard for the rights of other traders and CTA's and flagrantly dishonest conduct. At all times Lazzara and LCI facilitated in and participated in the unauthorized disclosure of Plaintiffs trade secrets across interstate lines.

386.   Furthermore, the extensive, and far reaching pattern of fraudulent conduct by evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large.

### I -  MORE GROSS NEGLIGENCE IN VISIONS RISK SERVICES

387.   The so-called risk services by *Vision* were not only unnecessary, not approved by the CFTC performed by disbarred individuals, they were also replete with errors and omissions. During the course of trading during the period January 2017 – June 2017 Plaintiffs transactions were impeded by and subject to multiple occurrences of gross negligence in the area of risk management and Kumaran, documented screenshots of material errors and omissions in risk management quantification, material miscalculations of intraday valuation.

388.   *Vision Risk Group's* errors documented were upwards of 200% of account value, and contained documented, non-compliant margin calculations in violations of the Commodities Exchange Act, CME Rules, CME Rule 980, 982, 930A and CFTC 1.11-1.15

389.   Incorporated herein is a further documented list of *Vision Risk Group's*  errors and omissions, that showed a wanton disregard for the duties to the customer and negligence they were disbarred for:

    a.   On or around March 8 2017, at 1.03pm and 1.50pm  and 2:16pm Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department in Crude Oil WTI Derivatives of over $17,000 intraday profit on a $25,000 account (about 75% of account value), and its  liquidation value over $44,000. The errors were in violation of CME Exchange Rules, intraday valuation, MTM and margin .

    b.   On or around March 21, 2017 at 4:08pm, Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 25% of Account Value,  misreporting intraday liquidation valuation of $28,264.71

c.     On or around March 24, 2017 Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 400% of Account Value, fraudulently financially misreporting intraday change in liquidating value of $96,660  on a $25,000 account.

d.     On or around April 10 2017, Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of 734.23% fluctuation in margin excess and erroneous 62.95% fluctuation in account value and resulted in material misstatements.

e.     On or around April 10, 2017 Plaintiffs documented more errors and omissions on the ADMIS portals, with material financial errors upwards of $14,000 on a $25,000 account.

f.     On or around May 12, 2017 Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department and violations of the CEA, misreporting financial valuation of over 400% of Account Value intraday change in liquidating value of $93,462.64

g.     On or around May 15, 2017 Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 33% of Account Value misreporting working order intraday margin for buying 1 call options at $9,138.50

h.     On or around May 15, 2017 Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value, misreporting working order intraday margin for buying 10 call options at $29,136

i.     On or around May 16, 2017 at 9:24am, Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the risk department of over 100% of Account Value, misreporting intraday Net Liquidating Value of $27,855.35.

j.     On or around May 16, 2017 at 10:08am Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department of over 100% of Account Value, misreporting intraday Net Liquidating Value of $37,445.35.

k.     On or around May 17,  2017 at 1:05pm, Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision  risk department of over 200% of Account Value, misreporting intraday liquidation valuation of $34,761.10

l.     On or around May 17, 2017 whereby between 11.37am and 12.30pm Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department of intraday margin calculation are shown within hours apart on the same day falsely reporting Plaintiff had suffered a wrongful -$20,520 negative decline in liquidating value (which amounts misreporting a derivatives loss of 80.2%  financial loss of account value)

m.     On or around May 17, 2017 between 12.30pm and 1.30pm Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk

department of false reporting of a reversal of intraday gain now of +$17,140.00 (which amounts misreporting a derivatives gain of 68.6%  financial loss of account value).

n.      On or around May 17 2017 at 1:14pm Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department of over 100% of Account Value, misreporting intraday liquidation valuation of $46,001.10.

o.      On or around May 17 2017 at 11:37am Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department  of over 200% of Account Value, misreporting an enormous intraday MTM Gain and change of liquidating value now showing a profit of $68,490

p.      On or around May 17 2017 at 11:53am Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department  of showing errors 300% of Account Value, misreporting intraday liquidation valuation of $53,991.10.

q.      On or around May 17 2017 at 1:17pm Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department  of over 200% of account value, misreporting intraday liquidation valuation of $46,481.10.

r.      On or around May 17,2017  at 1:35pm, Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department  of over 200% of Account Value, misreporting an intraday liquidation valuation of $54,991.10.

s.      On or around May 17,2017 at 1:39pm Plaintiffs documented gross negligence, material errors and omissions, financial fraud and misreporting in the Vision risk department of over 200% of Account Value, misreporting intraday liquidation valuation of $54,131.10

390.   On many of the foregoing dates, listed above, including but not limited to March 21, 2017, April 10, 2017,  May 2 2017,  May 12, 2017, Lazzara and LCI agreed  that Kumaran's findings were accurate and there were grave material deficiencies in the calculations in the risk group. Lazzara thereby admitted and acknowledged the material deficiencies in technological platforms incapable of handling Derivative Transactions at the unlawfully outsourced and disbarred Vision Risk Group.

391.   On repeated occasions Lazzara admitted even his screens had errors in amounts of tens of thousands of dollars on an intra-day basis and he had no accurate reporting on his IB platform to monitor the account value intraday. Lazzara further misled Plaintiffs – to conceal and cover up Visions tortious involvement, that ADMIS had "no intraday margin policy" and acknowledge systemic failures in calculations in risk management stating the company was "*flying blind*" and "*a disaster waiting to happen*".

392.   On or around March 24, 2017, Lazzara admitted that ADMIS were using decades old technologies, from the eighties, which had known errors in Derivatives trading, and they had been aware of the deficiencies for years, that ADMIS were incapable of monitoring options on a real-time basis. These statements materially contradicted the promotional and corporate brochures that had been supplied to induce Kumaran to entrust its CTA trading strategies to ADMIS..

393.   The errors and omissions were so pervasive that on or around March 24, 2017 Lazzara acknowledge the deficiencies and instructed Plaintiff not to use the portals to monitor its position "till they were fixed". However they were never fixed, and ADMIS had no intention of, and never did correct or remedy its material breaches of contract.

394.   Despite the gravity and seriousness of the situation, and Kumaran's repeated requests for information on the clearly documented errors and omissions and gross negligence in the risk reporting, intraday margin calculations and handling of risks on its account, Lazzara, LCI (with the knowledge, participation and direction from ADMIS, and HRF Defendants) persisted in the fraud and deceit in all telephonic communications and wire communications, with the dates and times in part listed above,  to conceal that risk management and handling of margin had in fact been illegally outsourced to the unqualified HRF Defendants, their employees, owners and affiliates.

395.   In bad faith, even when Kumaran sent screen shots of documented errors and omission and violation of margin ADMIS propagated the fraud and deceit.

396.   Lazzara, LCI (and ADMIS, and registered HRF Defendants) had a material obligation and statutory duty to not provide misleading facts, yet in answer to specific questions on mishandling of risk, and the procedures being followed for risk at ADMIS, Lazzara willfully, wantonly, intentionally fraudulently continued to fraudulently conceal that the unapproved rogue risk operation, not disclosed in the RMP or approved under CFTC 1.11 was being used a shell to disseminate trading strategies, to its competitors HRF Defendants in Stamford CT.

397.   Lazzara in response to the gross negligence and errors and omissions, admitted that ADMIS had materially deficient electronic platforms, inaccurate Back-Middle-Front office portals, and improper risk management procedures and technologies which were materially incapable of handling intraday MTM and margin on commodities derivatives. Such admission demonstrated that ADMIS had made false and

misleading statements in public literatures and disclosure made upon which Kumaran relied were false when made and its failures were material breaches of its obligations.[14]

398.   With wanton intention to deceive, fraudulently concealed from Kumaran, was that the grossly negligent risk services were being supposedly outsourced to the same individuals and management team, who had cause over $2 million dollars of customer losses in options traders, were wholly unqualified and  using materially deficient technologies and electronic platforms, that did not even have capabilities to monitor all strikes, and later admitted all their systems were "broken" and incapable of handling intraday margin on derivatives.

399.   The errors and omissions, and gross negligence, demonstrated egregious inaccuracies that had wanton disregard for the rights of others and were distinguished from the failure to exercise ordinary care. ADMIS errors and omissions in derivatives were not a careless mistake, but were so extremely careless that it was equivalent to recklessness.

 400.  ADMIS purported retention and illegal outsourcing of unqualified services of Vision management  that had also caused over $1.5 million dollars of customers losses, also constituted gross negligence.

401.       Furthermore, the extensive, and far reaching pattern of fraudulent conduct by evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large.

<b>J -PERSISTENT FRAUD  CONDUCT – RISK INQUIRIES</b>

402.   As evidenced below, Lazzara and LCI on several dates, with the knowledge, participation and direction from ADMIS and HRF defendants in a continuous pattern of deceit, propagated his deception and fraud, fraudulently concealed by using deceptive terminology and material omission, and also intentional misrepresentation fraudulently

403.   The conduct engaged directly violates the anti-fraud provisions of the Commodities Exchange Act, as well as NFA Member compliance Rules 2-2 and the anti-fraud provisions of the CEA Plaintiff was willfully an intentionally deceived.

   a.   On or around March 21 2017, Lazzara with the knowledge, participation and direction from ADMIS and HRF defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, that he spoke to "*my risk guy at ADM*" to materially deceive Kumaran he was talking to ADMIS employees. Lazzara materially concealed by omission and misrepresented his multiple

[14] See violation of CME Rule 982, 980, 930, CFTC 1.11-1.15

SAC Vision  - Page 76

communications related to the risk management on Plaintiffs account were with Felag the former Vision, the risk management and not ADMIS to deceive and defraud. [15]

  b.    On or around March 23 2017, Lazzar, with the knowledge, participation and direction from ADMIS and HRF defendants  using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, fraudulently concealed and materially omitted that he was speaking to John Felag and others at Vision affiliates, and used deceptive terminology that he was speaking to "*a risk guy*" to intentionally mislead Plaintiff, he was speaking to a risk management employee of ADMIS.  He fraudulently concealed he was speaking to was John Felag from Vision affiliates, and materially misled Plaintiff by concealment and omission[16]

  c.    On or around March 24 2017,  Lazzara, with the knowledge, participation and direction from ADMIS and HRF defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, made fraudulent misrepresentations, and fraudulently concealed and omitted that he received an email "*from a risk guy at ADM*" in order to willfully conceal and deceive Plaintiff he was speaking to ADM. He had in fact received the email and other communications from John Felag and others at Vision affiliates in CT< and intentionally misrepresented he was speaking to ADM.

  d.    On or around May 12 2017, Lazzara, with the knowledge, participation and direction from ADMIS and HRF defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City, with deliberate intention to deceive, used acronyms and short-hand names of "HR Risk" and "ADMIS Risk" to materially deceive Kumaran that HR was an acronym for Human Resources. The email was designed to be  fraudulently conceal and disguise that risk management operations in Stamford Connecticut, were being conducted by Vision, instead of ADMIS.

  e.    On or around May 12 2017, at around 4.30pm from his cellphone Lazzara, with the knowledge, participation and direction from ADMIS and HRF defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City with deliberate intention to deceive, stated he had spoken to the risk guy at ADM, and there was no requirement to post additional margin, The statement was false, he was fraudulently concealing his communications with John Felag and Vision affiliates.

  f.    On or around May 12, 2017 using interstate wire and telephonic communications, Lazzara, with the knowledge, participation and direction from ADMIS and HRF defendants fraudulently misrepresented intraday margin requirements on Plaintiffs account and despite the gravity of serious CME compliance, material questions by Plaintiff on the risk procedures being used by ADMIS, fraudulently concealed margin was being handled by Vision, and that instead Lazzara was maintaining active communications with John Felag, Howard Rothman and Robert Boshnack and Vision.

---

[15] Email LCI March 21 2017 - I just got the following from **my risk guy at ADM**. Just wanted to give you an update that I spoke with ADMIS yesterday and they are discussing internally on the best course of ac   on to take and will get back to me with an update maybe today if not early next week.

[16] Email LCI Mar 23 2017  "As I mentioned I talked **a risk guy** today that acknowledged the issue and is going to raise the issue with the developers. I would suggest not using the portal at all until it is fixed except to view your statements."

g.    On Monday May 15, 2017, at around 6pm, Lazzara, with the knowledge, participation and direction from ADMIS and HRF defendants using interstate wire and telephonic communications from his offices in Austin Texas, to Plaintiffs offices in New York City NY at 212-431-5098 made materially fraudulent representations that he had spoken to a risk person **at ADMIS** who had authorized $134,000 of intra-day performance bond margin on Plaintiffs' account. The information was false. In reality, Lazzara had spoken to John Felag and Vision who had unauthorized discretionary authority in risk on Plaintiffs account and provided fraudulent information on Plaintiffs margining. The fraud was material, and Plaintiff relied on erroneous and deceitful information in violation of the Commodities Exchange Act. This leverage was more than 500% of account value.

h.    On or around May 16, 2017 at or around 8am, Howard Rothman in Stamford CT, and Robert Boshnack, in New York City, NY with the knowledge, participation and direction from ADMIS and HRF defendants made interstate wire and telephonic communications to Lazzara, and were directly managing, overseeing and wrongfully involved in the risks and trading of its competitors CTA account, demonstrating their direct oversight made phone calls to Trey Lazzara, in Austin TX, and instructed Lazzara to fraudulently conceal their involvement on Kumaran's and NRCM's account. To perpetuate that concealment, on or around May 16, 2017 Lazzara, then emailed to Kumaran using interstate wire and telephonic communications to New York City,and fraudulently disguised

i.    On or around May 17 2017, Kumaran from its offices in New York City, spoke to Dave Glancy directly at ADMIS risk department in Chicago, IL, and inquired why it was receiving inconsistent and inaccurate communications, regarding margin requirements. Glancy by fraudulently omissions, materially concealed from Kumaran that this authorization came from Vision, and directly participated in the fraud to conceal John Felag's material mishandling of the account – despite the serious financial ramifications to Plaintiffs.

j.    On or around May 24 2017, Trey Lazzara, with the knowledge, participation and direction from ADMIS and HRF defendants using interstate wire communications from his offices in Austin Texas, to Plaintiffs offices in New York City, used "masked domains" and concealed emails, to conceal the email addresses and domains of Vision, and misrepresented in email that "*John from risk*" worked at ADMIS to deceive Kumaran that his communications were originating from ADM.

404.   Lazzara knew the statements were false intended to deceived Kumaran, as ADMIS  with wilful, wanton and scienter had fully disseminated its CTA trading account, to its direct competitors, with full knowledge that HRF ran both a directly competing options CTA referral business, and for direct use, profit and unfair competition in their affiliated trading arms.

405.   On repeated occasion, using interstate wires and telephonic communications, Lazzara, made representations that "*he spoke to ADMIS*", and that "*ADMIS were aware of the problems*". At all ties he fraudulently omitted he was in fact communicating with John Felag, and HRF Defendants.

406.   Given the express requirements of the anti-fraud provisions of the CEA and other NFA requirements, reasonably relied on his representations that these were employees of ADM and had reasonably relied on the misrepresentations.

407.   On or around April 24, 2017 Lazzara admitted that he, and upon belief with Felag and Boshnack, were "studying" and "watching" Plaintiffs trading patterns to examine how it had generated alpha and returns, short term commodities options trading.

408.   After the improper acquisition of traders and Plaintiffs trading program STORM, HRF and its affiliates, did in fact, copy, use, refer to, upload, download, modify, inspect, scrutinize, dissect, study, glean from, replicate, for  profit and gain, registering a few months later in March 2018, as a directing competing CTA, Vision Investment Advisors LLC which used, incorporate, modified, parts and aspects of the STORM program, for use and profits in a commercial and directly competitive environment called the SSP program, as discussed early, also in short term commodities options trading

409.   Upon information and belief, records showed there are dozens of other customers at LCI who's customer accounts and confidential records who had also succumb to the same fraudulent scheme and who's accounts were being overcharged fees and disseminated to Vision affiliates.

410.   Felag and Vision owners' Boshnack and Rothman, who were directly overseeing, knowledgeable and managing the conduct, and Vision affiliates, also actively participated in the fraud, as they as NFA Members knew, it was prohibited for them to obtain disclosure of or acquisition of other CTA's accounts repeatedly and persistent committed fraud to deceive Plaintiff and disguise and conceal Vision involvement.

### K- ACCOUNT INTERFERENCE

411.   On or around April 10, 2017 Plaintiff notified Lazzara that its registration had been completed as a CTA on the NFA website and instructed him to make the necessary or required notifications to ADMIS. Kumaran was still unaware and completely unaware of the rogue interference

412.   On or around April 20, 2017 Kumaran's CTA account performance was proving out and showing higher than average returns in its options trading strategies, estimated at about  12%  over sixty days.

413.   On or around April 24, 2017, Lazzara using interstate and wire communications from his offices in Austin, TX, to Kumaran stated expressly that he was "scrutinizing" Kumaran's CTA trading strategy in STORM Fund.

414.   Lazzara comments of dissecting Kumaran's CTA  trading strategies, studying and scrutinizing its algorithms were outside of his express limited duties as an Introducing Broker.  Upon information and belief his dissection and analysis and communications to disseminate Plaintiffs trades were being conducted together with Villa, HRF, Felag, Boshnack, Rothman, VIA, HRHC. Instead of responding  to an ordinary question related to investigating various additional expiration fees and options charges that had been charged, and was more interested in how the strategy had generated profits.

415.   Upon information and belief, LCI and was in direct communication with Felag and Visions' direct competitor affiliates who had gained unauthorized full disclosure and acquisition to  Plaintiffs' trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets", for their possession, control and analysis and were also involved in scrutinizing the performance history record, after Trey Lazzara's direct comments.

416.   On or around April 25, 2017, LCI, Lazzara, without authorization, and consent,  upon unlawfully distributed Kumaran's and other customer and CTA's trading accounts to Julie Villa,   another unregistered associated person, also across interstate lines. Villa was located in Hawaii, and had Lazzara and LCI then provided remote login and emailed distribution to all of LCI's customers data (including Plaintiffs trade secrets). **Exhibit 22** is a true and accurate copy of Villa working with a tradeportal.com email account and receiving dissemination of Plaintiffs trade secrets in Hawaii.

417.   Plaintiffs did not send their files to Villa, as it was unclear what role she was playing. Villa claimed she had access and Members 1 logins to everyone accounts from Lazzara. Villa's role was not secretarial but clearly customer facing with inner workings of customers' accounts, and also did not comply with the registrations necessary as an associated person or branch office. (**Exhibit 22)**

418.   Lazzara hasty apparent retention of Villa, failed to proper protocols, or comply with rules, regulations, and management of Villa, who remained unregistered as an AP and continued to moonlight with other entities, including Garwood Securities, may upon belief not have been properly documents, as she was employed at Garwood.

419.   Upon information and belief, Villa was not an employee of LCI, did not at any time during the unlawful acquisition of trade secrets and customer data, register with the NFA, and maintained affiliations with numerous competitive business interests, including Vision defendants.

420.   Upon information and belief, Villa, also directly participated in the unauthorized dissemination of trade secrets, and also given unauthorized dissemination to multiple customers, traders and CTA's accounts, to upload, download, study, copy, replicate, modify, analyze, test, scrutinize, glean from, dissect, use, incorporate on to her home computers, for personal use and benefit, or for the benefit of others.

421.   On or around May 2, 2017 – competitors and strangers – HRF, Boshnack, Rothman Felag, HRHC, and other  employees and affiliates who had been granted unauthorized  discretionary authority on their competitors Kumaran's CTAs trading account, in violation of NFA Rules,  willfully and intentionally tampered with financial controls, added on further unauthorized fees, and tortiously interfered with and sabotage their competitors, Kumaran's CTA's trading performance, in express violation of the CEA, and direct espionage.

422.   Without Kumaran's knowledge and consent, and with scienter, fraud and deception as Lazzara, LCI, Felag, Villa, Boshnack, Rothman, HRF, HRHC, recognizing their competitor's account had thus far proven to be profitable, and overtaking their own CTA's record,  On or around May 2, 2017, Felag, HRF, Boshnack. Rothman, HRHC and its affiliates, to deliberate thwart competition of Kumaran CTA's account, began withdrawing and scalping <u>additional</u> cash deductions from Kumaran's CTA performance records (after wrongfully acquiring and obtaining full disclosure of the account from ADMIS), to reduce the profitability on the account.

423.   The "new fees" coincided with Villa's retention and may also have been diverted to pay babysitting costs and/or other Lazzara's personal expenses. No such fees were authorized or approved by Plaintiffs and are unlawful. The withdrawals starting on May 2, 2017 exceeded $1,000 an constituted grand larceny. The theft of fees and reduction of Plaintiffs profits was unlawful.

424.   The adding or unauthorized fees, midway through a profitable competitors trading account is expressly forbidden under the Commodities Exchange Act.[17]   At no time did Plaintiffs authorize, approve, consent to or grant permission to these fees.

425.   Kumaran's CTA trading strategy  relies on accurate prices and calibration to the market. Since it also transacts commodities options, which sometimes have premiums of less than a $1.00 or as low as $0.10, concealing an additional of a fee even in the amount of 30 cents was a material adjustment to its

---

[17] NFA Rule 2-26 / CFTC Reg 33.7 (b) (2)  / CFTC Reg 33.7(c)   CFTC Reg 33.7 (f) / NFA Rule 2-4  Int Not 9005

account and deliberate economic interference, that procured breaches of contract and inherent rules and regulations. (See e.g. NFA 2-4 9005 / CFTC 33.7(b)

426.   To disguise and make the addition undetected, the fees did not appear on the online platforms. The addition of these May 2, 2017 fees caused significant damage to Kumaran's automated options trading program and the execution of trades and was a material destabilization of the program,

427.   As a direct result of the malicious and tortious interference Plaintiff's CTA trading performance and competitive advantage was materially harmed and it was executing trades not in calibration with the market and its program was intentionally destabilized.

428.   Lazzara and LCI, and ADMIS, in express violation of his duties as an IB, intentionally and knowingly failed to notify or seek consent from customer, fraudulently concealed the fees, materially omitted in communications their addition, failed to seek consent from Plaintiffs.

429.   The actions showed a wanton disregard for Plaintiff's rights evinces a high degree of moral turpitude and wanton dishonesty and was deceitful and prohibited NFA 2-4 / 9005

430.   On or around May 5, 2017 Kumaran again requested direct information from Lazzara, to be conveyed to ADMIS, on the risk management policies at ADMIS. Lazzara, who was concealing and fully aware that HRF,Felag, Boshnack, Rothman, HRHC and other employees and affiliates were operating the risks behind the scenes, fraudulently concealed and materially omitted that Vision affiliates had been delegated authority to handle margin and approvals of risk on Plaintiff's account.

431.  Despite direct requests, on or around May 5 2017 Lazzara, using interstate and wire communications made deliberately false and misleading statements that ADMIS had "no intraday margin policy" and acknowledge systemic failures in calculations in risk management stating the company was "*flying blind*" and "*a disaster waiting to happen*". Again by concealment he omitted HRF Defendant's unauthorized handling of margin and risk, that was not approved by the CFTC.

432.   On or around May 15, 2017 at around 6pm Lazzara using interstate wire and telephonic communications from his offices or cellphone in Austin Texas, speaking to Kumaran in her offices in New York, NY, made affirmative misrepresentations, that he had just spoken to ADMIS, and that ADMIS had authorized an intraday margin credit of $134,000. The information was false was spoken.

433.   On or around May 2, 2017, and until May 17, 2017 Lazzara, with the direct knowledge and participation of HRF, Boshnack. Rothman, Felag, HRHC, the foregoing as direct competitors, willfully, wantonly, fraudulently, and intentionally to harm and malicious interfered with Kumaran's rights as a

trader to fair market participation, unlawfully manipulated credit and margin on Kumaran's CTA account, while adding unauthorized fees which began effective May 2, 2017 to willfully maliciously diminish its competitors Kumaran and its trading strategies STORM performance.

434.   On or around May 2, 2017, May 5, 2017, May 12, 2017, May 15, 2017 using interstate wires and communications, Lazzara, LCI, (acting in direct participation with, and upon belief at the direction of HRF, Boshnack. Rothman, Felag, HRHC, direct competitors of Kumaran CTA and its STORM program), made the following fraudulent statements, to deliberately mislead Kumaran and fraudulently conveyed the following misinformation;

    a. that ADMIS had no intraday margin requirement, and the only penalty for trading intra-day was a 10% end-of-day overcharge to SPAN, which Kumaran met;

    b. that there was no requirement that Kumaran should reduce positions;

    c. Kumaran was free to transact till expiration with up to $134,0000 of intra-day margin;

    d. there was no additional margin requirement and Kumaran could transact freely, as along as it met its end-of-day margin, which Kumaran met;

435.   Kumaran complied with and relied upon the fraudulent directives and instruction which were being tortiously manipulated by its competitors, HRF, Felag, Boshnack Rothman, HRHC.

436.   Upon information and belief, Lazzara was not communicating with ADMIS, but instead spoken to HRF, Felag, Rothman, Boshnack, HRHC and had not received these directive from ADMIS, Instead HRF, Felag, Boshnack, Boshnack, Rothman, and HRHC, were violating exchange rules, performance bond calculations.

437.   **<u>Lazzara, LCI and ADMIS never issued a margin call</u>**, as is black letter law, required under exchange rules.

438.   On or around May 17, 2017 Kumaran documented errors and omissions of magnitude greater than $75,000 in the calculation of valuation and intra-day margin. When Kumaran questioned the errors, LCI and Lazzara failed to respond.

439.   In further malfeasance, wrongdoing, without Kumaran's knowledge and consent, Boshnack, Rothman, and Felag were tampering with, interfering with, violating exchange rules, and in gross negligence and errors and omissions, misstating account and using unreasonable, non-exchange complaint procedure to inflate Kumaran's account – with detrimental effects.

440.   At all times, including on or around May15, 2017 and May 16, 2017 using interstate wires and mail communications, Lazzara persisted in the fraud, deceit and misrepresentation, to conceal HRF, Felag, Boshnack, Rothman, HRHC and their affiliates distribution and acquisition and their grossly negligent, deliberate and material meddling in its competitor CTA's account, which was expressly forbidden under exchange rules, and instead fraudulently misrepresented that ADMIS had authorized an intraday credit line. The information was false.

441.   In reality, HRF, Boshnack, Rothman, Felag, HRHC and their affiliates had unlawfully manipulated credit without consent or authorization, causing material harm and wanton and reckless misguidance to a competitor Kumaran's CTA account. Their actions were  expressly forbidden under the CEA,.[18] They were also fraudulently misleading Plaintiffs on the margin requirements.

442.   While continuing the malfeasance, Lazzara, LCI materially concealed and omitted from dialog, that its direct competitors HRF, Felag, Rothman, Boshnack, HRHC,  had fully disclosed discretionary authority on his customer and CTA's and fraudulently concealed the outsourcing of risk management policies and procedures – even when it was evident customers account were suffering financial harm – and as later learned such risk policies were not approved by the CFTC.

443.   Despite the gravity and seriousness of the situation, Lazzara, using interstate wire and electronic and mail communications, intentionally, repeatedly and persistently continued the deception and fraud, knowingly misrepresented pretending to Kumaran that he was speaking to ADMIS, and instead fraudulently concealed and materially omitted that risk management services were being provided by Felag, Rothman, Boshnack, HRF, HRHC and Vision affiliates.

444.   As a result of the rogue risk services, and unauthorized tortious interference by HRF, HRHC, Felag, Boshnack and Rothman, at the "controls" of his competitors account, who had an unauthorized grant of discretionary rights on PLainitff's (a competitors) account, and with material conflicts of interest, were using a non-compliant,  unlawful unorthodox fraudulent margin and credit adjustments to Plaintiff's intra-day margin, they willfully, maliciously, intentionally misled Kumaran on its margin, and

---

[18] **7 U.S. Code § 2 - Jurisdiction of Commission**; liability of principal for act of agent; Commodity Futures Trading Commission; transaction in interstate commerce:  (c.) (v) . (IV)  **It shall be unlawful for any futures commission merchant to, directly or indirectly, extend or maintain credit to or for, or collect margin from any customer on any security futures product unless such activities comply with the regulations prescribed pursuant to section 7(c)(2)(B) of the Securities Exchange Act of 1934** [15 U.S.C. 78g(c)(2)(B)]

then restricted Kumaran's ability to place trades, and willfully caused substantial losses and harm to Kumaran's STORM program, to harm its competitor.

445.    Their actions, circumvented the rules, regulations and requirements under CME Span, and caused an avoidable loss, Kumaran's CTA track record, damage to its trading ability and the performance, in direct unfair competition, with malice and scienter, and in express violation of the CEA, HRF, HRHC, Felag, Boshnack, and Rothman, direct competitors, while systems were replete with errors restricted Kumaran's ability to place trades, or take risk mitigating positions.

446.    Under no provision under the CEA, should Boshnack, Felag, Rothman, HRF and HRHC have had discretionary authority or margin authority on the STORM program, without Kumaran's consent. And shortly after the tortious interference and unfair market activity, registered a directly competing trading program SSP, which substantially mirrors, copies, replicate, incorporate the same aspects of the STORM program, front-runs Kumaran's CTA, and direct competes with direct misappropriation of trade secrets and for use and profit.

447.    This is precisely the unfair market participation that the Commodities Exchange Act prohibits. Boshnack, Rothman and its affiliates have been disbarred from the exchange Vision Financial Markets, for failure to act in good faith, and unfair and unjust principles of trade.

**448.**    On or around May 17, 2017  Kumaran in New York, ignored directives to not call ADMIS directly, and finally spoke to Dave Glancey, requesting information on why access had been restricted to its account, in Chicago, IL, at ADMIS risk department. Glancey, also, by fraudulent concealment, intentionally omitted and failed to disclose that HRF, Felag, Boshnack, Rothman,  affiliates had been outsourced risk, and then conceded that "Kumaran had not been receiving correct information from the IB". Such actions to not convey accurate information were also fraud and direct interference in Plaintiffs contract.

449.    In  or around June 15 2017, when Plaintiff spoke directly to a Dave Glancey, at ADMIS, he  agreed that Kumaran did have a $250,000 intra-day margin credit on its account, and that previously in May, Kumaran had ***not*** been receiving "the correct directives" from the IB.

450.    Glancey also stated that the information being received was untruthful and ADMIS had not sent any directives to close the account. Glancey then subsequently referred Plaitiffs to open a new account but that the "IB was not competent".

451.   During all telephonic and wire communications with Glancy, on June 15, 2017 and other dates, ADMIS, through Glancy, also knowingly and intentionally concealed the delegation and authorization had been outsourced to its competitors HRF Defendants. At all times Glancey propagated the fraud and deceit, and willfully concealed in communications with Plaintiff, that HRF had been the cause of the interference, third parties had received disclosure and acquisition to the account, and instead referred to the problem as being caused by Lazzara, the "IB".

452.   To further interfere with Plaintiffs provision of rights to its business, asserts and property, on May 24, 2017 Lazzara sent an email that stated that "ADM sent an email about moving my account". (See **Exhibit 23**). It was later learned that it was the tortious action and interference to take overt actions to harm Plaintiffs and close the account was instigated by HRF, Felag, Rothman and Boshnack (and not ADM).

453.   Vision Defendants tortious actions to interfere in Plaintiffs provision of rights, were not only to interfere with and close Plaintiffs account, but to further cause breaches of the ADMIS Customer Agreement, violate margin rules, fail to convey accurate margin, and therefore deliberately interfered with and closed Plaintiffs account at ADMIS.

454.   On or around June 17,· 2017, Kumaran from its cellphone in New York City, New York spoke to Dave Glancy in his offices in Chicago, IL, and discussed the risk management policies on Plaintiffs accounts. Glancy again fraudulently concealed and materially omitted that Vision had been delegated authority to handle margin and risk management. In fraudulent concealment Glancy stated the "IB" was unqualified to handle the account.

455.   At the time Kumaran was still materially deceived that only IB was Lazzara and had no knowledge or awareness of Vision .

456.   Glancy knew and had actively participated in the fraudulent concealment that the account had been outsourced to HRF, Felag, Boshnack. Rothman, HRHC and their affiliates, but fully participated in the concealment and deception. Glancy then material representations that the fault of mishandling laid on Lazzara, as the IB, and recommended Kumaran migrated to a new IB.

457.   On or around June 8, 2017 Kumaran because of the gross negligence, errors and omissions began to close its account at ADMIS. At no time did it have knowledge that behind the scenes Vision were responsible for the risk management services at ADMIS.

458.   On or around June 25, 2017 Kumaran closed the account, citing gross negligence in the risk department and still materially unaware of Vision affiliates disclosure and acquisition to the account.

459.   On or around June 29, 2017 Kumaran sent a letter of termination to Lazzara that they had permanently terminated their relationship with him as an Introducing Broker, citing gross negligence and mishandling of the account. At the time, Kumaran had still no knowledge of the involvement of Vision its owners, employees and affiliates.

460.   On or around June 27, 2019 Glancy had recommended Kumaran reopen the account at the NY Office of ADMIS, still fraudulently concealing the activities of HRF Defendants.

461.   On or around June 29, 2017 Kumaran met with Joseph Noce at ADMIS in New York City. Noce stated the ADMIS Privacy Policy did not permit ADMIS to share Kumaran's CTA records at all, even between ADMIS NY and ADMIS Chicago, and that ADMIS policies prohibited the distribution of trade data. At the time, Kumaran had still no knowledge of the involvement of Vision its owners, employees and affiliates.

462.   On or around September 29, 2017 Noce, an ADMIS NY employee, resent a copy of ADMIS's Privacy Policy, that he stated prohibited sharing of customer accounts. Noce stated he was not aware of any risk management services being outsourced to Vision, or permissions to share confidential records with third parties.

463.   Other ADMIS employees also stated the Privacy Policy expressly forbade the sharing of customer account information, specifically trading data, even between ADMIS location offices and no such activity was permitted under ADMIS internal policies.

464.   On or around June 30, 2017 Kumaran was still receiving erroneous billing from Lazzara, and due to high volume of trades, it was noticing discrepancies in some of the financial statements – which over the summer, once the account was closed – it began to reconcile.

## L -DISCOVERY OF THE FRAUD

465.   On or around August 20 2017 Kumaran through reconciliation and audit, detected that cash balances in the account ending balances did not tie out, and that unauthorized fees and payments had been made to deplete its CTA performance by over  3.4% over forty five days, - calculated to be about 18% a year annually, to deplete its competitive valuation of the STORM program, without authorization and consent, in direct and targeted unfair market competition.

466.   The withdrawal of unauthorized "trade processing" fees starting on May 2, 2017 was an express violation of the Commodities Exchange Act, as well as willful, wanton and intention tortious conduct to deplete and reduce profitability of its competitors track records, which would be used in direct competition with VIA, and HRF's CTA referral business. Upon information and belief, the formed FCM Vision also operated with trade-craft of adding additional fees and charges of "trade processing fees" and "transaction fees" to inflate and exceed the charges under the Commodities Exchange Act. Kumaran never consented to fees being added, in breach of the

467.   The front-loading and excessive charging of fees, were symptomatic of the long standing bad faith conduct of Boshnack who had an predatory pattern of charging CTA's 6% a year or more, in their CTA referral business. (*See* supra) Therefore they had direct motivation to tamper with and reduce profitability of the competing STORM program.

468.   Kumaran promptly notified Lazzara who repeatedly stalled and prevaricated in response.

469.   ADMIS own reporting systems were incorrectly reconciling Kumaran's CTA performance records, as the "unauthorized fees" to HRF were not calculated in the one of annual reports, thereby showing lower than reported cash balances in the accounts. These were also material financial errors that are expressly prohibited in the financial reporting requirements of the FCM.

470.   In email on or around September 27, 2017 Kumaran, specifically questioned  to Lazzara, LCI what the "trade processing fees" and "transaction fees" were, what the difference was, and why some appeared and disappeared off the reports and specifically requested information on whom the beneficiary was on the fees, and requested clarification that ADMIS was the sole beneficiary of these unorthodox fees. (See **Exhibit 9**)

471.   Instead Lazzara, without explanation, attempted to suspiciously and hastily refund the "trade processing fees" – once caught - and claimed they were billing errors. However this information was false was made, because Kumaran was later provided with the Guarantee and Fee Agreements, (*See* 20-CV-03668 ECF 31).

472.   Again in bad faith, and willful, and  wanton disregard for Kumaran's rights Lazzara failed to provide answers to his Kumaran, on important questions on who the beneficiary of the trade processing fees and transaction fees on its account,  and refused to respond on the recipient.

473.   Lazzara however never refunded the transaction fees, and his explanations that they were exchange clearing costs, were also materially false when made, as they "disappeared" off the reports on

May 2, 2017, the same date the trade processing fee appears, and exchange fees, cannot be removed. Upon information and belief, these fees were also part of the fee structures contained in the Guarantee and Fee arrangements, and that Lazzara had fraudulently represented were "Exchange Clearing Costs".

474.    On or around September 20, 2017 Kumaran uncovered emails that which had copied externally that suggested that confidential communications about to Kumaran's trading account had been shared via email. Kumaran immediately started to question Lazzara and seek clarification on whether unauthorized disclosure  or unauthorized involvement had been given to its account an unauthorized third party called High Ridge.

475.    Lazzara in bad faith, failed to respond timely to the legitimate questions.

476.    On or around September 26, 2017 and September 27, 2017 Kumaran persisted in contacting Lazzara, demanding information on both the account overcharges, and for identification of what role and what purpose HRF played in its account.

477.    On or around September 27, 2017 Kumaran learned through the NFA Basic Website, that Felag and High Ridge were formerly the disbarred Vision Financial Markets LLC. Information that was showed  hundreds of  reparations cases, and bad faith conduct occurrences and complaints.

478.    On or around September 29, 2017 after multiple emails, seeking explanations from the introducing broker Lazzara, who for over nine months had engaged in a persistent pattern of fraud, questioned on how unauthorized third parties who appeared to be disbarred "Vision" affiliates had been copied on emails related to its accounts and sought confirmation if they had had received disclosure of its confidential accounts, and demanding to know what their financial interest was in her proprietary trading records as a CTA, Kumaran was alerted to the fraud. (**See Exhibit 8**)

479.    Lazzara on or around September 29, 2017 only months after the account was closed, and in express violation of the anti-fraud provisions and other disclosure requirements of the CEA, then finally admitted to the existence of various concealed "*ADMIS policies and procedures"* and that he was following that required him to "seek approvals" from Vision affiliates and employees. This admission, proved that Lazzara, LCI, Villa, ADMIS and all Defendants *knew* of the existence of this policies and procedures, and wilfully, wantonly and with scienter and deception, knowingly concealed them before, during and after except until caught.

480.    Lazzara's statement that  he was following the procedures of ADMIS to give confidential emails related to Kumaran's trading account to HRF, Felag  affiliates' demonstrated the willful and deliberate

intent to conceal material risk management procedures at account opening, and during the ongoing communications, and which he and ADMIS, at all times,  had a statutory and mandatory obligation to be disclosed. Kumaran had relied on these statements which contained omissions and misrepresentations, and would not have disclosed its trade secrets, in direct competition with HRF,  if the prerequisite risk disclosures were made. [19],

481.   As incorporated in full by reference amended complaint ADMIS, the CFTC had not approved or authorized the outsourcing of risk management to HRF, and the so-called risk program was not disclosed in the RMP, and in express violation of CFTC Reg 1.11, rogue, unlawful and authorized, and operated as a ruse and forefront for the enterprise and misappropriators to accumulate its competitors trading strategies.

482.   On or around October 12, 2018 ADMIS, admitted that it had shared the trading strategies of Kumaran's CTA account with its competitors HRF Defendants, its owners, employees and affiliates – in arrangement for them to provide risk management services. As the risk management services performed were unauthorized, illegitimate,  not approved by the CFTC, they were unnecessary, unlawful, prohibited, an express breach of contract, and an egregious violations of the rules and were non-compliant.  As documented herein, the unnecessary, unlawful services were also performed with material conflicts of interest, tortious interference, gross negligence, by unqualified personnel, replete with errors and omissions.

483.    On or around November 7, 2017, Plaintiff spoke with other ADMIS brokers, TJM securities, and they had not heard of any legitimate or necessary outsourcing of risk to Vision affiliates.

484.    On or around May 11, 2018 Plaintiffs spoke to Ms. Frances Gonzales a managing director at the CFTC responsible for oversight on the CFTC Reg 1.11 risk services. She stated she had no knowledge and CFTC had not approved any such risk services by Vision Defendants. Plaintiffs also spoke to Debbie Kokkal at the CME. They were not aware of any approvals between ADMIS and HRF or its affiliates that permitted sharing of customer accounts, or any outsourcing in the RMP that was authorized. The purported unlawful, unnecessary risk management service were fraudulently concealed from the CFTC, and violated CFTC 1.11.

---

[19] *See* NFA Rule 2-26 / CFTC 1.11, 1.55 and 33.7.

485.    On or around August 16, 2019 Plaintiffs spoke to James Koutoulas, a former NFA Board Member who also clears his company futures trading accounts through ADMIS. Koutoulas had no knowledge of any outsourcing of risk to HRF, Boshnack, Rothman of its affiliates.

486.    Later, it was learned that Kumaran's was one of many traders,  customers and CTA's that ADMIS had been giving backdoor disclosure and acquisition to HRF, Felag, Boshnack, Rothman, HRHC, and their directly competing entities, to unlawfully acquire the trading strategies, trade secrets and financial information of its confidential futures customers' accounts. Kumaran, a registered CTA and NFA Member had not authorized such conduct, and it was fraudulently concealed.

### SECTION VIII_- DIRECT COMPETITION, USE, PROFIT AND GAIN

487.    On or around March 13, 2018, after fraudulently acquiring Plaintiff's STORM trade secrets, confidential and proprietary transaction records and trading history, in violation of the Commodities Exchange Act, the Defend Trade Secrets Act, and other Federal and State Law, Boshnack, Rothman, ,Rothman Family, LLC ("RF"), Boshnack Family, LLC ("BF") and John Felag formed and registered Vision Investment Advisors, LLC, to offer directly competing CTA, and launched a CTA trading vehicle that it offers to the public, specifically in directly competition to STORM, that substantially replicates and mirrors commodities options trading program which they calls "SSP" .

488.    The program applies a *similar short-term short-options strategy, mirroring the options portfolio combination of calls and put,* with substantially components and architecture of the trading strategy. The trade secret features that are incorporated are translated to three commodities, Crude Oil, S&P and Gold, and the features *has similar, strikes, volumes, premiums, and time horizon, strike distance from the money, components and features.* The underlying commodity is immaterial and each strategy works equally on S&P and Crude Oil. Plaintiffs had also disclosed that their strategy was to be launched in all three commodities (S&P, Crude and Gold).

489.    In September 2017 Plaintiffs in public literature at the CTAExpo in NYC, listed and publicly announced it would be launching the STORM trading strategy for S&P options.(See **Exhibit 24**) There are almost no other CTA vendors other than STORM and SPP offering these particular type of short-term strategy short-options vehicle. The CTA vendor brochures list *no other* vendors offering that matches the

490.     Only six (6) months after, using fraud and misrepresentation, improperly acquiring  Kumaran's trade secrets, did Boshnack, Rothman, launch a substantially similar and competing offering which they had no record of publicly offering before. No such offering existed until March 2018, despite them being in the business for decade.  (See Exhibit 7 and Exhibit 4)

491.    The alter-ego trading arms VIA, BF, RF, owned and controlled by Boshnack and Rothman, and day-to-day operations managed by Felag, share the same offices, personnel, resources, and computers. Rothman lists himself, with material conflict of interest as the CTA on the account.

492.    The program was launched for directly competing use about nine (9) months, after Kumaran closed its account, and HRF, Felag, Boshnack, Rothman, HRHC had improperly acquired, uploaded, downloaded, studied, copied, replicated, analyzed, tested, gleaned from, scrutinized, dissected, used, modified, incorporated Kumaran's STORM trading strategies. The SSP strategies mirrors substantially similar components of the directly competing STORM strategies, in non-public components including trading records, transaction history, positions, trading data, positions, strikes, premiums, delta, gamma, vega, and option strategies, risk management techniques and real-time execution, "trade secrets". The underlying commodity is not material as the trading strategies, as was disclosed in April 2017 applies to S&P, Crude Oil and Gold, and the STORM fund is in all three.

493.    Defendants Vision Investment Advisors, Inc, ("VIA"), owned by Rothman, Boshnack, Rothman Family, LLC, Boshnack Family, LLC,  became registered as a CTA in direct competition with Kumaran and NAM and the entities are kept separate from HRHC and HRF, as part of using the corporate form, to perpetuate the fraud.

494.    The Vision Enterprise having willfully, wantonly, intentionally, recklessly, and with intent to damage and reduced Kumaran's CTA track record, including on May 2, 2017 directly inflicting more unauthorized fees to reduce its performance by 18%, knowingly and intentionally impeded its competitors transactions, fraudulently manipulated margin on or around May 16, 2017, outside of exchange rules, and concealed directives from ADMIS,  causing direct and economic interference in its competitors trading activities, which were unnecessary and tortious and violated exchange rules, to directly inflict harm and damage.

495.    Vision Defendants willful, wanton activities included but not limited to restricting trading access, concealing margin requirements, misleading transactional ability, withdrawing more fees, on a direct competitors account, for which the traders, CTA, had **not** granted them authorization, and in direct unfair

market competition did, cause significant damage to its competitors, interfered in its rights, while tortiously and maliciously misappropriating its trade secrets.

496.   The actions were performed without Kumaran's CTA's or Plaintiffs knowledge authorization, knowledge, permission or consent, and were used for directly competing activities..

497.   Since the HRHC CTA referral business is a "substantial" part of revenue for Boshnack, Felag and Rothman, it was a material conflict of interest, and a direct violation of the exchange rules for them to have any part of disclosure to the information, let alone discretionary control on a directing competing CTA's account, and the actions of the Defendants, and conspirators, to propagate the scheme and Enterprise, was with callous disregard for the rights of others.

498.   Having improperly acquired the real-time trading strategies of the STORM Fund, in direct competition, Boshnack, Rothman, Felag, HRHC, HF, BF, VIA, and the trading affiliates, have used, incorporated, modified, replicated and mimicked, substantial components of the STORM trading strategy for use, and profit in a directly competing trading environment, called SPP now front running STORM, and also to bolster and create a directly unfair competitive advantage of the substantial business of their directly competing HRF CTA Referral business.

499.   These "trading arm" Vision defendants, VIA, RF, BF, Felag, Rothman, Boshnack also maintain numerous other proprietary commodities options trading accounts, including their own individual trading accounts, from which they also directly compete, for use and profit, the misappropriated trading programs, from STORM, and of information and belief, numerous other CTA"s and traders, and customers, from whom, through the scheme with ADMIS, they improperly and unlawfully acquired and used for commercial benefit in direct unfair competition.

500.   Upon information and belief, all these trading arm accounts, including the VIA accounts, and other proprietary trading accounts, clear through ADMIS. Upon information and belief, the numerous CTA's under the HRF CTA Referral business, are also clearing through ADMIS,

501.   ADMIS, is therefore a direct beneficiary of the profits of the tortious interference and direct participant in the willful and wanton misappropriation and use and profit and other actions of unfair competition. ADMIS generates profit and revenue from the scheme and substantially benefits from the unlawful and unfair competition.

502.   Likewise, Tom Kadlec, the CEO of ADMIS, who serves on the board of the NFA, with direct, knowledge and participation of the fraud to Kumaran and other CTA's, engaged in direct unfair market

competition, and individually approved,  the "membership rights" of VIA, Boshnack, Rothman to directly compete with the CTA's who's accounts he misappropriated.

503.   These actions, for the benefit of ADMIS, were a direct violation of CEA, show bad faith, and wanton disregard for his CTA'a rights, for which ADMIS has and conitunes to profit at the expense of his traders and customers,  by knowingly engaging in conspiracy, fraud and direct unfair market participation,.

504.   Acting in conspiracy with ADMIS, the Enterprise and scheme generates material, anti-trust, unfair competitive advantage to VIA, HF, BF, Rothman, Boshnack, Felag, HRHC, the HFR CTA Referral program and their Vision trading arms, and allows the foregoing defendants, by using their alter-ego affiliates, HRF, and HRHC, with material conflicts of interest, to misappropriate dozens of customers and traders strategies, and then using separate businesses, front-run and trade against them, and promote a competing business

505.   The HRF Defendants as described above, have a directly competing economic interest in, and derive substantial revenue line from a CTA referral business and run themselves *options trading strategies*, rendering their conflict of interest material, and disclosure and acquisition of Kumaran's STORM *options trading* strategies, a direct target for misappropriation, an intentional failure to comply with the disclosure laws, and conduct of bad faith, malice. willful and wanton subterfuge and wanton attempt to  target a competitors strategies and performance.

506.   While Kumaran was being defrauded, HRF Defendants, *knew* that Kumaran was an options trader, *knew* that Kumaran was a direct competitor, knew they should have sought consent or obtained Kumaran's permission as a CTA, yet with willful, and wanton disregard for the exchange rules,  persisted with bad faith, intent to deceive and harm, and continued to propagate the misappropriation and unfair competition.

507.   As described supra HRF, Felag, Boshnack. Rothman HRHC, also own, operate, and receive direct financial benefits from a directly competing CTA referral business under which they funnel Assets Under Management "AUM" to a competing network of "High Ridge Futures Recommended CTA's" that also trade competing commodities options and futures trading programs, and compete for AUM in the market.

508.   Therefore all defendants, HRF, Felag, Boshnack, Rothman, HRHC, VIA, RF, BF, VBC, VFM, are in the direct commercial business, of raising AUM, diverting AUM, allocating AUM and soliciting AUM in competition with foregoing CTA's who's trading records and performance they wantonly

depleted, in directly competing options trading strategies, and diverted trading assets away from, and have substantial motivation in unfair competition to improperly restrict its competitors CTA performance, and misappropriate successful or competing strategies.

509.   After the unlawful and improper acquisition of its competitor Plaintiffs trade secrets, Vision Investment Advisors, and its other owned and operated Vision affiliates, Howard Rothman Family Offices, Boshnack Family Office and other affiliates, including their own personal and proprietary trading accounts have used, incorporated, copied, and profited from the acquisition of Plaintiffs CTA's including other similarly situated CTAs trading records which continues today.

**SECTION IX -  MAIL, WIRE AND TRADE SECRET FRAUD RACKETEERING ACTIVITY**

510.  As described herein, the illegal dissemination of trade secrets, withdrawal of moneys from customer and CTA's accounts (including Plaintiffs), the charging of unauthorized "trailing fees" on a per transaction basis from customer accounts, depletion of CTA competitive performance dissemination of trading records to competitors, the unlawful sales and telephonic solicitations by *Vision brokers* including Lazzara, while concealing the G&F Agreements, and concealing the non-compliant, oral-rogue risk management services (fraudulently concealed from the CFTC under Reg 1.11-1.14 and not permitted under the registration conditions of disbarred *Vision Risk Group)*, were not necessary, were unlawful, were fraudulently concealed, were replete with errors and omissions,  were performed with reckless and wanton grossly negligence, with scienter and deceit to harm its competitors were not authorized by or disclosed to the trader as required under the CEA, were fraudulently paid for and knowingly, violated the Commodities Exchange Act, the Commission rules of the CFTC, the Defend Trade Secrets Act,  and other laws, with scienter and deceit.

511.  The objective of the scheme to defraud customers and CTA's including Plaintiff, which started in or around August 28, 2014 and has continued and occurred in a continuous pattern until present date, was illegal, was for all Defendants financial benefit, and allowed *Vision defendants* to gain unauthorized disclosure and acquisition of their competitors accounts, disseminate and misappropriate their trade secrets and gain an unfair competitive advantage, and collect unauthorized overcharges and  fees, disguised in overcharges such as trade processing fees and transaction fees to which the Vision and its beneficiaries were not entitled to. The scheme involved tortious actions including misappropriation of

customer money, and dissemination of trade secrets for interstate commerce, and for the improper benefit of Conspirators.

512.  The purpose and objective of the scheme, was to perpetuate an unregulated dark pool of customer and trader accounts, of former *Vision brokers*, that were not subject to the same market participation rules or laws of the Commodities Exchange Act. The purpose of the scheme was to intentionally circumvent the rules, and treat the pool, as an unregulated slush fund of trading accounts from which monies could be purloined, and trading strategies disseminated without consent or knowledge, as Boshnack, Rothman and HRHC had become a "financiers" of the futures industry, on what is estimated to be over hundreds of millions of dollars of futures revenue.

513.  Kadlec and Defendants role in the scheme was to knowingly violated the CEA, to intentionally not enforce the compliance laws, in order to gain illicit unlawfully compensation from the Victims (including Plaintiffs) futures accounts, and the monies would be stolen for the unlawful purpose to compensate disbarred owners Boshnack, and Rothman, in exchange for them securing hundreds of guarantee and credit line to secure the clearing arrangements of about one hundred Vision brokers, that were impacted when Vision Financial was disbarred in 2014.

514.  The scheme additionally was in direct violation of the unfair competition and unfair market place laws, and was designed to create an unfair competitive trading advantage to HRHC and its trading affiliates,  and deplete and willfully disadvantage to ADMIS traders' accounts that are CTA's,  and misappropriate traders information for use and profit, in direct competition with the activities of Vision, causing significantly damaged customers and trader's confidential accounts.

515.  The schemes operation, facilitated by and through Defendants started in or around November 2014, and knowingly, intentionally, willfully and wantonly failing to abide by numerous NFA Rules, Commodities Exchange Act rules, and CFTC rules, and permitting illegal and unlawful activity to continue and although underlined disbarred, engaged in operations that violate the registration requirements of an FCM and IB to extend credit, margin or guarantee accounts. Defendants facilitated the scheme to avoid the CEA rules by setting up an undocumented, "oral" rogue risk management services "arrangement", for which no legitimate or legally binding contract existed, that was concealed from disclosure required under the CFTC Reg 1.11 and would not be disclosed to CTA's and traders (including Plaintiffs) under CFTC Reg 1.55.

516.  The rogue risk management services, for which upon belief no legitimate contract existed, and the CFTC had not approved under the RMP as required under Reg 1.11-1.14 and had to be disclosed to customers under CFTC Reg 1.55, were not necessary and were not lawfully rendered, violated exchange rules, were grossly negligent, were replete with errors and omissions, were performed by unqualified personnel, on materially deficient platforms, were fraudulently concealed, and required the unlawful dissemination of trade secrets across interstate lines,  the unlawful overcharging of trade processing and transaction fees, all of which were not authorized by or disclosed to the customer or trader as required under the CEA, were fraudulently billed, and were billed at excessive and unreasonable amounts, deliberately causing depletion of CTA's performance record, dissemination of CTA's trade secrets to competitors.

517.  This objective necessarily required the fraudulent disguise and inclusion of overcharges, fees, trade processing fees and transaction fees, to be deducted in cash payments from Plaintiff's accounts, to be paid across interstate wires to *Vision defendants*; and the fraudulent disguise and dissemination of customers and CTA's competitive trade secrets and trading strategies in violation of 18 USC 1831 across interstate wires to Vision defendants, and to generate significant profits and an unfair market competition advantage of Vision, and derive and unfair use and profit of its competitors trading strategies, which Vision trading arms have and continue to use and profit from today in direct competition.

518.  Incorporated herein by reference in **Exhibits 14 and 15**, Plaintiffs documented hundreds of line items of unauthorized withdrawals of monies across interstate lines, as well as hundreds of lines items of dissemination of trade secrets across interstate lines, each counting as a predicate act under RICO while Plaintiffs accounts were opened in January 2017 – June 2017.

519.  The conduct started in or around November 2014 and continues to date and therefore poses an open-ended continuity of activity. Vision in their MTD have admitted the conduct continues in the market place today. (See 20-CV-03871, MTD filed on December 1, 2020)

520.  All documents, communications, emails, letters, correspondence, transaction records, trade secrets, trading strategies and unauthorized fees and disclosures in connection with the illegal, impermissible, unnecessary, unqualified, risk services, and illegal extension of margin and credit on traders accounts (without registrations), and improper quantification of margin in violation of exchange margin rules, and the fraudulent concealment and misrepresentation thereof, and unlawful acquisition of its customer accounts, throughout this pleading traveled through interstate wires ,emails, telephonic communications

or mail and were delivered to, acquired from or received by Plaintiffs including in the Southern District of New York.

521.  Every fraudulent communication, electronic computerized statement, and unauthorized fees and statements, dissemination of trade secrets, unauthorized conduct on a daily basis, and unauthorized purloining and withdrawal of profits and fees from customers and CTA's account as itemized in **Exhibits 14 and 15** detailed therein involved at least two (2) use of the interstate mails or wire communications, including the e-mailing of false statements and concealment of financial records and concealment of Vision's unauthorized disclosure and acquisition of Plaintiff's trading records and account, and every single statements sent electronically to Plaintiffs (of which there are hundreds), and unauthorized purloining of profits and  deduction of fees from Plaintiff's account.

522.  It was foreseeable and of direct and proximate injury, to the Defendants and Conspirators that making false affirmative misrepresentations and material omissions to Plaintiffs would trigger reliance by Plaintiffs on the false affirmative misrepresentation statements and material omissions and concealments in furtherance of the scheme to defraud, including causing Plaintiffs to actually disclose its trade secrets, sharing its CTA Trading Program, opening, maintaining and transferring funds, capital, assets, and property including intellectual property to ADMIS, and Conspirators intended for Plaintiffs to fall victim to the scheme – in turn which illegally generates millions of illegal revenue, depletes the competitive performance of other traders – at the expense of small CTA's and start-ups who were victims of the scheme.

523.  Every unauthorized fee and deduction at issue as outlined in **Exhibit 14**, and every improper dissemination, acquisition, use and profits of its competitors trade secrets, as also described in this Complain in **Exhibit 14**, and each and every fraudulent sales and solicitation in Exhibit 15 where Plaintiffs were induced to rely on the Defendants' false statements, were a part of the regular and ordinary conduct of the Enterprise, and the  affirmative misstatements and material omissions  by Defendants when Plaintiffs inquired about the Enterprise, and every false representation and knowing omissions to fraudulently conceal the unauthorized rogue risk operation by disbarred Boshnack and Rothman, that caused Plaintiffs to be induced to rely on the Defendants' false statements and omissions and resulted in  Plaintiffs assets, property, funds and moneys being transferred, uploaded, downloaded, input, copied, monitored, reviewed, acquired, distributed, tampered with, deducted from Plaintiff's commodities futures trading accounts using interstate mail and wire communications, and were each a

separate and individual predicate act of RICO conduct misappropriation and unauthorized charges, as outlined in **Exhibit 14 and 15.**

524.  The fraudulent scheme detailed herein generated thousands of individual deductions and fees taken out of Plaintiffs and futures customer's accounts across interstate bank wires, and generated thousands of instances of where Defendants and their conspirators, unlawfully acquired, transferred,  downloaded, copied, distributed, misappropriated, and acquired their competitors transaction records, financial information and trade secrets, across interstate lines for use and profit.

525. As detailed herein, the Defendants fraudulently concealed and disguised Vision Defendants' unauthorized disclosure to and acquisition of Plaintiffs and other customers and CTA's accounts and fraudulently concealed and disguised these overcharges and fees, and using fraudulent communication, affirmative misrepresentations and material omissions, that were submitted to Plaintiffs via interstate wires, email or telephonic communications all related to Plaintiff, and also related to other customers and CTAs as  discussed in this Complaint.

526.  It was within the ordinary course of business for Defendant with their Conspirators,  to fraudulently conceal, misrepresent and improperly acquire their competitor CTA's trade secrets, to fraudulently conceal and mispresent trade processing and transaction fees to generate unauthorized overcharges of fees, from Victims and Plaintiffs confidential accounts through interstate wires and mail and unlawfully deplete CTA's and Plaintiffs' performance records in unfair competition.

527.  Moreover, the business of fraudulently gaining unauthorized disclosure of customer and CTA's financial accounts and trading records, seeking unauthorized fees and payments, and gaining an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and providing unnecessary and unqualified services, impermissible by the CEA, by each of the Vision Defendants and the LCI Defendants and ADMIS, at issue herein is regularly conducted by to which each Vision defendant and Lazzara Defendant is not entitled to and is achieved through the use of fraudulent communications sent via intestate wires and mail. In other words, discrete fraudulent misrepresentations, improper acquisition, use and profit from their competitors' CTA's trading accounts, fraudulent concealment of fees, deducting trade processing and transaction fees without Plaintiffs' and other customer's authorization, are each individual instances of mail and wire fraud are a regular way of doing business for each of the defendants.

528.  The Defendants at the direction of and with the knowledge and participation of their owners and managers, including Trey Lazzara, John Felag, Howard Rothman and Robert Boshnack, and Vision Defendants, have perpetuated by over action a continuous pattern and continue to permit Vision Defendants to improperly acquire their competitors' confidential trade secrets; overcharge fees, collect and deduct cash payments, fraudulently seek unauthorized fees and payments, and gain an unfair competitive advantage by acquiring their competitor CTA's trading and risk management strategies, and harm Plaintiffs and other similarly situated .customers and CTA's.

529.  Thus, Defendants commission of wire fraud and misappropriation of trade secrets continues.

530.  As Defendants named in the conspiracy agreed that they would use (and, in fact, did use) the e-mails, telephonic calls over interstate wires, and false statements over the computerized logins, and other emailed statements, in furtherance of their scheme to defraud Plaintiffs, including but not limited to theft of trade secrets and to distribute, disseminate, acquire, use and profit from their trade secrets and confidential trading accounts, and deduct, steal and purloin unlawful fees not permissible under the CEA, charging fees and performing unnecessary and unqualified services that are not permissible under the CEA, these defendants committed mail fraud, as defined in 18U.S.C. § 1341.

531.  Vision entities consist of disbarred members (who's registrations were permanently revoked to act as an FCM), to perform unnecessary, unqualified services that are not permissible without disclosures, under the CEA,  and then use fraud and other illegal RICO predatory conduct to permit them to directly engaging in unfair competition, and engage in market place fraud. These defendants committed mail fraud as defined in 18U.S.C. § 1341.

532.  As the Defendants named herein and Conspirators (including their agents, employees) agreed that they would use (and, in fact, did use) emails, telephonic calls over interstate wires, and false statements over the computerized logins, and other emailed statements, over interstate wires in furtherance of their scheme to defraud Plaintiffs to illegally propagate the scheme, violate the CEA, securities laws and federal laws, in interstate commerce, and to illegally and unlawfully disseminate, distribute, acquire, use and profit from their trade secrets and confidential trading accounts, and deduct unlawful fees not permissible under the CEA, charging fees by receiving payment for and performing unnecessary and unqualified services that are not permissible under the CEA, these Defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

533.  Plaintiffs reasonably relied on the fraudulent representations received from LCI Defendants and Vision Defendants listed in detail above, including but not limited  the material representations that "*John from risk*" worked at ADM, and that LCI "*works with a division of ADM*" that he "*just spoke to his guy at ADM*" and "*ADM is fixing the problem*" and that "*ADMIS is extending credit to your account*" indicated above and **Exhibit 14** and **Exhibit 15** (showing the fraud and misstatements and how theand have suffered significant damage and harm as alleged herein.

534.  As the Defendants agreed to pursue the same criminal objective (namely, mail and wire fraud, and theft of trade secrets), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Plaintiffs' damages.

## SECTION X - DAMAGES

535.  As a direct and proximate result of the unlawful and fraudulent conduct Defendants and their Conspirators have wrongfully profited from their fraudulent conduct, and been unjustly enriched, and that by reason of the foregoing, the Plaintiffs have been damaged, suffered irreparable harm and been injured in their livelihoods, financial assets, economic advantages, business and property.

536.  As a result of the foregoing conduct alleged herein, Plaintiff Kumaran as the sole *owner* of the trade secrets, and the STORM trading strategies, has suffered damages that includes without limitation, irreparable and significant harm in loss of their confidential and trade secrets, STORM trade secrets, (including its transaction history and trade data), as well as loss of all profits earned by the competitors, and reasonable royalties that should have been paid to a CTA for distribution and acquisition of their competitive trade secrets, in amounts to be proven at trial but estimated to be not less than $1.5 million dollars.

537. In addition Plaintiffs have suffered, economic interference, financial losses in their trading accounts, depletion and reduction, and losses in CTA's and CPO performance records estimated to be not less than 18% a year, damages to her good will and other impacts to the her CTA and CPO career, reductions to the financial trading account balances, financial losses to their property, and significant increased legal and compliance costs to its CTA and CPO business, and other due diligence costs and fees, in amounts to be proven at trial but estimated to be not less than $500,000.

538.  Plaintiff Kumaran, individually as a risk management service and software developer, has suffered losses by Defendants misuse and dissemination of Kumaran's competitive risk management software,

uniquely developed and designed over twenty years, which Kumaran is the sole owner and inventor of the trade secrets, by improperly misuse of the account  as a testing and debugging facility, to benchmark and test and misappropriate Kumaran's risk management systems, and use of Z-Live to document, monitor, quantify, and debug their materially deficient electronic platforms, and errors and omissions as demonstrated herein above in Section VII during the period January 2017 until June 2017, without compensation.

539.  Plaintiffs, by virtue of opening a futures account or doing business with ADMIS and LCI were not compensated for its use of its software, for use by Defendants as a testing and debugging facility for HRHC Defendants unauthorized illicit risk services. HRHC Defendants and LCI Defendants have been unjustly enrichment in the benchmarking, debugging and testing services performed for Z-Live. HRHC Defendants and LCI Defendants' use of Plaintiffs' uncompensated risk services, operated outside of the parameters of any provision of any agreement for Plaintiffs to trade futures. Plaintiffs never contracted to provide such testing, debugging and IP services, and Defendants' distribution of that proprietary and trade secret analysis to its competitors, HRF who provide, directly competing risk consulting services, for which Plaintiff Kumaran, as the sole owner of the IP and risk software, received no compensation or license fees, in amounts to be proven at trial but estimated to not less than $400,000.

540.  In addition, Plaintiff Kumaran, as the sole owner of the rights, title and interest to the trade secrets in its rights and ownership interests of the trade secrets, and the STORM trading strategy and trading program (which includes its transaction history and trade executions) and Plaintiffs have suffered "consequential damages" in it valuation and license to its STORM Fund, LP, and valuation of its CTA and CPO,  by the unlawful misappropriation by Vision and Defendants of its hedge fund, "front running" its trading program, use in direct competition, by its competitors VIA.

541. Plaintiffs have suffered net present value loss, to its good will and reputation capital by being "tarnished" by Vision of the STORM trading strategy, damages, delays, and interference in it its performance record and abilities to raise capital, damages, interruptions and interference in their business operations, delays to their commercial livelihoods and investments in the futures industry, damages and interference in their hedge funds and commodities options trading pools, increased costs of business, as well as other significant damages including Kumaran's loss in present value and futures profits into the STORM Fund LP, as well as disgorgement of all unjust enrichment by its competitors HRF, HRHC, VIA, Boshnack, Rothman, in amounts to be proven at trial but estimated to be not less than $1million

dollars. Kumaran is the sole owner of these claims in and to the fund and its trading programs, and NRCM never had, or never contemplated to have any rights, title, ownership interest in the trade secrets, trading strategies, or the STORM Fund, LP.

542.  Plaintiffs have also collectively suffered damages and financial harm in unauthorized fees and deductions, actual and realized losses in their trading accounts, estimated to exceed $75,000 in overcharges, drawdown losses, MTM errors, and other software charges, as a result of the tortious interference by Vision Defendants, LCI Defendants and Villa, and the tampering with Plaintiffs account being concealed to pay Vision its owners, employees and affiliates.

543.  Plaintiffs have suffered additional damages, by Defendants direct participation in the scheme to procure an unlawful and unjust advantage to its competitors, and VIA's improper, acquisition and "front running" of its trading program, for use in direct competition. Plaintiffs have also suffered damages in the  interference in their hedge funds and commodities options trading pools, increased costs of business, delays and interference into its operations, loss of opportunity costs,  as well as other significant damages including Kumaran's loss in present value and futures profits into the STORM Fund LP.

544.  Plaintiffs accordingly seek disgorgement of all unjust enrichment by its competitors HRF, HRHC, VIA, Boshnack, Rothman, LCI, Lazzara, Villa, and the other Vision Defendants in amounts to be proven at trial but estimated to be not less than $1million dollars.

545.  Defendants have wrongfully profited from its fraudulent conduct, and been unjustly enriched, and that by reason of the foregoing, Plaintiffs have been damaged, suffered irreparable harm and been injured in their livelihoods, financial assets, economic advantages, business and property.

546.  Plaintiff Kumaran, individually, as a CTA, and sole owner of the STORM trading strategies  has also been harmed by the depletion of fair market competition, by the unlawful disclosure and acquisition of their trading strategies by competitors Vision its owners, employees and affiliates. The wrongful conduct and misappropriation of Plaintiffs' trade secrets alleged herein will continue unless enjoined and restrained by this Court, and is causing and will continue to case great and irreparable injury to Plaintiff's livelihoods and business, and is causing and has caused Vision its owners, employees and affiliates to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment.

547.  Absent injunctive relief, further disclosure and use of Plaintiffs' trade secrets by LCI defendants, Villa and Vision Defendants as well as ongoing depletion of performance records, and deduction of fees, continues to irreparably harm to Plaintiffs confidential futures trading accounts. The unlawful and

unauthorized fees are ongoing and accumulating, causing ongoing financial damages and losses, depletion to account value and losses from Plaintiffs' accounts.

548. Furthermore, the far reaching pattern of fraudulent conduct by LCI defendants and Vision defendants, evinces a high degree of moral turpitude and wanton dishonesty and disregard for the rights of others, which, as alleged above, has harmed and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

## CAUSES OF ACTION
### COUNT I– CIVIL RICO - § 1962(c).

549.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

550.   18 U.S.C. § 1962(c)  provides, in pertinent part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity."

551.   RICO Defendants Boshnack, Rothman, Felag, Lazzara and Villa are material persons and as such, each is a "person" within the meaning of 18U.S.C.§1961(3) ("RICO Individual Defendants")

552.   Defendants High Ridge Holding Corporation, LLC  ("HRHC"), Vision Financial Markets, LLC ("VFM"), Vision Investment Advisors, LLC ("VIA"),  Rothman Family, LLC, ("RF"). Boshnack Family LLC ("BF"), Vision Brokerage Services ("VBS"). High Ridge Futures ("HRF") are collectively referred to as Vision RICO Entity Defendants. Lazzara Consulting, Inc d/b/a Trade Portal ("LCI") is also an entity RICO defendants referred to as LCI RICO Entity Defendant. The Vision RICO Entity Defendants and LCI Rico Entity Defendant are collectively referred to as the RICO Entity Defendants.

553.   The above RICO Individual Defendants and RICO Entity Defendants are collectively referred to as the "RICO Defendants."

554.   Commencing in or around November 2014 and continuing until present date, the RICO Defendants, each individually playing a role, engaged in a scheme with ADM Investors Services, Tom Kadlec, and key insiders at the National Futures Association, named as Defendants in related cases 20-CV-3873 and 20-CV-3668, and called herein "Conspirators", over a pattern of continuous and ongoing conduct, formed an association-in-fact enterprise (the "Enterprise").

555.   The Enterprise carried out and continues to carry out a multi-year fraudulent scheme by which they stole monies, purloined funds, assets, intellectual property, confidential and proprietary information, and trade secrets, depleted their competitors performance, and engaged in other tortious acts to divert business opportunities,  diminish their competitors and divert their assets and property away from the businesses and livelihoods of customers,  traders, CTA's and Plaintiffs collectively the "Victims".

556.   They diverted first to HRF (wholly owned by HRHC) and Felag who used secret guarantee agreements from Boshnack, Rothman and HR, and *sham* illegal oral risk services arrangements, not permitted under the CFTC Regs to improperly overcharge fees and reduce profitability of the Victims, and to improperly acquire their competitors trade secrets accounts, tamper with the margin on their accounts, extend and reduce credit, and purloin monies profits and fees without Victims and Plaintiffs' consent. ("Diversions").

557.   All the foregoing not only violated common law and federal law, thefts and misappropriations, they conduct was also illegal under the CEA. The scheme was perpetrated without compliance with the black-letter laws of the Commodities Exchange Act and CFTC Rules for which many of the RICO Defendants purported to be members, bound by strict anti-fraud and participation rules. (See Ver.Fac.3668) They then diverted the misappropriations, thefts, of business, property to Boshnack and Rothman and the trading arms of Vision RICO Entity Defendants who converted, used and profited from the stolen property to benefit HRHC CTA Referral service and launched directly competing businesses VIA and other Vision RICO Entity Defendants RF, BF, VBS, VFM as outlined in Section VI above.

558.   At all times relevant herein, the RICO Defendants and its Conspirators (defined below)  engaged in and continue to engage in the activities  which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

559.   Among other things Plaintiffs (New York) engaged in extensive email and telephonic communications with Lazzara's Austin Texas Office (Texas) and also received daily statements and electronic communications from Conspirator ADMIS (Chicago). On essentially a daily basis, HRF and Felag (Connecticut) engaged in sham risk services to improperly acquire Plaintiffs trade secrets (New York) and information travelled between the risk management groups of ADMIS (Chicago) and HRF (Connecticut). Boshnack (New York) supervised and engaged in hands-on monitoring and decision making on Plaintiffs account including shutting access to trading. The information travelled between

New York and Chicago, Texas and when Villa joined on April 25, 2017 shortly before the destruction of profits started on May 2, 2017 information also travelled on a daily basis to Hawaii. Villa coincidentally left working for LCI, just days after Plaintiffs closed its account on June 19, 2017. The communications to New York were extensive as **Exhibits 14 and 15** indicate.

560.   The RICO Defendants and Conspirators all collectively engaged in extensive efforts to conceal their misconduct by engaging in the Concealment Scheme in furtherance of the fraud and to benefit and gain an unfair competitive advantage to RICO Defendants and to steal from, misappropriate from and cause intentional damage to Plaintiffs and Victims.

561.   The RICO Schemes were effected by a long-standing pattern of RICO predicate misconduct (Exhibit 14 and 15 particularizing wire and mail fraud allegations and criminal misconduct ranging from misappropriation of trade secrets  grand larceny to theft - all of which, foreseeably and directly cause injury to Plaintiffs business and property within the meaning of RICO statue and numerous common law breaches, as alleged below, which, as well, directly injured Plaintiffs.

562.   The Diversions were concocted, implement and concealed by the RICO Defendants and Conspirators as alleged above and below.

### The RICO Defendants Predicate Acts

563.   The objective of the Enterprise (as defined below) is to steal assets, moneys and property of Victims to RICO Defendants, for the profit, gain and financial benefit in exchange for illegal financial benefits from Boshnack and Rothman hinged on their individual guarantees. (See ECF58.1 ¶2.2)

564.   The Enterprises used and continue to use predicate acts of wire fraud, mail fraud to steal, misappropriate and use Plaintiffs and other CTA's and customers trade secrets under 18 USC 1831,  and purloin and steal monies from Plaintiffs accounts, and engage in illegal overcharging of fees, and money laundering to defraud new commodities futures customers and CTA.

565.   The Diversions/thefts of business, assets, funds, profits and property including trade secrets that injured Plaintiffs were effected through Defendants' pattern of mail and wire fraud crimes and misappropriation crimes by the RICO Defendants.

566.   Each of the emails/mailings/telephonic communications and misappropriations set forth in Exhibits 14 and Exhibit 15 is an instance of racketeering activity within the meaning of 18 USC 1961(1) because each such act was indictable under 18 USC 1341 and 1343 (mail and wire fraud) and also 18

USC 1831  el seq – misappropriation of trade secret. The activities were also illegal and unlawful as expressly provided for under the CEA. (See 7 USC 13, See Ver.Fac.3668¶359-¶414)

567.   The repeated and continuous pattern of fraudulent communications by Lazzara, LCI and Vision Defendants in each instance of misappropriation and removal of fees are incorporated by reference in Exhibit 14. Each conveyance occurred through interstate wires and is also described above.

568.   Each email, text and/or referenced telephone call sent by wire in furtherance of the RICO Diversions and the RICO schemes to defraud Plaintiffs and other Victims, was integral to achieving the object of the RICO schemes in that these fraud were used to obtain money and/or property, including trade secrets from Plaintiffs and Victims, in violation of law, and each is racketeering activity within the meaning of the RICO statute.

569.   Each RICO Defendant committed wire fraud by participation in the fraudulent scheme which were furthered by the use of interstate transmission facilities.

570.   The crimes particularized in Exhibit 14 and Exhibit 15 and as also described in detail above in Section VII  form a pattern of criminal acts lasting from August 28, 2014 through the present date. Plaintiffs documentation of predicate crimes are established largely by the RICO Defendants own secrecy and failure to disclose – and overt attempts to conceal the Vision Enterprise.

571.   The scheme involves using interstate wire and mail communications, and fraudulent and deceptive sales and solicitations, to fraudulently induced new customers, CTA's start-ups including Plaintiff, to open and maintain commodities futures trading accounts at ADMIS, and after the accounts are opened, repeated fraudulent communications whereby, in violation of the law, while materially concealed, that Vision, its owners, affiliates, employees would (a) gain fully disclosure  to their accounts and trade secrets in violation of 18 USC 1831  (b) would unlawfully deduct withdraw and steal cash payments, disguised as trade processing fees or transaction fees, out of their accounts across interstate lines to make payments to Vision and procure more favored rates (c)  would engage in unlawful margin activity to suppress the profitability of their competitors CTA accounts outside of exchange rules and (d) would be used, with the direct actions of Boshnack, Rothman and Felag to engage in direct competition by Vision Investment Advisors, and High Ridge Holding Corporation, who run a CTA referral program, to front run and compete with the CTA proprietary trading programs, in unfair competition, after improper acquisition of Plaintiffs and CTA's trade secrets (e) engage in other tortious anti-trust activity to interfere in and diert away priofts, asserts, moneys and commercial advantage of its competitors.

572.   In furtherance of the Enterprise, the RICO Defendants and Conspirators intended to and knowingly stole and diverted monies out of Plaintiffs accounts and without Plaintiff's authorization, used, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, or conveyed Plaintiffs  trade secrets, money, property, assets and business competitive advantage.

573.   The RICO Defendants and Conspirators also received, acquired, or possessed Plaintiffs trade secrets, knowing that they had been stolen, obtained, or converted without Plaintiffs authorization in violations 18 USC 1831 el seq. Each predicate act of misappropriation and theft counts as a pattern of RICO activity.

574.   The Defendants intentionally engaged in these acts to benefit RICO Defendants, with the knowledge or intent that these acts would injure Plaintiffs and other Victims.  The RICO Defendants each agreed to further, facilitate, support, and operate the Enterprise. As such, the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) .

### The Two Criminal Enterprises

575.   The RICO Defendants operated and managed the affairs of at least two criminal "enterprises" with different but largely overlapping members.

576.   The first criminal enterprise is a business entity enterprise (the "Vision Enterprise"), the activity of which is directed and controlled by its owners Boshnack, Rothman and with vested management interest John Felag. It uses a façade of alter-ego corporate entities to steal property, revenue, profits, assets, business, intellectual property and monies from Victims to Boshnack and Rothman (all without their knowledge and consent). HRHC is the successor-in-interest and assignee of Vision Financial Markets, LLC after it was disbarred in 2014 and as publicly stated in Exhibit11. HRHC is essentially the same company with a different name, and transferred all assets as VFM in the futures markets. HRHC's primary business is its CTA referral and penchant for acquisition of CTA's. The Vision Enterprise consists of all the alter-ego affiliates HRHC, VFM and the numerous trading arms VIA, RF, BF, VBS,VFM  as well as the acquisition arms HRF as Section VI   The Vision Enterprise uses HRF and Felag as the front person, using the "corporate forms" and sham services agreements that are impermissible under the CEA, to perpetrate fraud and to commit the thefts, purloining and fraudulent acquisition of trade secrets, which are then transferred on vision servers, and to Boshnack, Rothman and the other alter-egos. The stolen monies, unauthorized withdrawals of fees are used to fund the operation, estimated to be $10 million a year. Boshnack and Rothman, having depleted Victims, asserts, trades

secrets, property and profits, then registered other alter egos VIA, RF, BF in 2018 provided another vehicle to use and profit from the misappropriated trade secrets, and diverted asserts, property and business and to deplete the competitive advantage of Victims.

577.   Boshnack and Rothman use their illegal agreements, and Vision Enterprise, to engage in other criminal activity and violate the rules of the exchange. A list of illegal activities is also outlined in 7 USC 13 and Ver.Fac03668 ¶359-414. They deflate and inflate margin, and front load fees as high as 6%-18% on their competitors, and take other overt actions to not engage in a fair market playing field, including restricting access to trading and forcing losses – all without consent.

578.   The Vision Enterprise is a criminal entity enterprises within the meaning of 18 U.S.C. 1961 (4) through which Boshanck, Rothman and Felag, by and through that entity continued the pattern of predicate crimes which they had begun at VFM and transferred to HRHC, adding new predicate crimes, as indicated herein. None of the Victims or Plaintiffs consented to transfer fees, property, money, assets or trade secrets to the Vision Enterprise and the illegal activities are procured by fraud and concealment.

579.   The second criminal enterprise is an association in fact enterprise within the meaning of  18 U.S.C. 1962 (b) and/or conspirator violators under 18. U.S.C 1962 (d) which comprised of Vision RICO Entity Defendants, Rothman, Boshnack, Felag, and a network of about one hundred *Vision brokers*, (not all defendants in this action), particularly in this action Lazzara Consulting, Inc and his owners and representative Lazzara and Villa, ADM Investor Securities and his CEO Tom Kadlec, (in related actions 20-CV-3873 and 20-CV-3668), and key persons at the NFA, Wahls and Kiela who rubber-stamped audits to permit the illegal conduct to go undetected. (The Association Enterprise").  The Association Enterprise was operated and managed by each of its member in all the ways detailed herein, and in the Verified Complaints of related cases regarding the operation.

580.   The Association Enterprise commenced in or around August 28, 2014 relies upon fraudulent sales and telephonic solicitations by *Vision brokers* in this case Lazzara, LCI and Villa and Kadlec,  ADMIS to open commodities trading account at ADM Investor Services and then actively conceal among other things that (a) fees, overcharges and profits would be stolen from the account funneled across interstate lines to make personal compensation to Vision's Enterprise (all of which needed to be disclosed prior to account opening); (b) CTA's trading strategies and trade secrets, would be unlawful dissemination across interstate lines and improperly acquired by Vision Enterprise and its directly competing CTA referral business; (c) Vision Enterprise and its owners and employees would engage in sham illegal risk services

(not permitted under CFTC Reg 1.11) and without consent having fully disclosure (all of which needed to be disclosed prior to account opening);  (d)  Vision Enterprise would have discretionary authority on the accounts, and tamper with an apply non-exchange margin calculations, and violate exchange laws to penalize its competitors accounts; (e) RICO Individuals Boshnack and Rothman would place guarantees on traders account thereby improperly and operating outside of an IB Registration;

581.   The Association Enterprise is controlled essentially by the same people all with the aim and objective of effecting the continued diversions of business, property, trade secrets and monies, and competitive advantage to the Entity RICO Defendants, and derivatively the individual RICO Defendants which owned or managed them.

582.   RICO Individual Defendants Rothman, Boshnack, Felag, Lazzara and Kadlec (in related case) and RICO Entity Defendants and ADMIS (in related case), acted as a continuing unit for the common purpose of obtaining business, theft of monies, property, trade secrets, assets, and intellectual property for themselves and stood at the top of the hierarchy of RICO scheme,  who then directed to engage in acts which furthered their own illegal schemes to divert monies, business, asserts, property, trade secrets and intellectual property from Victims to the Association Enterprise and Vision Enterprise.

583.    Each of the Defendants individually and jointly permitted the Enterprises to operate, by their direct participation in the scheme to intentionally engaged in acts of theft, misappropriation and wire fraud,  as alleged in Paragraphs above and as otherwise herein. The Enterprise also intentionally includes unlawful conduct and Defendants intentionally did not abide by the CEA and NFA rules that prohibit the conduct, and is also deemed unlawful under the CEA. (see e.g. 7 USC 13)

584.   All Defendants directly benefited from its employees' and agents' racketeering activities, and the racketeering activities of Lazzara, Villa, Felag, Rothman and Boshnack and others were committed within the scope of their employment while at LCI and/or Vision affiliates. An employee who conducts the affairs of a business entity through illegal acts is separate from that entity within the meaning of RICO's distinctness requirement.

585.   Each of the RICO Defendants is a separate and distinct "person" within the meaning of RICO. Sufficient distinctness exists as between the entities High Ridge Holding Corporation, Vision Investment Advisors, Boshnack Family, LLC, Rothman Family, LLC, High Ridge Futures, LLC. Vision Brokerage Services, LLC, Vision Financial Markets, LLC, Lazzara Consulting, Inc, and the natural persons owning

and controlling their activity, to satisfy RICO enterprise-person distinctness, because they are all separate , distinct legal entities.

586.   Each RICO Defendant was an is separate and distinct from the predicate crimes of mail fraud and wire fraud, in which they engaged, because, each had or has legitimate functions and activities, apart from their criminal activities chronicled in **Exhibit 14** (listing detailed wire fraud and 18 USC 1831 detailed chronological events) and **Exhibit 15** (listing detailed how each fraudulent statement and overt act furthered the fraud)

### How each of the RICO Defendants Operated and Managed the Enterprise Activity

587.   Each criminal enterprise was operated for the common purpose of diverting monies, property, asserts, intellectual property, commercial advantage, business, profits, trade secrets and economic advantage away from Victim and Plaintiffs, and <u>concealing what was occurring,</u> so that Plaintiffs for a period of time would open and maintain accounts at ADMIS, continue to do business with ADMIS while the fraud and concealment continued, and while behind-the-scenes, their accounts were subject to theft and misappropriation all profits, business information and trade secrets to the Vision Enterprise, and instead become a source of unlawful revenue and unlawful acquisition of trade secrets for the RICO Defendants. This in turn permitted Vision Enterprise to divert assets, money, competitive advantage, trade secrets and property from its competitors Plaintiffs and other Victims, for their own use, dissemination, profit and gain, going as far as to damage and shutter their competition with unlawful margin and account tampering, to shut down their competitors.

588.   Each of the RICO Defendants satisfied the operation and management test, each controlling a substantial part of the activity of the Enterprises as follows:-

589.   Rothman and Boshnack as owners and controllers of the Vision Enterprise, directed its alter-ego affiliates and employees to conceal its individual guarantees, and to misappropriate Victims confidential information in their accounts and engaged in other criminal conduct, including directing its employees and alter-ego affiliates to purloin fees, profits and monies from Victims' accounts, directing Vision brokers and Felag and HRF to commit fraud and concealment of the Vision Enterprise, and directly and by instruction to their employees, improperly acquired, stole, transferred Victims trade secrets on the Vision Enterprise computers, officers and servers to be shared with the Vision trading arms. Boshnack and Rothman then disseminated, used and profited from the stolen monies, profits and trade secrets in their alter-ego- trading affiliates HRHC CTA Referral and Vision Investment Advisors, and RF and BF.

590.   The day-to-day operations of the Enterprises were run by Felag and HRF (a shell front-façade corporation) used to perpetrate the fraud by providing illegal unauthorized risk services and withdrawal of fees that the Victims did not consent to and under black letter law of the CEA, are required to be disclosed. Felag and HRF then conceal Boshnack and Rothmans' other enterprise activity in HRHC, HRHC CTA Referral and the numerous other Vision Enterprise affiliates. Felag and HRF knowingly engaged in sham risk services agreements, not permitted under the CFTC Reg 1.11, and unlawfully and actively concealed their arrangements from Victims. The sham risk service contracts, were used to improperly acquire trade secrets from customer accounts, and steal monies and fees without Victims consent. Felag and HRF were the key instigators of the day-to-day fraud to perpetrate customer confidential accounts, private data, steal monies and business property, trade secrets, asserts and transfer it to the Vision Enterprise.

591.   Lazzara, LCI and Villa (unregistered) were the front-sales-team of the Enterprise, and part of the *Vision broker* network, who's day-to-day operation was to use deceptive and fraudulent sales and solicitation to induce Victims and Plaintiffs into opening accounts at ADMIS, and thereafter in their ongoing day-to-day operation and management is to persist in the concealment and fraud, making multiple affirmative misrepresentations and material omissions in their communications over wire fraud to conceal the Vision Enterprise. Exhibit 15 provides a detailed list of the extensive wire fraud by the Lazzara RICO Defendants.]

592.   The trading arm units day-to-day operations in the enterprise, which were RF, BF, VIA, VFM, HRHC CTA Referral and VBS were all managed and controlled by Boshnack and Rothman. Felag also has management authority on the trading and operations of the Vision trading arms. The individual directed and used the trading arm defendants, to convert, disseminate, used and profit from the stolen and improperly acquired trade secrets and property and assets of the Victims. The Vision trading arms entities, and HRHC orchestrated and directed the transfer of monies, property and trade secrets to the profit centers and through their control and dominion, Boshnack and Rothman instructed concealment and ongoing fraud to his employees and subordinates continue the unlawful disclosure.

593.   Each of the Defendants, individually and jointly, directly acquired financial benefit from the scheme. The predicate RICO acts set forth herein were carried out on a continued basis for more than a five year period, were related and similar and were committed as part of the ongoing scheme of Defendants, one or more of the *Vision brokers* including in this action Lazzara, to fraudulently induce

accounts to ADMIS and then unlawfully misappropriate funds, divert profits, and disseminate CTA's trade secrets and strategies to Vision Defendants, and unlawfully deduct cash and transfer it to Vision Defendants, and, if not stopped, such acts will continue into the future

### The RICO Defendants Active Concealment of the Predicate Crimes from Plaintiffs /Victims

594.   Each of the Defendants actively concealed information from Plaintiffs in all the ways alleged above and as set forth in Exhibits 14 and 15, to impair and prevent Plaintiffs from learning about the existence of and harm being caused by the racketeering activities described above.

595.   Concealment of RICO predicate crimes is itself a predicate crime pursuant to 18 U.S.C. § 1961. Here many of the RICO Defendants' acts of concealment were orchestrated and directed through wire and mail communications, violations of 18 U.S.C. § 1341 (mail fraud) and/or 18 U.S.C. §1343 (wire fraud) and misappropriation and theft of trade secrets under 18 U.S.C. § 1831 el seq using fraud, misrepresentation and deception, and, hence, instances of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) as well as through theft and concealment of the fees and itemized withdrawals and transfers to the Vision Enterprise, which as of concealment are predicate crimes.

### RICO Defendants' Pattern of Criminal Conduct

596.   The RICO predicate misconduct and diversions of payments and business to Vision Enterprise were made continuously between September 2014 and until present date, including the period of time Plaintiffs fell victim to the scheme between December 2016 and June 2017, establishing a pattern and open ended continuity and a period in excess of two year of predicate crimes.

597.   As admitted by Vision Defendants in filings on the record (ECF37) on December 1, 2020, this pattern of activity poses a specific threat of repetition extending indefinitely into the future, and continues to harm to the present day therefore being open ended pattern.

598.   No statement, public document, literature, marketing documents, solicitation, used to solicit and induce the account at ADMIS, including those in Ver.Fac.03873 Exhibits 1-5 with public disclosure documents reviewed related to ADMIS clearing business from 2014-2017, and/or emails and telephonic wire solicitations, provided by Lazzara RICO Defendants, disclosed that the real purpose and business of opening accounts at ADMIS and LCI was the diversion of business, asserts, moneys, property, intellectual property and trade secrets from Plaintiffs to the Vision Enterprise. Therefore  all RICO Defendants intended to and conspired to and did conceal the fraud.

599.   The discovery of the RICO Defendants criminal misconduct did not occur until September 29, 2017 when various unauthorized fees and withdrawal were detected in reconciliation of Plaintiffs then-closed accounts, and Lazzara and LCI were unable to provide explanation of who the recipient of the monies were, and what the purpose of withdrawals was. The amount stolen exceed $1000 and constitute grand larceny. Lazzara and LCI when repeatedly questioned the "trade processing fees" and uncovered an email to High Ridge, then admitted that an entity, later uncovered as an alter-ego of Vision played a material role in the account without Plaintiffs knowledge and/or consent.

600.   Plaintiff did not have confirmation on the theft and distribution of trade secrets until October 12, 2018 and the RICO Defendants prevaricated, avoided responding, stalled and obstructed answering legitimate questions. The RICO Defendants then engaged in other concealment, for over 375 days to conceal the existence of the G&F Agreements, and enacted their concealment even after, by violating judicial Panel orders to never produce any documentation or evidence of the existence of the sham risk services agreements. The concealment and obstruction continues to date (See Ver.Fac.3668)

601.   None of the **Exhibit 14** and **Exhibit 15** predicate crimes were isolated events; all were "continuous" within the meaning of RICO's pattern element and part of the scheme to defraud Plaintiffs and other Victims.

602.   The RICO Defendants' criminal acts were related within the meaning of RICO's pattern element in that the same predicate crimes were used to implement the subject schemes (mail and wire fraud, and trade secret misappropriation and theft under 18 USC § 1831), for the same purpose ( to improperly seize Plaintiffs CTA business, monies, trade secrets, assets, commercial advantage, property, funds, profitability for use for themselves, in breach of criminal and common law obligations), causing the same result (deprivation of Plaintiffs of its trade secrets, customers, business advantage, monies, business projects, economic advantage, performance record that should have been a source of revenue to Plaintiffs) as well as the loss of ongoing business projects.

603.   The  perpetrators controlling the activity of each of the Enterprises were the same, Boshnack, Rothman, Felag controlling Vision Entity RICO Defendants,, Conspirators Kadlec and ADMIS (defendants in related case 3873), and *Vision brokers,* Lazzara, Villa, LCI owning, operating and managing LCI RICO Entity Defendants and each implementing, facilitating, and/or concealing the schemes and damages being done, as detailed in allegations regarding the operation and management of enterprise activity and herein  this Complaint.

604.   The victim was the same, Plaintiffs and derivatively its affiliates and hedge funds Nefertiti Risk Capital Management, LLC (which had to be shuttered as a result of the fraud), Nefertiti Asset Management, LLC and its Nefertiti STORM Fund, LP.

605.   The instances of misconduct were not isolated events. Specifically the methodology by which Diversions/thefts and concealments were accomplished as the same e.g. fraudulent and deceptive sales, and ongoing and repeated affirmative misrepresentations to Plaintiffs and other Victims, to conceal the Vision Enterprise's pervasive conduct in its account and CTA. The scheme relied on a methodology of affirmative misrepresentations and material omissions, fraudulently and illegal charging and collecting unauthorized fees and deductions, estimated to be over than $10 million dollars a year, coordinated thefts of Plaintiffs and Victims' assets, profits, monies property, intellectual property, trade secrets, competitive advantage, and Diversions of the foregoing to the Vision Enterprise, to collect and divert assets property and non-public confidential information, and trade secrets,  in violation of the Defend Trade Secrets Act, the Commodities Exchange Act, Federal and State law, the coordinated use of telephonic communications and wire emailed communications, and cryptic names and acronyms, to avoid detection, and the purposeful manipulation of profits and withdrawal from competitors, and purposeful theft of trade secrets for transfer to the competitive HRHC CTA Referral business and other trading alter-ego affiliates, later Vision Investment Advisors.

606.   The Defendants methodology of ongoing way of doing business, was to use fraudulent concealment and predicate acts, and unlawfully transfer those funds, assets, monies, property, intellectual property and trade secrets, under false pretenses, and without the customer and CTA's or Plaintiffs' knowledge and approval to the Vision Enterprise.

607.   The scheme therefore also underpins unlawfully theft of monies, overcharging of fees, money laundering Plaintiffs cash from its customers futures accounts, across interstate commerce, which directly depleted the profits of their accounts and the performance record of their trading activities, as well as stole the trading strategies. Defendants knew that the transaction involved such proceeds would be wired across interstate to Vision Enterprise and made persistent and repeated attempts to fraudulently conceal. RICO Defendants, intended to promote the carrying on of the specified unlawful activity and knew the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds -  namely Rothman, Boshnack and the Vision Enterprise.

608.   Each predicate act was intended to and did have the same result, i.e. Plaintiffs were wrongfully deprived of revenue and business property, which were wrongfully diverted to the Vision Enterprise from the inception of acquisition of Plaintiffs account in December 2016 by Lazzara RICO Individual defendants, and continues by its ongoing use, profit in the alter-ego affiliates VIA business which were registered in March 2018 as CTA's to enter into direct competition with Plaintiffs, front running their trades and replicating their strategies and trade secrets.

609.   Each predicate act involved the same perpetrators, five individuals named herein, and eight business entity RICO Defendants, all actively engaged in the same types of predicate crimes **Exhibit 14 and Exhibit 15** (itemizing mail and wire fraud and theft of trade secrets) as well as other crimes grand larceny and theft, unlawful interference in their competitors trading accounts, manipulating margin on their competitors account their coordinated efforts as alleged above to conceal the RICO Schemes through other and further crimes and acts of fraudulent concealment.

610.   Vertical relatedness is satisfied because each of the predicate acts was related to the Enterprise and its activity i.e. stealing business, monies, property, intellectual property and trade secrets form Plaintiffs and Victims, through the companies the individual RICO Defendants owned and controlled, to divert business, customers, AUM, profitability, to Vision Enterprise since November 2014 and thereafter transferring and diverting to Vision Investment Advisors once it was registered to directly compete in March 2018.

611.   The RICO Defendants were able to commit the predicate crimes solely by virtue of their senior positions within their entities, and dominant control of the activities, which enabled them to direct monies, funds, property, intellectual property, trade secrets where they choose, and as well, through their control of enterprise activity, as detailed in the operation and management allegations above (and as amplified Exhibit 14 and 15). Both were crucial to the racketeering which was the pattern of activity of each enterprise. The predicate crimes furthered, implemented and/or concealed enterprise affairs – and it was solely the RICO Defendants which benefitted.

612.   Horizontal relatedness is satisfied because each predicate crime was related to the other predicate crimes in that each and all of these crimes had the same object, i.e., implementing enterprise activity and schemes, including the theft of Plaintiffs monies, assets, property, intellectual property and trade secrets, concealing their RICO violating fraudulent conduct and thefts and larceny of Plaintiffs resources and

asserts, as well as implementing and concealing all their breaches of common law fraud, and regulatory duties as licensed registered NFA or FINRA Members and brokers bound by securities laws.

### But-for Causation, Proximate Causation and Direct Injury

613.   The RICO Defendants criminal and tortious misconduct was the but-for cause of Plaintiffs injuries as detailed above and below. The RICO Defendants' criminal and tortious misconduct was the foreseeable, direct and proximate cause of injury to Plaintiffs in the form of stolen revenue, depletion of trading profits, withdrawal of unauthorized fees, misappropriation and theft of trade secrets and theft of business and property within the meaning of the RICO statute.

### Criminal Scienter

614.  Each Defendant acted with actual criminal scienter, as evidenced by the emails, telephonic communications, and concealments that all Defendants engaged in (See Exhibit 14 and Exhibit 15) which cannot be plausibly construed as anything other than documentation of an intentional and highly coordinated plan to engage in the thefts and fraud alleged herein.

### Damages

615.  Plaintiff has been damaged as a direct and proximate result of a violation of the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961-1968) ("RICO") and by reason of this conspiratorial conduct whereas Plaintiff has been induced to open accounts at ADMIS, and unwittingly contribute and disclose trades secrets, assets, capital, property, goodwill, and irreparable loss of competitive trade secrets to Vision as a result of Defendants' unlawful conduct described herein.

616.   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(c) by the co-conspirators, Defendants have wrongfully profited from their civil conspiracy and have caused Plaintiffs economic damages and irreparable harm, including, but not limited to, injuries in the Southern District of New York in an amount to be proven at trial, and as outlined in Section X.

617.   The actions of the co-conspirators constitute racketeering activities in violation of 18 U.S.C § 1832. This pattern of activity poses a threat of continuing because Defendants are continuing to proceed with the fraudulent activity, overcharging of fees, dissemination of customers confidential financial trading accounts, dissemination of trade secrets, and other unlawful conduct;

618.   The racketeering activities and violations of 18 U.S.C. §1962(c) has caused and will continue to cause Plaintiff irreparable and substantial injury and therefore cannot be fully redressed through damages

alone. An injunction prohibiting Defendants from further acquisition, disclosure, use, and possession of the Plaintiffs trade secrets is necessary to provide Plaintiffs with complete relief.

619.    If the co-conspirators were permitted to continue to engage in their racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs and all future Plaintiffs will and are being irreparably harmed and the economic damages to Plaintiffs will be difficult to quantify. The aforementioned acts of the Co-Conspirators were done willfully, with malice toward Plaintiffs and with wanton disregard for their rights;

620.    Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiff damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein

621.    Defendants are jointly and severally liable to Plaintiff and Plaintiff  is entitled to recover from each treble damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

622.    Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT II – CIVIL RICO -  U.S.C. § 1962(d)

623.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

624.    18 U.S.C. § 1962(d) provides in pertinent part, that "[i]t shall be lawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section"

625.    The RICO Defendants and Co-Conspirators have intentionally conspired and agreed to directly and indirectly participate in the affairs of the Enterprise, and took overt actions to further the scheme, through a pattern of racketeering activities in violation of 18 U.S.C § 1832, as described in Count 1.

626.    The RICO Defendants and Co-Conspirators knew that their actions constituted a pattern of racketeering activities and agreed to those actions in furtherance of, and for the benefit of the Enterprise, and took over actions to perpetuate the scheme over a period of five years as described in Count V, and the conduct is ongoing and open ended. A partial list of predicate and overt acts in furtherance of the scheme are incorporated in **Exhibits 14 and 15**.

627.   The Vision Enterprise and the Association Enterprise agreed to act together to bring about the objects of the conspiracy, i.e. to divert business, assets, moneys, property, intellectual property, trade secrets and economic advantage from Plaintiff and Victims to the RICO Defendants and Vision Enterprise, and other entities they owned and controlled, through the activity of the enterprise as described herein and, later through Vision Investment Advisors, and to otherwise divert profits, economic advantage, monies, profitability from its competitors, traders and Plaintiffs.

628.   The actions of the RICO Defendants and Co-Conspirators constitute a conspiracy to violate 18 U.S.C § 1962(c), in violation of 18 U.S.C § 1962(d).

629.   As a direct and proximate result of racketeering activities and violations of 18 U.S.C. § 1962(d) by the RICO Defendants and Co-Conspirators, Plaintiffs have suffered economic damages throughout the world, but not limited to, injuries in the Southern District of New York; in an amount to be proven at trial.

630.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Paragraph Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein

631.   The aforementioned acts of the RICO Defendants and Co-Conspirators were done willfully, with malice toward Plaintiffs and wanton disregard for their rights, entitling Plaintiffs to treble damages, attorneys' fees, and costs.

632.   Defendants are jointly and severally liable to Plaintiffs and Plaintiffs are entitled to recover from each three times the damages sustained, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

633.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

COUNT III – MISAPPROPRIATION OF TRADE SECRETS  (Defend Trade Secrets Act)
**Against all Defendants**

634.   Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein. Section IV incorporated herein provides notice pleading that the trade secrets, include without limitation its transaction records, transaction history, positions, prices, volumes, strikes, premiums and options portfolio, and trading details and risk management strategies.

635.   Plaintiff Kumaran is the sole owner, author and inventor of the trade secrets hereunder. The Defend Trade Secrets Act ("DTSA"), enacted on May 11, 2016,  affords the owner a Federal civil remedy if its trade secrets are used in interstate or foreign commerce.[20]  That Act creates a private cause of action in favor of the owner of a trade secret that is misappropriated...if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C.§ 1836(b)(1).

636.   Plaintiff Kumaran's transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, that give them an economic advantage are trade secrets are (1) non-public information; (2) protected by reasonable measures; and (3) and which derive independent economic value, actual or potential, from not being known to other persons, who can obtain economic value from its disclosure or use of the information.  Plaintiff has maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of such information.

637.   The NFA Rules 2-4, 9061 specifically recognizes a CTA's transactions records, and trading strategies as a trade secret, and that the trading strategies, and performance records of a traders and CTA fall under the definition of "trade secret".  The trade secrets in this action include trade details, transaction history, trading records, timing, execution of trades, positions, prices, volumes, strikes, premiums and options portfolio, constitute competitive trading strategy, compilations of the foregoing, and their methods, techniques, formulae, programs, or processes.

638.   Plaintiff's trade secrets, as traders and owner of a CTA and CPO give Plaintiffs an economic advantage that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets disclosure. Plaintiff has maintained this information in confidence and it is not generally known to other persons or the public who could obtain economic value from the disclosure or use of this information, Plaintiffs derive substantial economic advantage over their competitors who do not know how to use it and who do not have knowledge of the inner workings of it.

639.   Plaintiff took and takes reasonable measures to maintain the secrecy of its trade secrets. Such measures include, but were not limited to: (1)limited access to confidential information; (2) requiring

---

[20] *See Agilsys, Inc. v. Hall*, 2017 U.S. Dist. LEXIS 111824, at *27 (N.D. Ga. May 25, 2017) (*cit* 18 U.S.C. § 1836(b)(1)).

third-parties to execute strict non-disclosure agreements before being allowed to access the information; and (3) requiring passwords for access to such information.

640.   A substantial investment of time, money, cost development over a long period of time was invested by Plaintiffs to develop the trading strategies, risk management strategies, that gives Plaintiffs a valuable, unique and competitive advantage to compete as a trader in the commodities futures industry and a risk management professional, Kumaran also invested substantial capital, money and time to register as a trader, and start commodities hedge funds under the name Nefertiti from which it could derive substantial economic advantage as an entrepreneur and small business owner in NYC and the launch of Nefertiti Asset Management, LLC ("NAM").

641.   Defendants misappropriated trade secrets by deliberate actions which include but not limited to: (1) acquisition, dissemination and use of Plaintiff's trade secrets using improper means, including but not limited to misrepresentation, deceit and fraud, fraudulent inducement, fraudulent sales and telephone solicitation, and fraudulent concealment of Vision's disclosure of an acquisition of CTA's strategies, and violations of duties and obligations under the CEA; (2) Defendants willful and wanton breach of their duties of confidentiality and secrecy under  CEA, NFA Rules, CFTC Rules, compliance duties and Federal laws, Defendant Trade Secrets Act, and breach of confidential relationship and obligations to maintain the secrecy and restrictive covenants of Plaintiff's trade secrets; (3) ongoing use and profit by Defendants, in interstate commerce. in direct competition and to cause economic harm, by HRHC CTA Referral services, Boshnack, Rothman, Vision Investment Advisors, RF, BF, LCI, Lazzara, Villa and others and their conspirators own economic benefit without the express or implied consent of Plaintiffs; all in violation of the Defend Trade Secrets Act  "DTSA".

642.   Defendants have wrongfully profited from their misappropriation and have caused Plaintiff Kumaran and CTA's damages and irreparable harm. in loss of their confidential and trade secrets to their competitors, and depletion of their competitive advantage, and reduction in their performance track record by Vision, its affiliates including HRHC, Vision Investment Advisors and others.

643.   Defendants for fraudulent and illegal purpose, willfully, maliciously, with wanton disregard for Plaintiffs' rights, and moral turpitude,  and with intent to deceive, knowingly stole, and without authorization acquired, disseminated, disclosed, copied, downloaded, uploaded, replicated, transmitted, delivered, communicated, conveyed, referred to, obtained guidance from Plaintiffs' trade secrets and disseminated trade secrets for its competitors use, referral and tortious conduct, for use and profit in

competing trad and risk management activities, in their affiliates, and unlawfully profited from, in unfair competition.

644.   Defendants acquired, used, disclosed Plaintiffs trade secret *knowing* that they have been stolen, obtained, or converted without Plaintiffs' authorization. Defendants intentionally engaged in these acts to benefit their self-interests and their RICO Enterprise (at the expenses and destruction of Plaintiffs) and with the knowledge, foreseeability and intent that these acts would injure Plaintiffs, and deny them of their competitive economic advantage in their trade secrets.

645.   Defendants, jointly and severally, have wrongfully profited from their misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein.

646.   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and it could cause Vision Defendants to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Vision Defendants would irreparably harm to Plaintiffs.

647.   Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

648.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT IV – MISAPPROPRIATION OF TRADE SECRET UNDER  NEW YORK LAW
**Against all Defendants**

649.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein. All paragraphs from Cause III are included by reference.

650.   Plaintiffs trade secrets (as described in Cause III above, and included by reference herein) trading strategies and risk management strategies constitute competitive commercially sensitive information that give them an economic advantage are trade secrets, and that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

651.   Plaintiff has taken reasonable measures to protect the secrecy of Plaintiffs trade secrets, and includes by reference in Count III and  Section IV above.

652.   Plaintiffs' transaction records, trading strategies and risk management strategies constitute competitive commercially sensitive information, including trade details, transaction history, trading records, timing, execution of trades, positions, prices, volumes, strikes, premiums and options portfolio, constitute competitive trading strategy, compilations of the foregoing, and their methods, techniques, formulae, programs, or processes, that give Plaintiffs an economic advantage and that derive independent economic value from not being generally known to the public or other persons who can obtain economic value from the trade secrets' disclosure.

653.    Under New York law a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it". [21]

654.   The NFA Rules specifically recognizes a CTA's transactions records, and trading strategies as a trade secret, and that the trading strategies, and performance records of a traders and CTA fall under the definition of "trade secret".  The definition of trade secret under New York law, is also defined under the Restatement of Torts, for which Plaintiffs have met all six factors.

655.   However, the Defendants intended to and knowingly stole and, without authorization, acquired, used, profited from, studied, incorporate, referred to as guidance, disclosed, copied, downloaded, uploaded, photocopied, replicated, transmitted, delivered, communicated, conveyed or otherwise obtain commercial benefits from Plaintiffs' unlawfully acquired trade secrets.

656.   The Defendants acquired, used or disclosed Plaintiffs' trade secrets, knowing that they have been stolen, obtained, or converted without Plaintiff's authorization. Defendants intentionally engaged in these acts to benefit Vision Defendants and LCI Defendants with the knowledge or intent that these acts would injure Plaintiffs.

657.   Defendants acquired, used, disclosed Plaintiffs trade secret *knowing* that they have been stolen, obtained, or converted without Plaintiffs' authorization. Defendants intentionally engaged in these acts to benefit their self-interests and their RICO Enterprise (at the expenses and destruction of Plaintiffs) and with the knowledge, foreseeability and intent that these acts would injure Plaintiffs, and deny them of their competitive economic advantage in their trade secrets.

---

[21]  See *Ashland Mgt. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 [1993], quoting Restatement of Torts § 757, comment b.

658.   As a direct and proximate result of violations of New York law, by the Defendants Plaintiff has suffered economic damages both domestically and abroad, including, but not limited to, in the Southern District of New York in an amount to be proven at trial but exceeding $75,000.

659.   The aforementioned acts of the Defendants were done willfully, with malice toward Plaintiffs. Based on the willful and intentional misappropriation of Plaintiffs' trade secrets : (1) Defendants should be enjoined from any further use and/or disclosure of Plaintiffs' trade secrets until such time that no further commercial advantage that would be derived from the misappropriation of Plaintiff's trade secrets; (2) Plaintiffs should be awarded damages including actual losses and a disgorgement of unjust enrichment caused by the misappropriation ; (3) an equitable accounting  for  all profits or benefits arising out of such breach (4) exemplary damages including  but  not  limited to all special, indirect, punitive, consequential or other damages; and (5) all other remedies in equity and law, including recovery of its costs and legal fees under New York law.

660.   As a direct and proximate result of defendants' misappropriation, Plaintiffs have suffered actual damages as set forth in Section X, and Defendants have been unjustly enriched.

661.   Defendants have wrongfully profited from their misappropriation and have caused Plaintiff Kumaran and CTA's damages and irreparable harm. in loss of their confidential and trade secrets to their competitors, and depletion of their competitive advantage, and reduction in their performance track record by Vision, and affiliates Vision Investment Advisors.

662.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X  and repeated herein.

663.   The wrongful conduct and misappropriation of Plaintiff's trade secrets alleged herein will continue unless enjoined and restrained by this Court, and will cause great and irreparable injury to Plaintiff's livelihoods and business, and it could cause Vision Defendants to have improper advantages, positions, and rights in the marketplace to Plaintiffs' detriment. Absent injunctive relief, further disclosure and use of Plaintiff's trade secrets by Vision Defendants would irreparably harm to Plaintiffs.

664.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT V – CONVERSION
### Against All Defendants

665.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

666.   Defendants intentionally and willfully improperly converted Plaintiffs' property, assets, monies, funds, trading rights, intellectual property, trades secrets, profitability, and trading advantage for use and profit for Co-Conspirators and Vision Defendants, and for unlawful and improper purpose, by engaging in a scheme of fraud and misrepresentation.

667.   Defendants intentionally and substantially interfered with Plaintiffs rights to its property, assets, intellectual property, trading rights, trade secrets, profitability and funds, by, illegally authorizing the purloining and withdrawal of unlawfully charging fees, and withdrawing taking the funds in express violation of the Commodities Exchange Act. Their conversion included without limitation the misappropriation of funds for Defendants and Conspirators unlawful use and illegal "arrangements" with disbarred Vision and its owners and affiliates. Defendants also intentionally and wantonly converted the trading strategies of Plaintiffs, depleted the trading profitability of Plaintiff's CTA and the STORM trading strategy, as it converted its trading assets and profits to unlawfully pay Vision. New York courts have defined ''conversion'' as the unauthorized assumption and exercise of another's ownership rights in property to the exclusion of the proper owner's rights.[22] Conversion has also been defined as ''any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with that person's rights in the property.''[23]

668.   Plaintiff did not consent in any manner to Defendants taking and conversion of its monies, funds, assets, property, and/or property rights at issue to give to HRHC, its owners or affiliates, or any other Co-Conspirator.

669.   Despite repeated complaints by Plaintiffs, including LCI and Lazzara, Defendants continued the conversion,  persisted in and continued to deny Plaintiffs' rights to their property and continued to act in a manner inconsistent with their own statutes to protect Plaintiffs confidential property, assets, funds, monies, property and trade secrets Defendants permitted ongoing use and conversion of Plaintiff property for use in unfair competition by its competitor HRHC CTA Referral and VIA. Defendants in

[22] *See* Vigilant Ins. Co. of Am. v. Housing Auth. of City of El Paso, 87 N.Y.2d 36, 660 N.E.2d 1121, 637 N.Y.S.2d 342 (1995); Kranz v. Town of Tusten, 236 A.D.2d 675, 653 N.Y.S.2d 194 (3d Dep't 1997).
[23] *See* 23 N.Y. Jur. 2d, Conversion § 1 (2001), citing Meyer v. Price, 250 N.Y. 370, 165 N.E. 814 (1929). t

fact continued to accelerate and convert more asserts, property deplete more funds, monies and theft, including additional fees on May 2nd, 2017,  conferring Plaintiffs trading funds for its own use to pay and compensate Vision Defendants and even Julie Villa  and Co-Conspirators.

670.    The conversion and additional fees lasted the same 45 days that Villa involved herself in Plaintiffs accounts starting on May 2, 2017 and ending on account close on June 15, 2017, and depleting of profits and moneys by 3.45% starting only after Villa entered. Villa in fact leaves working for LCI after there are no more profits to withdraw at the end of June 2017 admitting the same "45 days" of overlap of involvement.

671.    Plaintiffs have sent cease and desist after the closing of its account after it learned of the dissemination. Defendants have failed to cease and desist, and Defendants and their Conspirators, including HRHC and Vision Investment Advisors, still have and are using and profiting from Plaintiff's property, and have incorporated it into competing trading and risk management programs with direct competition – for the taking of Plaintiff property in direct competition through Vision Investment Advisors, HRHC and its affiliates, owners and employees.

672.    Plaintiffs at no time consented to the taking of its funds, property, trade secrets, intellectual property and assets. Defendants, for illegal and improper purpose, wrongfully exerted dominion over Plaintiffs property denying Plaintiffs its rights and to therefore and without that persons consent or authorization and inconsistent with Plaintiffs.

673.    Defendants fraudulently intended to convert Plaintiffs monies, funds asserts, property and trade secrets, and to use them as "payment in kind" for the illegal scheme, and at all times acted without the authorization of Plaintiffs thereby depriving Plaintiffs of its property.

674.    Defendants, jointly and severally, have wrongfully profited and conferred illegal benefit from its conversion and fraudulent conduct and have caused Plaintiffs damages and irreparable harm.  As a result Plaintiffs have been damaged in accordance with the Damages in Section X supra  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra and repeated herein.

675.    Defendant's conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

COUNT VI – AIDING AND ABETTING IN CONVERSION AND MISAPPROPRIATION
**Against all Defendants**

676.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

677.   For the reasons included by reference in Counts III-V,  Plaintiffs' confidential information and trade secrets, assets, funds, monies, property and other information were misappropriated an converted by Defendants across interstate lines to and to other affiliates in Stamford, CT

678.   Defendants had direct, actual and constructive knowledge of the conversion and misappropriation, as evidenced at length in this Complaint.

679.   Defendants had an affirmative duty to abide by the  rules and laws the prohibit a Plaintiffs moneys, assets and property being distributed across interstate lines and CTA's trading records being supplied to another NFA member without their permission.

680.   Defendants knowingly assisted in participating in the fraudulent scheme, concealing their involvement, took overt actions to engaged in a Concealment scheme, and knowingly made affirmative misrepresentations or fraudulent concealments and omissions as documented herein, so that Vision Defendants could improperly divert, acquire and misappropriate Plaintiffs (and other victims) assets, property and business. All Defendants provided substantial assistance in converting the competitive trading strategies in direct unfair market competition, for their use and profit in violation of DTSA.

681.   Defendants have all, wrongfully profited from misappropriation and conversion and have caused Plaintiffs damages and irreparable harm. As a result of Defendants bad faith failure to abide by it duties, and failure to abide by the CEA, and aiding and abetting in misappropriation, Plaintiffs have suffered irreparable harm in loss of their confidential and trade secrets, to their competitors, as well as other significant damages, as alleged herein;

682.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiff damages and irreparable harm. As a result of the foregoing conduct, Plaintiff has been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein;

683.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT VII – FRAUD AND FRAUDULENT OMMISSION
**Against Trey Lazzara, Lazzara Consulting, Inc, Julie Villa,  John Felag, Howard Rothman, Robert Boshnack. High Ridge Futures, High Ridge Holding Corporation, Vision Investment Advisors, Inc, Vision Financial Markets, LLC**

684.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

685.  Count VII - Defendants had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.

686.  Count VII - Defendants and its agents, servants, employees had an affirmative duty to abide by the CEA, abide by the compliance rules and laws of registered brokers, registered NFA Members, as well as FINRA licensed members, and their disclosure laws, and abide by the compliance NFA rules, regulations and requirements including the anti-fraud provisions. A complete list of fraudulent statements and omissions is incorporated in Section IV.

687. Count VII – Defendants representations were false or required disclosure of additional facts to render the information furnished not misleading, including as required. Specifically and without limitation of the material disclosure requirements, Count I - Defendants,  are obligated to abide by the anti-fraud laws of the CEA 7 USC 6(b) and NFA 2-2 which prohibits any form of deceit, misrepresentation and fraud to a customer or member.

688.  Among the many duties and obligations under the Act, Count I defendants, were obligated to not engaged in any type of artifice, scheme, deceit or trickery. Further they were obligated to disclose their risk services, and any attempts to acquire their competitors trading strategies and CTA records. The disclosure requirements under the CEA, prohibit registered members from in anyway contravening the good faith duties under NFA 2-4, or charging fees, to customer or traders without their knowledge and consent.

689.  Count VII – Defendants also had independent duties, under the CEA, 7 USC 13  to not engage in unlawful conduct. They had independent duties to Plaintiffs as members and customers, to not, as members, violated the exchange rules. Similarly as registered FINRA members they are also obligated to not engaged in any type of artifice, scheme or deceit.

690.  Further, without limitation Count VII - Defendants are obligated under NFA Rule 2-4 9061 to not disseminate CTA"s confidential and trade secret records,  which states expressly that it is a NFA Compliance violation for NFA Members Vision owners, employees, affiliates to obtain a CTA's trading

records without their permission; and to abide by Federal Laws, under the Defend Trade Secrets Act; Defendants made fraudulent omissions in all communications in knowingly not seeking or being granted consent to received disclosure of and acquire their competitor CTA's trade secrets, and in the propagation of deceit to conceal their involvement in the account.

691. The affirmative misrepresentations, material fraudulent concealments and omissions,   were intentionally made by Count VII - Defendants,  in furtherance of their scheme to defraud Plaintiffs by inducing them to disclose their trade secrets, open accounts at ADMIS, and then engage in the scheme to disseminate their accounts for profit, to generate unlawful revenue and income to Vision, and to engage in direct unfair market competition, by disseminating CTA"s accounts to other NFA members, and CTA's. Vision Enterprise was  expressly prohibited under fair market place laws and other market place misconduct to create an unfair advantage to Defendants.

692.  Count VII - Defendants, misrepresentations were known to be false and were made for the purpose of fraudulently inducing Plaintiffs to open accounts, entrust funds, property and business to ADMIS under false pretenses, to continue to maintain accounts at ADMIS,  and to participate in the unlawful and fraudulent scheme to deduct unauthorized fees that are not compensable under the Commodities Exchange Act, and to unlawfully disseminate of customer and CTA"s trade secrets and trading strategies, which is not permitted under the CEA and/or the Defend Trade Secrets Act; and to deplete the fair market competition and economic advantage of customers and CTA's, and Plaintiffs, as alleged herein.

693.  The misrepresentations of fact made by the Count VII - Defendants,  include, but are not limited to, those material misrepresentations discussed in detail and exemplified herein, and in Exhibit 14 and Exhibit 15.

694. The scheme to defraud perpetrated by Count VII - Defendants and its co-conspirators, was dependent upon a succession of material misrepresentations of fact, fraudulently concealments and omissions, by Count VII - Defendants, as outlined herein by which among other concealments, Count VII - Defendants, materially concealed, that substantial portion of ADMIS's futures clearing business, instead of being guaranteed by Archer Daniel Midlands, or ADMIS' own credit worthiness, instead is reliant upon significant personal financial guarantees, personal credit lines obtained from the owners of the disbarred Vision Financial Markets, Howard Rothman, Robert Boshnack and Vision affiliates, and that customer and CTA accounts, were being disseminated without consent;

695.  The fraudulent concealment and omissions, were material and directly impacted the customer and CTA's, and violate the material obligations of disclosure of the IB and NFA rules,  because in exchange for the secret financial guarantees from Vision's owners and affiliates, in express violation of the CEA, the Defend Trade Secrets Act, and other Federal laws, and its fraudulently without the customer and CTA's knowledge, consent, permission and authorization ADMIS are

(a)      unlawfully distributing customer and CTA' confidential trading secrets and futures accounts to Vision, who then set up a competing CTA, in direct unfair market competitions in violation of Federal law, privacy laws, and the Defend Trade Secrets Act;

(b)      unlawfully overcharging customers and CTA"s fees between 0.30 cents and $6.00 for compensation to unauthorized third parties and Vision amounting to over $10 million dollars a year, without the customers consent;

(c)      unlawfully permitting Vision to tamper with, extend and manipulate margin controls, liquidate accounts, place trades for customers, and engage in other manipulation of their competitors accounts in direct unfair market competition [24];

(d)      improperly acquire their competitors trade secrets, for use, profit, gain, engage in economic sabotage and direct unfair competition;

(e)      other misconduct alleged herein,

so that Defendant and its co-conspirators, can fraudulently secure business that violates the CEA, for their profit, gain and financial benefit;

696.  Plaintiffs reasonably relied upon such material misrepresentations, fraudulent concealments and omissions to their detriment in agreeing to open accounts at ADMIS, and transferring valuable money, property, assets, confidential information and  trade secrets to ADMIS therein.

697.  As a direct and proximate result of the defendants' fraudulent representations and acts, Plaintiffs have been damaged in its business and property as described herein. Defendants have wrongfully profited, received concrete benefits, from their willful, knowing participation fraud, with wanton disregard for their customers and CTA's rights, and have caused Plaintiffs substantial damages and irreparable harm.

698.   Count VII - Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

---

[24] CFTC 1.11 and 7 U.S. C.§ 2 (c)(v) .(IV) 15 U.S. C§ 78g (2) (A)(B), NFA 2-26 17CFR§1.57 (c.) §1.55 Part (k);

699.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

COUNT VIII – FRAUDULENT INDUCEMENT OF CONTRACT

**Against Trey Lazzara, Lazzara Consulting and Julie Villa (LCI Defendants)**

700.  Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

701. Count VIII - Defendants falsely made material representations to Plaintiffs. commencing in or around December 2016  at specific dates, times and places as alleged herein in Section VII and also incorporated in Exhibit 15 and thereafter that Count VIII Defendants had a duty and obligation to comply with the sales and solicitations requirements of introducing brokers under the Commodities Exchange Act and other duties of honesty

702.   Those obligations and duties include but are not limited to

a.   NFA 2-2 which makes it an NFA Compliance Rule violation to in any manner deceive, cheat or defraud another NFA member or customer; the unlawful violation of the anti-fraud provisions of the CEA 7 USC 6(b)(2);

b.   7 USC 6(b) prohibiting any type of fraud, deceit and misrepresentation

c.   NFA 2-29 which prohibits the fraudulent sales and telephonic sales and marketing communications by a network of Trey Lazzara and other Vision IB's; and NFA Bylaw 801 which prohibited solicitations from unregistered AP's Julie Villa

d.   NFA 2-4 Int Not 9005 and NFA Rule 2-26 / CFTC Part 33.(7) which required that Lazzara disclose all the costs and fees, transaction fees and trade processing fees (being deducted from Plaintiff's accounts to pay Vision affiliates) *prior* to the account being open, and that any arrangement that is likely to deceive customers is a violation of NFA Requirement

e.   NFA 2-26 including without limitation CFTC 1.11, CFTC 1.55 and CFTC 1.57 which required Lazzara and ADMIS, disclose customers, *all* its risk management policies and procedures, *prior* to opening the account[25];

f.   NFA 2-4 Int Not 9061 which is a NFA Compliance violation for NFA Members Felag and Vision owners, affiliates to obtain a CTA's trading records without their permission;

g.   7 USC 13(a)(1) (3)(4) and (5) prohibiting knowing violations of the regulations, theft of monies over $100, and failing to disclose fees and engage in form of deception.

---

[25] CFTC 1.55 (k) ..disclosures about risk policies *prior* to a customer entrusting funds to an FCM were prerequisite and CFTC 1.55.(l) .. expanding upon such information as necessary to keep such disclosure from being misleading whether through omission or otherwise CFTC 1.55(i) including LCI's ongoing requirement to not engage in misrepresentation NFA 2-2.

h.   NFA Margin Handbook and NFA Financial Handbook Section 7, which mandated that Lazzara and ADMIS, issue margin calls directly to customers, and not to Robert Boshnack, an arrangement which to a material failure to enforce exchange compliance laws in Performance Bond margin and failure to issue margin calls under CME 980, CME 982.

i.   NFA 2-26 17 CFR 1.57 and 7 USC 2 (c.)(v)(IV) and which prohibited Vision, its owners, affiliates and employees from directly  or indirectly extending, or maintaining credit to or for, or collecting margin on Kumaran's account. It also prohibited them from having discretion on Kumaran's account, as well as power of attorney to handle margin calls.

j.   the unlawful and unauthorized dissemination of customers and CTA's personal financial data, social security numbers, net worth, financial balances, names, addresses, telephone numbers and other personal and confidential information in violation of CEA;
k.   participating in the scheme with ADMIS, Vision and Vision IB"s to a participate in direct unfair market competition, and a deplete innovation in the market from CTA's, in violation of the CEA. 7 U.S.C. § 6b (2)

703.  LCI Defendants, individually and jointly, made material misrepresentations, fraudulently concealed and **materially omitted** in their sales, promotions, and solicitations of the accounts at ADIMS, as detailed herein, including but not limited to

a.   that the carrying FCM had unlawfully outsourced the material handling of risk management procedures and margin approvals to HRF,  its owners, employees and affiliates, outside of the CFTC Reg 1.11 including impermissible delegations of discretion and authority to liquidate customer accounts; place trades on behalf of customers, and extend margin and credit to the customer, without power of attorney all in violation of the CEA;
b.   that non-exchange compliance margin calculations not consistent with CME Span were being used, which were required to be disclosed prior to account opening;
c.   that the rogue risk management services purportedly provided by the Vision Defendants were not necessary, were unlawful, were fraudulently concealed, were performed by unqualified personnel on material deficient platforms, were not approved by the CFTC, violated the Commodities Exchange Act and other laws, were grossly negligent, were replete with errors and omissions, were not authorized by or disclosed to the customer as required under the CEA, and were fraudulently paid for;
d.   that the foregoing unnecessary, unlawful risk management services were  conducted on materially deficient electronic platforms, using decades old eighties technologies, that did not possess technologies to handle all strikes in options trading,  were materially unable to monitor intraday valuation MTM and margin in violation of CME Rules, and were using a non-exchange compliant form of "margin allowances" which expressly violated the margin criteria under CME 930, 980 and 982, and expressly impaired trading to deplete fair market competition and concealment Vision's employees, owners and affiliates.
e.   that their confidential and proprietary information including trading strategies, account information, financial information, account valances, and all real-time details of their account information would be disseminated across interstate lines to Vision defendants;
f.   that unauthorized fees would be deducted from their accounts to pay HRF Defendants;

704. Reliant on the fraudulent misrepresentations and deceived by the material omissions and fraudulent concealments, Plaintiffs were induced to entrust their CTA programs to ADMIS, and open futures trading accounts at ADMIS, and entrusted funds, business, property, intellectual property, capital and money with ADMIS. Plaintiffs reasonably relied on LCI Defendants fraudulent representations in deciding entrust to do business with ADMIS.

705. Count VIII - Defendants however knew their representations were false and they had been engaging in the fraudulent and illegal scheme since September 2014.

706. The foregoing misrepresentations and omissions were material, because if Plaintiff had known the foregoing misrepresentations were not true, or if the concealments were properly disclosed, Plaintiff would not have chosen to , and do business with ADMIS, and would not have disclosed its trade secrets or opened accounts, and would not suffered the significant harm incurred today.

707. Count VIII - Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiff damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

708. Count VIII - Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT IX – AIDING AND ABETTING IN FRAUD
### Against all Defendants

709. Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

710. Defendants, individually and collectively, had actual, direct and constructive knowledge of the fraud and fraudulent scheme as fully alleged above.  The fraud was also enacted by all Defendants and together with Conspirators ADM Investor Services in their concealments and failures to disclosure. Without limitation Defendants *knew* that trailing fees and commissions were being stolen from the account to be paid to Vision without Plaintiffs consent, that trade secrets and confidential information were being shared with Vision, and that risk services were being outsourced without knowledge and consent, and that Boshnack and Rothman and HRF had placed guarantees on Plaintiffs account, and

knew of the affirmative misstatements and material omissions were being made by Defendants and other Conspirators, to conceal the activities.

711.   Count IX -Defendants LCI, Lazzara and Villa, as the independent broker and is representatives, were responsible for and had superior knowledge of material information which they intentionally concealed from Plaintiffs and were responsible for communicating complete and accurate information to Plaintiff. They also had an affirmative and statutory duty to abide by the CEA, rules, regulations and laws, and comply NFA bylaws, rules, regulations and requirements including the anti-fraud provisions, and if registered at FINRA also their anti-fraud and deception rules.

712.   Count IX Defendants LCI, Lazzara and Villa provided affirmative and substantial assistance in concealment and propagating the fraud, by continuing and making affirmative misstatements and material omissions, and not disclosing (even when asked) the role of Vision Defendants. Even when Plaintiffs documented substantial errors and omissions (*See* Supra 7G), and were reliant on accurate information about intra-day margin upon which to make material business decisions, Count IX Defendants all knowingly concealed that margin decisions and risk services had been outsourced to HRF, Felag , Boshnack and Rothman, and among other things, materially mispresenting the margin allowance of $134,000 (see above) and causing substantial losses to Plaintiffs business. LCI, Lazzara and Villa, at all times, propagated the fraud and deceit even at times of dire impact.

713.   Defendants for fraudulent and illegal purpose, and motivation to commit such predicate acts as described herein, willfully failed to comply with the anti-fraud provisions of the CEA, NFA rules and bylaws, and Federal laws, and participated with Conspirators ADMIS to enact the same concealments, and therefore provided substantial assistance in aiding and abetting in the fraud, as listed supra.

714.   Count IX - Defendants, acted in conspiracy with and with the same actual and direct knowledge of the fraud – a fraud perpetrated by all Defendants and Conspirators including ADMIS, for their own benefit, profit and gain, and provided substantial assistance in the fraud to cover up and conceal it.

715.  Count IX – Vision Defendants, VFM, HRHC, Rothman, Boshnack, HRF, Felag, VBS, as registered NFA members and/or FINRA members with statutory duties to not deceive, defraud or misrepresent information also knew and had actual and constructive knowledge of the fraud, *knew* they were parties to the G&F Agreements that required disclosures and consents from customers, and had knowledge that they were performing risk services without consent, knew that Plaintiffs were reliant on

the risk information to make material decisions on their execution of trading, and knew that they had unlawfully acquired Plaintiffs  trades, transactions history and trade secrets.

716.   Count IX – Vision Defendants also knew that during May 2017, they had added additional fees on May 2, 2017 to reduce Plaintiffs profitability and took overt actions to conceal those fees. As above, they also knew they had unlawfully manipulated margin on Plaintiffs account, and provided errors and omissions in risk services, were violating CME Exchange rules in margin calculations and material misstatements in margin calculations to propagate the fraud. Their overt actions to conceal their risk services and unlawful margin participation directly caused substantial losses in Plaintiffs account and in their business as CTA's and CPO's and launching a hedge fund.

717.   At all times Defendants, took overt actions and provided substantial assistance in allowing the fraudulent conduct to proceed and intentionally took actions to not disclose to Plaintiffs the role of HRF and other Vision affiliates – especially as Plaintiffs relied upon accurate risk information.

718.   As a result of the foregoing actions and concealments, and as a direct and proximate results of the Defendants fraudulent representations, acts and omissions and aiding and abetting in fraud and violation of the anti-fraud of the CEA, including but not limited to 7 U.S.C. 6(b) and direct participation in the scheme Plaintiffs have suffered harm and damages therein.

719.   Defendants,  jointly and severally,  have wrongfully profited, received concrete benefits, from their aiding and abetting in fraud, and took substantive actions to enable the fraud to perpetuate and have caused Plaintiffs substantial damages and irreparable harm, as well as irreparable loss of its trade secrets to its competitors.

720.   As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein;

721.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT X - CIVIL CONSPIRACY
### *Against all Defendants*

722.   Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

723.   The conduct in Count X is fraudulent and illegal and was for unlawful and improper purpose, and not permitted under the rules of participation under the CEA as laid out in Section 11 of Ver.Fac.03668 as incorporated herein. Conspirators, knowingly and intentionally violating the CEA and other Federal Laws including but not limited to the Defend Trade Secret Act.

724.   Defendants Lazzara, LCI, Villa and Vision Defendants named herein, entered into an association in fact and civil conspiracy with each other and other Conspirators ADMIS, Kadlec, and key NFA insiders, Wahls and Kiela, and/or were beneficiaries of the agreements, to defraud customers (and Plaintiffs) to opening futures clearing accounts at ADMIS, while fraudulently concealing Vision Defendants material participation in the account.

725.   The fraudulent and illegal conduct included without limitation (a) distributing customer and CTA' confidential trading secrets and futures accounts to Vision Defendants; (b) overcharging fees between 0.30 cents and $6.00 for compensation to unauthorized third parties; and (c) other misconduct alleged herein, so that Defendants could procure financial credit lines and guarantees from Vision's owners and support the futures industry – while using the customers and Plaintiffs account as collateral - and operate an enterprise that violates the CEA, for their profit, gain and financial benefit; and other unlawful conduct as described in Section 11, Ver.Fac.03668 ("Agreement to Defraud").

726.   The Conspirator each took overt actions to perpetuate the fraud, by not making the black-letter law required disclosures that (a) Vision Defendants would obtain fully disclosure of their non-public proprietary trading account and transaction records; and (b) that Vision Defendants would charge trailing fees and commission from their account including the ability to withdraw and purloin trading profits; and (c) Vision Defendants engage in illegitimate risk services on their account that were not approved by the CFTC and not disclosed; that (d) disbarred owners Boshnack and Rothman would have discretionary authority to extend credit, margin and guarantee accounts in violation of their rules of market participation.

727.   A lynchpin of the fraud and civil conspiracy was to misappropriate the trading strategies of start-up CTA's transfer it to its competitors, for use and profit in interstate commerce, and to create an unfair competitive advantage to HRHC and its competing CTA referral service and inequitably continue revenues streams to HRHC without the customers, traders including Plaintiffs knowledge and consent. A second driver of the fraud was to garner unauthorized fees and tamper with the profits of its competitors businesses to secure an unfair competitive advantage to HRHC.

728.   The purpose of the fraud and civil conspiracy was to misappropriate assets, monies, funds, property and funds including the trading strategies of start-up CTA's transfer it to its competitors, for use and profit in interstate commerce, and to charge unauthorized fees to continue revenue streams to HRHC. The Conspirators used artifice, misrepresentation, trickery, deception and fraudulent intent to convert money, property and funds from the *Vision broker* accounts, (which included Plaintiffs account) without their knowledge and consent to pay for their illegal non-compliant arrangements with disbarred Vision, all of which was fraudulently concealed from CTA's and Plaintiffs, and fraudulently paid for by purloining funds from CTA's and Plaintiffs. This conduct is illegal and violates the CEA.

729.   Lazzara, LCI and Villa knowingly and intentionally participated in the fraud  by making repeated false statements and omissions, to conceal the Vision arrangements, in exchange for which, as part of the scheme of *Vision brokers*, received a "risk-free" credit line on a substantial part of its business, and defrauded their customers, for their own profit and gain to maintain a "risk free" distribution through ADMIS, and propagate their own profit and gain, and benefits from their relationship with ADMIS.

730.   Accordingly, they intentionally  deceived their customers and traders (including Plaintiffs).

731.   Conspirators knowingly encouraged and/or engaged in fraudulent sales and solicitations and failed to abide by  black-letter law CFTC disclosures about fees, risk management, account disclosure and at all times engaged in fraudulent conduct to permit dissemination of CTA's proprietary trade secrets to  a disbarred *Vision Risk Group*. Even when questioned they persisted in a conduct of deceit and fraud. (See Section 7G-7K).

732.    At all times Defendants acted in conspiracy together to keep the Agreements to Defraud concealed from traders including Plaintiffs. The fraud and deceit violates the heart of the CEA,  7 USC 6(b) which prohibits market participants from – in any way – deceiving or using trickery, deception and artifice in the commodities futures markets.

733.   Conspirators, LCI, Lazzara and Villa, acted in a morally reprehensible and dishonest manner to conceal Visions' involvement, and persistently acted with intention to deceive Plaintiffs made misrepresentation and omissions which they *knew* propagated fraud and deceit to conceal Vision's pervasive involvement.

734.   For the non-NFA registrants, Defendants violated common law fraud statutes, and other state and Federal law misappropriation statutes to steal property, moneys, funds, competitive confidential

information and also to defraud Plaintiffs to doing business with ADMIS, for which they knew they would be subject to the scheme.

735.   Defendants, individually and jointly acted in furtherance of their Agreement to Defraud, by, among other things, coordinating: (i) material concealments and false representations in public documents, such as the sales and solicitations emails and communications, Disclosure Documents, Corporate Brochures; (ii) fraudulently concealing the alleged risk services and risk procedures from customers, in express violation of the black-letter disclosures under the CFTC Rules; (iii) secretively and without traders consent, disclosing and distributing their trading accounts, (iv) knowingly and intentionally engaging in a consistent pattern of bad faith, dishonesty and deceit when customers, including Plaintiff question the irregular conduct to cover up and conceal the fraud, and (v) conspiring with and engaging at least two compliance officers at the NFA,  who acted in concert with the scheme, to willfully, knowingly, and intentionally not enforced the compliance laws in bad faith, to permit the scheme to go undetected; (vi) and other conduct alleged herein;  in the Agreement to Defraud.

736.   Defendants engaged in intentional and overt acts as described herein to propagate the Agreement to Defraud, including intentionally violating the rules and regulations which required without limitation they not act with fraud and deceit, or make misstatements to futures customers.

737.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

738.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT XI – UNFAIR COMPETITION / MISAPPROPRIATION OF CONFIDENTIAL INFORMATION

**Against All Defendants**

739.   Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

740.   Vision Defendants are direct competitors of Plaintiffs as CTA's, CPO operators, and options traders, and also as risk service providers and also in options trading in the provision of numerous

services and business, both as CTA's with economic interests in performance of trading strategies, in the commodities futures markets and second in the provision of risk management services. Defendants knew they ran directly competing HRHC CTA referral business and their own VIA in options trading.

741.    Count XI -All Defendants *knew* that Plaintiffs had direct competitive interests, conflicts of interest in both risk management and commodities trading, and knew that Plaintiffs were starting various commodities options hedge funds as a CTA and CPO under the brand name Nefertiti. Defendants also *knew* that Kumaran had a ran a professional competing risk advisory and risk software consulting with HRF risk services. Defendants intentionally, and unlawfully aggressively pursued wrongful acquisition and dissemination, use and profit from Plaintiffs non-public confidential information and trade secrets, non-public risk management and trading strategies, and trading account, emails discussing its competitive advantage and other confidential information.

742.    Using fraudulent misrepresentation, deceit and other morally reprehensible conduct, Defendants', absconded the fruits of Plaintiffs' labor for self gain, and use in direct unfair competition.

743.    Defendants also wrongfully acquired, disseminated and used Plaintiff's competitive confidential information that was borne from significant cost, labor, expenditure of money, time, expense and decades of professional experience.  Vision Defendants did not pay for, did not earn and did not pay equitable restitution or compensation to acquire such detailed knowledge of their competitors, which they acquired through fraud and misrepresentation.

744.    Neither the Privacy Policy nor the CFTC rules, permitted the outsourcing of risk-services, without disclosure, consent and express compliance with CFTC 1.55(k)-(i) which required risk management services be disclosed. Therefore any agreements that failed to comply with the law and regs, are void, illegal and unenforceable.

745.    Specifically, their use and competition includes but not limited to Vision defendants, use in the provision of purported risk management services, and their improperly acquired, use and incorporation of Plaintiff confidential information for use as a third-party testing facility services, to benchmark, validate, test the grossly negligent, errors and omissions in their competing services.

746.    Additionally Vision Defendants, have improperly acquired detailed knowledge of their competitors confidential risk and trading strategies, which they in whole or in part, then used, incorporate, copies, infringed, included, and acquired in their own proprietary and other direct competing

trading activities, as Vision Investment Advisors, LLC. And for directly competing activities as HRF CTA Referral business.

747.   Also as indicated herein, Vision Defendants and their co-conspirators, engaged in willful and malicious acts to harm their competitors, actively monitoring their competitors trading performance, and intentionally, with direct conflicts of interest, sabotaging and destabilize their accounts, and reducing their performance record, adding on new fees as indicated on May 2, 2017.

748.   Their malicious intent to harm their competitors, and intentionally deceive CTA's they intentionally schemed, to lower their overcharges to 0.30cents a trade ,so the, CTA's that are price sensitive, would not "notice the overcharges" and then deceitfully, in express violation of the fair market exchange rules, the CEA, and NFA Rule 2-4, acquired detailed, real-time, line-by-line disclosure to their competitors trading account.

749.   Defendants have misappropriated their competitors' Plaintiff's confidential information, skills, labor  for their own profit, gain and benefit and have been unjustly enriched.

750.   Their careful planning was  with scienter and malicious intent to includes conceiving plans to defraud CTA's in particular, with lower fees that would go "undetected" so they could acquire their accounts.

751.   Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. Plaintiffs have been damaged in accordance with the Damages supra in Section X  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein

752.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XII – UNJUST ENRICHMENT
### Against All Defendants

753.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

754.   By reason of their wrongdoing, all Defendants, have been unjustly enriched, in that they have, directly and/or indirectly (and improperly), fraudulently, illegally and wrongfully acquired financial benefit, commissions, fees, charges, and credit lines acquired, and profited from business that was fraudulently solicited from Plaintiffs and fraudulently induced.

755.   Boshnack, Rothman, HRF and HRHC placed individual guarantees or corporate guarantees on Plaintiffs CTA accounts and Kumaran's proprietary trading activities and therefore were not arms-length parties to Plaintiffs NRCM and Kumaran. The G&F Agreements and supposed risk services agreements also required consents from the customers and traders, to which the parties to those agreements then breached.

756.   Further Boshnack, Rothman, HRF, Felag, VIA and other Vision Defendants are bound contractually by the their NFA Membership rules, which impose contractual relationships on how they treat both customers and  traders and other NFA Members. Their participation in the commodities futures markets requires them to abide by the rules and regulations, and deemed Kumaran and NRCM their "customers" -  even though Plaintiffs had never agreed to this. By virtue of the CEA rules being bound as a contract, their relationship with Plaintiffs was and is not attenuated, and is incorporated as a contract.

757.   By using the alter-egos and the corporate forms to perpetrate the fraud, as described in Section IV, all other Vision Defendants and trading arms, then procured commercial benefit and unjust enrichment in their directly competing benefits, HRHC CTA referral and VIA and other trading arms.

758.   Lazzara, LCI and Villa were bound by the implied-in-fact contractual duties of an Independent Broker to its customers and traders and CTA's to whom it opened accounts. The NFA Membership rules are include a duty to be bound as a contract in LCI Defendants dealings with his customers and traders.

759.   Defendants have been unjustly enriched in all profits, gain and fees and commissions and other unlawful commercial benefits from the accounts they fraudulently solicited, and all commercial benefits thereunder, while Plaintiffs have been harmed that equity and good conscience requires restitution.

760.   All Defendants have also been unjustly enriched, by the improper acquisition, dissemination, use and incorporation of valuable trade secrets and confidential information of Plaintiffs, for use and profit in their trading and risk management operations of Vision trading affiliates that are currently trading and using today, in an amount to be proven at trial but estimated to be not less than $1mm and improperly acquired Assets Under Management ("AUM") from the sabotage and economic interference in their competitor CTA's performance records.

761.   Plaintiffs trade processing fees, transaction fees and other overpayments and unauthorized fess and payments which were deducted from their commodities trading accounts constitute a benefit which the Count XII -  Defendants aggressively sought and voluntarily accepted.

762.   The Count XII – All Defendants to achieve an unjust enrichment (i) wrongfully, willfully, wantonly and with intent to deceive acquired, and misappropriated Plaintiffs trade secrets and trading program, and directly, used and incorporated it in direct competition and for profit in interstate commerce; (ii) wrongfully obtained fees and collected moneys from Plaintiffs without consent; (iii) wrongfully obtained trading profits and risk management savings and other financial benefits to their trading operations; (iv) wrongfully acquired AUM and depleted performance of their competitors through the fraudulent scheme detailed herein; and (v) unfairly obtained a competitive advantage in the CTA market place, to the detriment of Plaintiffs and victims of the fraud, including ability to diminish the performance of their competitors, and positional advantages which are unjust by having improperly acquired their competitors trade secrets;

763.   The Count XII – All Defendants have been unjustly enriched by receipt of these wrongfully obtained trading profits and financial benefits, and wrongfully acquired AUM,  and wrongfully obtained fees and from Plaintiffs.

764.   The Count XII – All Defendants' retention of these payments and profits and other financial benefits would violate fundamental principles of justice, equity, and good conscience. that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

765.   Count XII - Defendants, jointly and severally, have wrongfully profited from its misappropriation and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

766.   Defendants, jointly and severally, conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XIII –  TORTIOUS INTERFERENCE IN ECONOMIC ADVANTAGE
### Against All Defendants

767.   Plaintiffs repeat and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

768.   The conduct in Count XIII is fraudulent and illegal, was independently tortious, was for unlawful and improper purpose, and is not permitted under the rules of participation under the CEA as laid out in Section 11 of Ver.Fac03668¶359-¶414 and as elsewhere incorporated herein. Defendants committed

unlawful acts, and knowingly and intentionally violating the CEA, rules and regs and other Federal Laws including but not limited to the Defend Trade Secret Act, and New York State law and common law.

769.   Plaintiffs had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world and/or careers as CTA's. Plaintiffs had economic relationships with third parties friends and family to secure funding to build a track record. Those relationships have also been damaged by the fraud and torts committed herein. Plaintiffs have also lost substantial amounts of their own capital which cannot be replaced in the tortious actions taken against a start-up.

770.   Defendants were aware that Plaintiffs as CTA's and CPO's had a reasonable expectation of deriving income from acting as a CTA and forming a commodities hedge fund with competitive options strategies throughout the world.

771.   As a direct and proximate result of the tortious interference and fraudulent acts herein, Defendants have also diverted business, property, monies, profitability, good will and reputation away from prospective customers and investors in its career as a CTA and CPO, both directly and indirectly, in a manner that was intended to interfere, disrupt, and preclude Plaintiffs  from experiencing the economic benefits it was deriving and would in the foreseeable future have derived from such relationships.

772.   Count XIII – Defendants, with moral reprehensibility and callous disregard for Plaintiffs rights, persisted in the unlawful and fraudulent actions described herein, and have interfered with, tampered with, prevented and obstructed and otherwise irreparable harmed Plaintiffs from fully maximizing its economic advantage as a CTA, CPO and depleted its competitive advantage in entering the futures business, including loss of its trade secrets. Their conduct was intentional, fraudulent and bad faith.

773.   Count XIII – Defendants fraudulent and illegal conduct, violated multiple CFTC and CEA rules as listed herein and was for unlawful purpose to secure an unfair competitive advantage. Vision Defendants and Lazzara Defendants willfully engaged in as well as anti-trust activity to harm their competitors, purloin profits and funds, distribute their confidential information, including emails and communications, engage in unfair "margin allowances" to slow down their performance, and damage Plaintiffs CTA track records and performance. Their conduct enabled Defendants to secure an unfair economic advantage at the expense of its competitors.

774.   Count XIII - Defendants have all wrongfully profited from their fraudulent and illegal interference with economic advantage and have caused Plaintiffs damages and irreparable harm, as a result of

Defendants interference with Plaintiffs economic advantage. Plaintiffs have been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

775.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT XIV – TORTIOUS INTERFERENCE IN CONTRACT
**Against Lazzara, LCI, Villa, John Felag, Howard Rothman, Robert Boshnack, High Ridge Futures, High Ridge Holding Company, LLC,**

776.   Plaintiffs repeat and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

777.   Plaintiff NRCM and Kumaran had valid and enforceable agreements with ADMIS. Kumaran individually also signed online trading execution agreements with ADMIS.

778.   Count XIV – Defendants were aware of and had direct knowledge  the agreements between Plaintiff and ADMIS.

779.   Count XIV – Defendants, willfully and in bad faith, initiated and procured breaches of the agreements and engaged in illegal activities, to materially interfere with Plaintiffs provisions under the agreements and cause material breaches under the agreements, to materially impair their rights to trade and harm their provisions of benefits under the agreements.

780.   Those material breaches included (a) taking over actions to cause ADMIS to terminated Plaintiffs account with ADMIS on or around May 24, 2017; (b) taking over actions to tamper with and use unlawful margin calculations and violated CEA, CME and CFTC Rules on the margin on Plaintiffs account rendering performance under the contracts impossible breaching Section 11; (c) taking overt actions to interfere with the controls, reporting and execution to Plaintiffs trading accounts rendering performance under the contracts impossible; (d) unlawfully manipulating fees and purloining profits and adding unauthorized charges from Plaintiffs to also materially render performance under the contract impossible, including adding "transaction fees" on May 2, 2017; (e) limiting account access and execution without Plaintiffs knowledge and consent and violating the sole discretion provisions throughout the contract; (f) extending margin, credit and guarantees on Plaintiffs accounts and trading without Plaintiffs knowledge and consent and doing so outside of CEA rules; (g) failing to apply CME Span on margin calculations and CME exchange intraday calculations with numbers replete with errors

and omissions, rendering performance under the contracts impossible; and (h) restricting trading access, and engaging in fraud and misrepresentation over margin calls.

781.   Among other things, Defendants HRF, Felag, Boshnack, Rothman and HRHC took overt actions to terminate Plaintiffs contract with ADMIS and interfere in its contractual privity with ADMIS and to mislead Plaintiffs on its margin.

782.   Further the foregoing Defendants, tortiously interfered performing replete with errors and omissions, with gross negligence and a lack of care, obstructing Plaintiffs rights to communicate with ADMIS, and using material miscalculations including but not limited to those on May 12, 2017 – May 17, 2017 (with over a dozen documented errors and omissions) and failing to disclose proper intra-day margin procedures, and notify Plaintiffs of their mishandling of margin.

783.   All Defendants procured breaches of contract of the Privacy Policy and Section 11 of the ADMIS Customer Agreement by not complying with the disclosure laws, and consents to withdraw fees and privacy of customer data and trade secrets.

784.   The conduct in Count XIV was fraudulent and illegal, was independently tortious, was for unlawful and improper purpose, and is not permitted under the rules of participation under the CEA as laid out in Section 11 of Ver.Fac03668¶359-¶414 and violated common law, and Federal law, including DTSA, and other rules and regulations as elsewhere incorporated herein.

785.   Defendants, jointly and severally, have wrongfully profited from its tortious interference in contract and have caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct, Plaintiffs have been damaged in accordance with the Damages supra in Section X  and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X  and repeated herein.

786.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

### COUNT XV– BREACH OF GOOD FAITH AND IMPLIED COVENANT
**Against all Trey Lazzara, Lazzara Consulting, Inc, Julie Villa, John Felag, High Ridge Futures, Robert Boshnack, Howard Rothman, High Ridge Holding Corporation, Vision Investment Advisors**

787.   Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

788.   Count XV - Defendants had a duty to act in good faith and in fair dealing, and a duty to apply with applicable laws, rules and regulations, and to conduct its operations.

789.   As stated in Count XII supra, the rules of NFA and the CEA were binding as a contract on Defendants market participation and dealings with Plaintiff, even as a customer, trader and also as NFA members. Amongst those provisions, Defendants under NFA 2-2 could not engage in any conduct to deceive Plaintiffs, and NFA 2-4 9005 could not deceive Plaintiff about the fees being charged to its account. Neither could they deceive Plaintiff about fees and/or dissemination of its trade secrets. Further NFA 2-4 requires that all Members conduct themselves with a covenant of good faith and fair dealing.

790.   At all times, Count XV - Defendants acted with fraud and deceit, made material representations, obscured, obfuscated, avoided and deliberately withheld information, even at material times of financial implication to Plaintiff, and instead acted in bad faith, fraudulently concealing the involvement of Vision Defendants, knowingly concealing that risk management policies and procedures were outsources to Vision, its employees, owners and affiliates, and engaged in other dishonorable conduct alleged herein.

791.   Plaintiffs Kumaran and NRCM made good faith attempts to reach out to Lazzara, and LCI on numerous times before, during and after the trading and made repeated requests to understand and request information about the risk management policies and procedures, and the errors in its account.

792.   Instead Count XV - Defendants conduct was bad faith, and violated the principles of just and equitable trade including but not limited to those fraud in Section IV incorporated herein and NFA 2-4.

793.   Count XV - Defendants acted with bad faith and with deliberate intent to circumvent their independent obligations under the CEA, as registered Introducing Brokers, or NFA Members, to (i) deprive and cause irreparable harm to their loss of trade secrets and economic commercial advantage; (ii) deprive and/or significantly reduce Plaintiffs' performance record and compensations from their trading activities; (iii) and bonuses and other deprivation of commercial benefits that were relied upon as consideration of the bargain.

794.   Defendants have wrongfully profited from its bad faith conduct and have caused Plaintiff damages and irreparable harm. As a result, Plaintiff has been damaged in accordance with the Damages supra in Section X and repeated herein. Defendants conduct was with moral turpitude and wanton disregard for the rights of others as stated supra in Section XI and repeated herein.

795.   Count XV Defendants' conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## COUNT XVI– NEGLIGENT MISREPRESENTATION / BREACH OF DUTY OF CARE
### Against Trey Lazzara and LCI

796.   Plaintiff repeats and reallege each and every allegation set forth in the foregoing paragraphs, as if fully set forth at length herein.

797.   Over the period of time December 16 2016 until around June 29, 2017, Trey Lazzara and LCI, had superior control and information on information related to Plaintiff's futures account at ADMIS, and Kumaran's rights to its CTA trading strategies as the sole Introducing Broker, and were solely responsible for day-to-day communications and the conveyance of accurate and honest information related to Kumaran and NRCM's trading accounts.

798.   Lazzara and LCI had a duty of care were in the business of supplying information and had a duty to provide and communicate accurate and honest information, and a duty to avoid negligently conveying false information. Lazzara and LCI knew as was fully disclosed prior to opening the accounts that Kumaran had her Series 3, she was forming various hedge funds under the name Nefertiti Asset Management, LLC ("NAM") and Kumaran, NRCM and NAM were to register as CTA's and have professional careers.

799.   Plaintiff placed trust, confidence and reliance on the misstatements and misrepresentations made herein and as described in detail in Section VI supra.

800.   Plaintiff, reasonably relied upon the misstatements, omissions and fraudulent representations, that caused them to entrust its business to Lazzara and LCI as an Introducing Broker, and to also entrust its competitive trade secret, CTA and confidential trading strategies to do business with LCI and Lazzara and open, and continue to maintain and open commodities futures accounts at ADMIS.

801.   As indicated herein, Lazzara, and LCI, repeatedly and wantonly engaged in a continuous pattern of fraud, deception and making material misrepresentations to Plaintiffs, negligently and fraudulently conveyed inaccurate information about the risk management policies and procedures, negligently and with a breach of duty of care failed to disclose complete and accurate information about fees, negligently and with a breach of duty of care failed to discose information about margin and the handling of intraday margin 0 including without limitation negligently conveying that Plaintiffs was authorized to trade intrada-y up to $134,000 performance bond limit, and that ADMIS had no intraday margin requirement.

802.   Lazzara and LCI also negligently and with breach of duty of care, negligently misrepresented the capabilities of FCM's risk department and technologies platforms resulting in significant errors and omission on the account. (See Supra VII.(I))

803.   Lazzara and LCI knew the FCM had materially deficient electronic platforms, knew it was using decades old technologies, incapable of handling all strikes in commodities derivatives options, and was unable to monitor intraday valuation and margin calculation on derivatives that violated exchange rules, and posed significant and systemic risks to consumers.

804.   The errors and omissions included by referenced herein demonstrated egregious inaccuracies that had wanton disregard for the rights of others and were distinguished from the failure to exercise ordinary care.

805.   Lazzara and LCI's negligence to lead Plaintiffs to a risk department that was disbarred and making errors and omissions in derivatives were not a careless mistake, but were so extremely careless that it was equivalent to recklessness.

806.   Finally Lazzara and LCI acted with negligence and breach of duty of care to protect and not disclose his customers trade secrets, and engage in scheme of theft of trade secrets across interstate lines.

807.   Those fraudulent and negligent misrepresentations, include but not limited to those in listed in detail in Exhibit 14 and Exhibit 15 and otherwise throughout the Complaint herein.

808.   Plaintiff relied upon the misrepresentations and independent ethical obligations as a registered Independent broker of Lazzara and LCI, and this conduct was in express breach of their independent duties of care, and their independent duties as an Independent Broker, under rules regulations and laws of the CEA.

809.   As a direct and proximate cause of Lazzara and LCI's fraudulent misrepresentations and breaches of his duties, Plaintiffs have been harmed as indicated herein and Plaintiffs Kumaran would not disclosed its CTA program or done business with ADMIS, and/or would have closed their accounts immediately upon uncovering the truth.

810.   Lazzara and LCI, acted with scienter and intention to deceive, provide false representations and breached their independent duties to Kumaran, and similarly situated customers and CTA's.

811.   Defendants, jointly and severally,  have wrongfully profited from their fraudulent conduct and has caused Plaintiffs damages and irreparable harm. As a result of the foregoing conduct Plaintiffs have been damaged in accordance with the Damages supra in Section X  and repeated herein. Defendants conduct

was with moral turpitude and wanton disregard for the rights of others as stated supra in Section X and repeated herein.

812.   Defendants conduct was intentional, fraudulent, willfully and wantonly reckless, and malicious which justifies an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and respectfully requests that the Court enter judgment against Defendant as follows:

a.    Damages in the form of disgorgement of all profits gained by each Defendants from the fraudulent conduct and the misappropriation of trade secrets, Plaintiffs' trade secrets fraudulently induced hereunder;

b.    Disgorgement of all fees and profits unlawfully gained from the activity;,;

c.    Damages in the form of royalties, and costs and development costs, and other lost profits of Plaintiffs' from the scheme and fraudulent activity;

d.    Damages for the misappropriation of trade secrets, restitution, unjust enrichment, and disgorgement of profits, from Defendant, its agents, servants, employees and introducing brokers, resulting from the fraudulent scheme, and including misappropriation of Plaintiff's trade secrets;

e.    Entry of an order that restrains and preliminarily enjoins, and a Final Order that permanently enjoins, Defendants and their agents, servants, employees, introducing brokers, service providers, attorneys, and all persons acting in active concert or participation with them, from the unauthorized acquisition, disclosure, use, duplication, or distribution of the Plaintiffs' trade secrets;

f.    Damages calculated as by loss of property,  assets, livelihood and liberty, including loss of businesses, lost opportunities, loss of CTA revenue, and intellectual property, in an amount to be determined at trial;

g.    Damages in the form of loss of capital, loss of income, loss of economic advantage, interruptions to business, costs of development, economic interruption, economic interference, disruption and delays, royalties, irreparable losses for trade secrets in an amount to be determined at trial;

h.    Damages in the amount of all reimbursement of all financial losses and reductions of economic advantage, for all commodities trading accounts involved in the scheme;

SAC Vision  - Page 149

i.     Exemplary damages including  but  not  limited to all special, indirect, punitive, consequential or other damages;

j.     Treble damages as provided in 18 U.S.C. §§ 1964(c) and 1964(d);

k.     Attorney Fees, Costs and Expenses of this action;

l.     Post and Pre Judgment Interest;

m.    All other relief, remedies and rights available in law and equity as this Honorable Court deems just and proper;

n.

PLAINTIFF DEMANDS TRIAL BY JURY

Electronically Signed


//S//Samantha Siva Kumaran


Dated: New York, New York

March 15, 2021